**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON<br>9615 Grand Ronde Road<br>Grand Ronde, OR 97347<br><br>*Plaintiff,*<br><br>v.<br><br>KEN SALAZAR<br>*in his official capacity as*<br>Secretary<br>United States Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240<br><br>LARRY ECHO HAWK<br>*in his official capacity as*<br>Assistant Secretary - Indian Affairs<br>United States Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240<br><br>STANLEY M. SPEAKS<br>*in his official capacity as*<br>Regional Director, Northwest Region<br>Bureau of Indian Affairs<br>911 Northeast 11th Avenue<br>Portland OR 97232<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>*Defendants.* | Case No. 1:11-cv-00284<br>Judge Richard W. Roberts |
| COWLITZ INDIAN TRIBE, a federally recognized Indian Tribe<br>c/o Hon. William Iyall, Chairman<br>Tribal Headquarters, P.O. Box 2547 | |

5180779

| Longview, WA 98632 *Intervenor.* | |
|---|---|

# MEMORANDUM OF LAW IN SUPPORT OF
# THE COWLITZ INDIAN TRIBE'S MOTION TO INTERVENE AS A DEFENDANT

Because the above-captioned action could significantly and detrimentally affect the rights and interests of the Cowlitz Indian Tribe, the Tribe respectfully requests this Court enter an Order granting intervention as a defendant as a matter of right.[1] In the alternative, the Tribe requests permissive intervention pursuant to Federal Rule of Civil Procedure Rule 24(b).

## PRELIMINARY STATEMENT

This lawsuit seeks to reverse the December 17, 2010 decision of the Secretary of the Interior, acting through the Assistant Secretary – Indian Affairs, to accept title to 151.87 acres of land and hold it in trust for the benefit of the Cowlitz Indian Tribe ("the Tribe"). This trust acquisition is the first for the Tribe, which is landless, and represents the culmination of a century-old effort on the part of the Tribe for federal recognition and for acquisition of a land base from which the Tribal government can operate and engage in economic development.

This lawsuit, if successful, would undo the Secretary's action, with profound consequences for the Tribe. As the Tribal applicant, the Tribe has invested significant time and resources in the Department of the Interior's nearly 8-year long administrative process leading up to the Secretary's trust acquisition decision, and as the beneficiary of the federal trust acquisition, the Tribe is the party whose interests are most directly and profoundly affected by this litigation. If the Secretary implements his December 17, 2010 decision and acquires trust title to the land on behalf of the Tribe, the land will become the Tribe's initial reservation, and in fact, its only trust or reservation

---

[1] Pursuant to Rule 24(c) and Local Rule 7(j), a Proposed Answer stating the Tribe's interests, claims, and defenses is attached as Exhibit D.

land, subject to its sovereign authority and jurisdiction. The trust acquisition will allow the Tribe to pursue its plans to use the trust property for tribal government offices, tribal elder housing, a tribal cultural center, and a tribal gaming facility. In contrast, if the Plaintiffs prevail, the Tribe will remain landless, without any federally protected land base and without any prospects for economic development and a stable revenue stream.

The Tribe's compelling and unique interest in this litigation entitles it to intervene as of right under Federal Rule of Civil Procedure 24(a). At a minimum, in the alternative the Tribe should be granted permissive intervention under Rule 24(b) because this motion is timely and the Tribe's participation will neither prejudice the parties nor burden this Court.

## FACTUAL BACKGROUND

The current litigation is the latest chapter in what has already been a long effort by the Tribe to have its parcel taken in trust. In fact, the Tribe has been trying for more than a century to reestablish a federally-protected tribal homeland in order to replace the lands it lost in the mid-1800's as a consequence of the United States' historic failure to enter into a treaty with the Tribe and its subsequent opening of Cowlitz lands to non-Indian settlement.

### I. HISTORICAL BACKGROUND

The Cowlitz Indian Tribe, which currently has approximately 3,500 members, is located in Southwest Washington State, where the Cowlitz have historically made their home. The first noted contacts between Cowlitz Indians and Europeans occurred around 1805, and were reported along the Columbia River, Lewis River, and Cowlitz River, which are located in the same general geographic area as the Cowlitz Parcel.[2] *See* Exhibit A (Cowlitz Amended and Reorganized Request for a Reservation Proclamation) at 4; Exhibit B (Cowlitz Amended Fee-to-Trust Application) at 2.

---

[2] Title to the Cowlitz Parcel currently is held by the Tribe's development partner, Salishan-Mohegan, LLC, but Salishan-Mohegan has committed to transfer its interest to the Tribe when the Department's decision to take the land into trust is finally implemented.

3

5180779

In 1855, soon after the Oregon and Washington territories were established, the Tribe engaged in treaty negotiations with the United States, but no treaty agreement was ever reached because the United States insisted that the Cowlitz move to a shared reservation on the Olympic Peninsula, far from its historic territory.  Despite the fact that the United States never obtained a land cession treaty from the Tribe, the United States opened Cowlitz lands to non-Indian settlement pursuant to an Executive Order in 1863.  *Id.*  Eventually, the Tribe's lands were completely lost to non-Indians and its members became scattered across Southwestern Washington.  Nevertheless, the federal government continued to identify and count Cowlitz Indians in government statistical tabulations of Indians, and to provide services to Cowlitz Tribal members through the late 1800's.  *See* Exhibit C (Department of the Interior Record of Decision (ROD)) at 98.  Despite the Tribe's repeated requests through the end of the nineteenth century for a reservation in the Tribe's traditional territory, no land was set aside for the Tribe or its members. Exhibit B at 2.

Throughout the twentieth century, the Tribe sought to reestablish a land base in Southwestern Washington to replace lands taken by the federal government by virtue of the 1863 Executive Order.  Exhibit B at 3.  As part of its efforts to regain land, in the early 1900's the Tribe reorganized and elected its own governing body.  *Id.* at 2.  In 1908, the Tribe initiated land claims by submitting an affidavit to the Department, and later expanded these claims to include additional ancestral lands.  The Cowlitz thereafter continuously pursued federal legislation that would allow a federal court to consider the Tribe's land claims.  *Id.* at 3; *see also* Exhibit C at 100.  Although helpful bills were introduced in Congress from 1915 to 1929, none became law.

At about this same time in the early 1900's, the Department of the Interior gradually ceased to engage in a formal government-to-government relationship with the Tribe, largely because the Tribe did not have any trust land.  Exhibit B at 2.  Despite that fact, the federal government continued to exert federal jurisdiction over the Tribe throughout the early to mid-1900's, actively

supervising, providing services to, and taking governmental actions on behalf of Cowlitz Tribal members, including, *inter alia,* representation of the Cowlitz in asserting fishing rights, providing education, medical and other services, accounting for Cowlitz Tribal members in official federal records, issuing and supervising trust allotments, including allotments on the Quinault reservation pursuant to federal statute and the decision in *Halbert v. United States,* 283 U.S. 753 (1931), adjudicating probate proceedings for Cowlitz Tribal members, investigating Tribal claims to aboriginal lands and approving attorney contracts for the Cowlitz Tribe.  Exhibit C at 79, 99-103.

In 1946, Congress enacted legislation establishing the Indian Claims Commission (ICC), which allowed the Tribe to pursue its claims for its lost land against the United States.  The Tribe filed suit in 1951, and in 1969 the ICC determined that the Cowlitz had exclusive use and occupancy of a particular area of Southwest Washington, and acknowledged the Tribe's historical connections to the lands immediately south of that area, where the Cowlitz Parcel is located.  Exhibit B at 3.  In 1973, in a settlement agreement between the Tribe and the United States, the ICC awarded the Tribe $1,500,000 as compensation for the taking of the Tribe's exclusively-used lands (about 87 cents per acre).  When Congress subsequently considered legislation to implement the Tribe's award, the Tribe made clear that it wished to use some of the settlement money for land acquisition; however, the Department objected because the Tribe was not formally recognized.  Exhibit B at 3-4.

In the 1970's, after prior efforts to regain formal recognition had failed, the Tribe decided to submit to the Department of the Interior's federal acknowledgment process under 25 C.F.R. Part 83, an onerous and time-consuming administrative process through which tribes may regain federal recognition.  As part of the federal acknowledgment process, the Department determined that the Tribe had a continuous political and community existence from at least the time of the 1855 treaty negotiations to present.  *See* Exhibit C at 79.  In 2000, approximately 25 years after the Tribe began the recognition process, the Tribe was finally restored to federal recognition, *see* 65 Fed. Reg. 8436

5

(Feb. 18, 2000); and the restoration of its federally recognized status became final on January 4, 2002.  *See* 67 Fed. Reg. 607 (Jan. 4, 2002).  Two years later, in 2004, Congress finally passed a settlement statute with a land acquisition provision intact, allowing the Tribe to use some of its ICC settlement funds to purchase land.

## II.  THE TRIBE'S TRUST APPLICATION

On the same day the Tribe's federal recognition became final in 2002, the Tribe submitted a fee-to-trust application to the Bureau of Indian Affairs (BIA) , requesting that the Department of the Interior accept trust title to the Cowlitz Parcel in Clark County, Washington, pursuant to the authority in Section 5 of the Indian Reorganization Act (IRA), 25 U.S.C. § 465.  In March 2004, the Tribe submitted an amended fee-to-trust application stating that the parcel would be used for gaming (as well as tribal government and other purposes), and further requesting that the parcel be proclaimed its "initial reservation" pursuant to Section 7 of the IRA, 25 U.S.C. § 467, and consistent with Section 20 of the Indian Gaming Regulatory Act, 25 U.S.C. § 2719.

On June 6, 2006, the Tribe supplemented its original submissions to BIA, submitting an amended fee-to-trust application to more clearly address the regulatory requirements under 25 CFR Part 151 (Exhibit A).  On August 11, 2006, the Tribe submitted an amended reservation proclamation request, again to more clearly address BIA's requirements for reservation proclamations (Exhibit B).  In March 2007, pursuant to the requirements of 25 C.F.R. § 151.11, the Tribe submitted a Business Plan and Unmet Needs Report, detailing the Tribe's mission, goals and strategy for creation and use of anticipated gaming revenues to meet Tribal needs. *See* Exhibit A.

### BIA NEPA REVIEW

In compliance with BIA's regulations implementing Section 5 of the IRA, found at 25 C.F.R. Part 151, and BIA's Guidelines for Reservation Proclamations, BIA re-initiated its review process for the Tribe's fee-to-trust and reservation proclamation requests, including compliance with the

6

National Environmental Policy Act (NEPA). *See* BIA Notice of Intent to Prepare an Environmental Impact Statement (EIS), 69 Fed. Reg. 65,447 (Nov. 12, 2004). The Tribe participated in the BIA NEPA process both as the applicant and as one of several "cooperating agencies," which included Clark County and the City of Vancouver, two of the Plaintiffs in the companion case to this one, *Clark County, Washington, et al. v. U.S. Department of the Interior, et. al*, Case No. 1:11-cv-00278-RWR. In accordance with BIA NEPA procedures, the Tribe as applicant was responsible for the payment of all BIA's NEPA compliance costs incurred by a private NEPA contractor solely subject to BIA control and direction. The NEPA process involved the submission of thousands of pages of comments from the Plaintiffs in this case and the companion case, included extended public comment periods, and took more than three and a half years to complete, culminating in the release of the multi-volume Final EIS in May 2008. The tribe spent millions of dollars to comply with the process.

### NIGC Restored Lands Determination

While BIA's review process was ongoing, on March 15, 2005, the Tribe submitted a gaming ordinance to the National Indian Gaming Commission (NIGC) for approval, pursuant to the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. 2710(d). The ordinance approval request included a request for a determination that the Cowlitz Parcel, once in trust, would be excepted from IGRA's general prohibition on gaming on lands acquired after 1988 and eligible for gaming as "restored lands" for a "restored tribe" under IGRA Section 20(b)(1)(B)(iii), 25 U.S.C. 2719(b)(1)(B)(iii). On November 22, 2005, after considering comments submitted by Plaintiffs in this and the companion case, the NIGC issued a determination that, as a matter of law, the Cowlitz Parcel would be eligible for gaming as "restored lands" once acquired in trust, based in part on the Tribe's historical and modern connections to the Cowlitz Parcel.

### Clark County MOU, Tribal EPHS and Amended Gaming Ordinances

In March 2004, at about the same time that it first amended its fee-to-trust application, the Tribe entered into a Memorandum of Understanding (MOU) with Clark County, in which the Tribe agreed to address potential impacts of the Tribe's fee-to-trust request and development plans. Soon thereafter, several of the Plaintiffs in the *Clark County* case, Al Alexanderson and the two card rooms, Dragonslayer and Michels Development, challenged the validity of the MOU, alleging that Clark County had not complied with certain state law requirements. *See* Exhibit C at 8. The County defended the MOU as the litigation made its way through the state courts, but the litigation resulted in uncertainty regarding the enforceability of the MOU and the mitigation measures in it.

In response, on October 6, 2007, the Tribe enacted a Tribal Environment, Public Health and Safety (EPHS) Ordinance that contained mitigation measures equivalent to those in the MOU and enforceable by the County, to serve as a new legal mechanism to ensure the mitigation of any impacts from its proposed trust acquisition, and also passed an amendment to its gaming ordinance that incorporated the entire EPHS Ordinance. The Tribe submitted the gaming ordinance amendment to NIGC for approval, and NIGC approved the Tribe's amended gaming ordinance on January 8, 2008. As a consequence, both Clark County and the federal government have enforcement authority to ensure the mitigation measures will be implemented. *Id.* The City of Vancouver, another *Clark County* plaintiff, filed suit to challenge NIGC's approval of the Tribe's amended gaming ordinance, but the case was dismissed in August 2010. *City of Vancouver v. George Skibine, et al.,* D.C. No. 3:08-cv-05192-BHS (9th Cir. Aug. 31, 2010). In April 2009, the County and the Tribe officially rescinded the MOU in favor of the Tribal EPHS Ordinance, the MOU litigation was dismissed, and the mitigation measures from the Ordinance were incorporated into the Department's Final EIS and Record of Decision. *Id.*

**CARCIERI**

5180779

After BIA issued its Final EIS, and while the decision on the Tribe's fee-to-trust and initial reservation proclamation requests was pending, in February 2009 the Supreme Court issued a decision in *Carcieri v. Salazar*, 129 S.Ct. 1058 (2009). The *Carcieri* decision held that the Secretary of the Interior's authority to acquire land in trust for Indian tribes under Section 5 of the IRA is limited to those tribes that were "under federal jurisdiction" in 1934, when the IRA was enacted. As a consequence of this decision, which is contrary to 80 years of Departmental practice and policy and creates significant uncertainty for Indian Country, the Tribe submitted additional analysis and documentary evidence to the Department in June 2009, and again in August 2010, to demonstrate that the Tribe was "under federal jurisdiction" in 1934. Exhibit C at 78-79.

**RECORD OF DECISION**

In December 2010, more than eight years after the Tribe's federal recognition was finally confirmed, and after the submission of its initial fee-to-trust application, the Department of the Interior finally issued a decision to take the Cowlitz Parcel in trust and proclaim it as the Tribe's initial reservation. *See* Cowlitz Indian Tribe of Washington, Notice of Final Agency Determination, 76 Fed. Reg. 377 (Jan. 4, 2011); Exhibit C (Record of Decision).[3] The Department's Record of Decision (ROD) thoroughly documents that the decision fulfills all the statutory and regulatory requirements, and explicitly approves the Tribe's plans to build a Tribal government headquarters, Tribal elder housing, a cultural center, and a gaming facility and resort. *See id.*

More importantly, the Department's ROD correctly recognizes the reasons that the decision to acquire the Cowlitz Parcel in trust is of real significance to the Tribe: the trust acquisition will promote tribal self-determination, provide opportunities for economic development, aid in the construction of Indian housing, and provide a land base from which the tribe may exercise governmental powers, operate governmental programs to serve its members, and operate an

---

[3] The decision was stayed at the commencement of this suit.

economic enterprise that will provide revenue for these programs. In addition, the ROD identifies the reasons that support the proclamation of the Parcel as the Tribe's reservation, which implicitly recognize the significance of the Tribe's history: the failure of the United States to set aside any lands for the Tribe before the Tribe's lands were opened to non-Indian settlement in the 19th Century, the Tribe's refusal to be moved outside its historical territory, the Tribe's demonstrated historical and modern connections to the area in which the Cowlitz Parcel is located, and the Tribe's continuing landlessness even after federal recognition. *See id.* This decision is the culmination of the Tribe's longstanding efforts to regain its federally recognized status and a federally protected homeland. But despite the abundance of legal and factual support for the Department's decision, the above-captioned suit seeks to reverse that decision for the pecuniary benefit of Plaintiffs.

## ARGUMENT

A federally-protected land base is integral to a tribe's ability to maintain stable tribal government. As a newly-recognized but currently landless tribe, the Cowlitz Indian Tribe's need for a reservation and land base over which it can exert civil jurisdiction and government powers is particularly acute. If effect is given to the Department's recent decision, the Cowlitz Tribe will be able to re-establish its homeland, gain economic self-sufficiency, generate a stable source of revenue through gaming development, fund a strong and stable tribal government, provide services to its members, create employment opportunities, become eligible for many federal programs tied to a reservation base, build housing for tribal elders and a cultural center to help preserve and strengthen tribal culture and identity, establish an adequate and fully-staffed Tribal government headquarters, and further support its efforts to achieve self-determination. In other words, the Tribe's compelling interest in this litigation, shared by no other party to the action, entitles it to intervene as of right under Federal Rule of Civil Procedure 24(a). At a bare minimum, the Tribe should be granted

permissive intervention under Rule 24(b) because its participation will neither prejudice the parties nor burden this Court.

## I.  THE TRIBE IS ENTITLED TO INTERVENE AS A MATTER OF RIGHT.

The Tribe meets each of the requirements for intervention as of right. Rule 24(a)(2) provides that on a timely motion, "the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Assuming the intervenor has standing under Article III,[4] *see, e.g., Building. & Construction Trades Department v. Reich*, 40 F.3d 1275, 1282 (D.C. Cir. 1994), an applicant *must* be granted leave to intervene under Rule 24(a)(2) if (1) it has an interest in the action; (2) the action potentially impairs that interest; (3) the applicant is not adequately represented by existing parties to the action; and (4) the motion to intervene is timely. *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003). In applying this test, a court should be "guided primarily by practical considerations, not technical distinctions." *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001) (internal quotation marks omitted). Moreover, it is well-established that "Rule 24(a) is construed broadly, in favor of the applicants for intervention." *Scotts Valley Band of Pomo Indians v. United States*, 921 F.2d 924, 926 (9th Cir. 1990).

---

[4] To establish Article III standing, a party seeking to intervene as a defendant must simply demonstrate that it would suffer an injury in fact if the action were to be resolved in favor of plaintiffs. *See Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1 (D.D.C. 2008); *see also Am. Horse Prot. Ass'n v. Veneman*, 200 F.R.D. 153, 156 (D.D.C. 2001). The tribe unquestionably satisfies this requirement. Indeed, "[t]he standing inquiry is repetitive in the case of intervention as of right[,]" because an intervenor with Article III standing will also satisfy Rule 24(a)'s interest requirement. *See Akiachak*, 584 F. Supp. 2d at 7 (internal citations omitted). *See also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("any person who satisfies Rule 24(a) will also meet Article III's standing requirement.").

### A. The Tribe Has An Interest In This Action.

The Tribe's interest in this action is self-evident. First, the Department's decision granting its reservation proclamation and fee-to-trust application is the central subject matter of the case. More specifically, intervention is appropriate where, as here, a prospective intervenor claims an interest that "is protectable under some law, and . . . there is a relationship between the legally protected interest and the claims at issue." *Sierra Club v. EPA*, 995 F.2d 1478, 1481, 1484 (9th Cir. 1993). Here, the Tribe's interest in having the Cowlitz Parcel accepted into trust and declared as its initial reservation is an interest created by and protected under the Indian Reorganization Act (IRA). The statute authorizing the Department to acquire land in trust and proclaim new Indian reservations, 25 U.S.C. §§ 465 & 467, was passed with the specific purpose of benefiting Indian tribes such as the Cowlitz. *See, e.g., South Dakota v. U.S. Department of the Interior,* 423 F.3d 790, 798 (8th Cir. 2005) (purpose and intent of IRA is to "rehabilitate the Indian's economic life," "conserve and develop Indian lands and resources" and to "provide land for Indians who have no land or insufficient land, and who can use land beneficially.") The Ninth Circuit has previously explained that when a plaintiff challenges an action by the Department of the Interior, an entity is entitled to intervene under Rule 24(a) if its members are "precisely those Congress intended to protect" in enacting the law requiring the Department to act and "precisely those who will be injured if the Department . . . does not act expeditiously." *County of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980). Because the IRA was enacted to benefit Indian tribes like Cowlitz, and because its people will be injured if the Cowlitz Parcel is not taken into trust, the Tribe's interest in this lawsuit entitles it to intervention as of right.

Second, the Tribe has a "significantly protectable interest" in this litigation because it has a property interest in the "property . . . that is the subject of the action." Fed. R. Civ. P. 24(a)(2). If the Cowlitz Parcel is accepted into trust and proclaimed the Tribe's reservation by the Department,

the Tribe will become the beneficial owner of land legally held in trust by the United States, and the land will become the Tribe's federally-protected reservation, over which the Tribe exercises significant governmental authority and jurisdiction. These property interests are more than sufficient to satisfy Rule 24.

Third, if the Department accepts the Cowlitz Parcel into trust and proclaims it the Tribe's reservation, the Tribe will have a sovereign interest in the land, as it will acquire greater regulatory and other sovereign authority over the land. *See Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 152-154 (1980). If Plaintiffs successfully challenge the Department's December 2010 decision, however, the Tribe will not be able to exercise its full range of regulatory, taxing, and other sovereign authority over the land. *Cf. Scotts Valley Band of Pomo Indians v. United States*, 921 F.2d 924, 927-28 (9th Cir. 1990) (finding that a local government's interest in exercising regulatory and taxing powers over land justified intervention in suit regarding that land). The Tribe's compelling interest in exercising its full range of sovereign authority over the land once in trust and designated as its reservation entitles it to intervene to protect that interest.

Finally, the Tribe has an obvious and direct economic interest in the outcome of this litigation. While a mere indirect economic interest in a lawsuit is insufficient to satisfy Rule 24(a), *see Medical Liability Mutual Insurance Co. v. Alan Curtis, LLC,* 485 F.3d 1006, 1008 (8th Cir. 2007), in this case, the Tribe has vital economic interest that will be directly affected by the outcome of this lawsuit. As described in the Tribe's Business Plan, the Tribe has very limited revenues and even since its federal acknowledgment has received minimal federal funding. This lack of funds is exacerbated by the fact that the Tribe has been without federal funding and a federally protected land base for more than a century. The Tribe's existing funding sources are simply inadequate to meet the needs of the Tribal government and its members. As described in detail in the Final EIS and the ROD, as well as the Tribe's Business Plan, the Tribe plans to develop a gaming facility and

resort on the Cowlitz Parcel after the land is held in trust and designated its reservation. The Tribe has no other trust or reservation lands that can be used for economic development. The proposed economic development project will generate revenues to address the significant unmet needs of the Tribe and its members. In addition, the Tribe has incurred millions of dollars in debt to date as part of its efforts to bring these plans to fruition. But the Tribe's economic development plans cannot proceed until the Department actually implements its decision. If Plaintiffs succeed, the Tribe will remain without a federally-protected land base and be unable to build and operate the gaming facilities necessary to fund its Tribal government and much-needed programs for its members, and to reach its ultimate goal of economic self-sufficiency and self-determination. This would be a crippling blow for the Tribe and its members. Particularly in combination with the Tribe's legal, proprietary and sovereign interests, these direct and important economic interests justify intervention.

### B. The Tribe's Interest Would Be Impaired If Intervention Is Denied.

Courts have explained that, in situations such as this one, where "an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001); *see also See American Horse Protection Ass'n, Inc. v. Veneman,* 200 F.R.D. 153, 158 (D.D.C. 2001) (holding that where the relief sought is to set aside agency action that affects a proposed intervenor, such relief could practically impair the proposed intervenor's interest). Simply put, the Department's decision was favorable to the Tribe, and the present action is a direct attack on that decision. In determining whether a movant's interests will be impaired, courts look to the "practical consequences" of denying intervention.[5] *Fund for Animals*, 322 F.3d at 735.

---

[5] Importantly, this standard applies even where "the possibility of future challenge . . . remain[s] available." *Natural Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977).

14

5180779

Here, the practical effect of this suit could be to prevent the Tribe from obtaining its only federally protected trust land and initial reservation, both of which are crucial to its self-sufficiency, sovereignty, and right to self-government.  Reversing the Department's decision, as the Plaintiffs request, would prevent the Tribe from, among other things, (1) re-establishing a homeland; (2) establishing and operating an adequate Tribal government headquarters to provide housing, health care, education and other governmental services to members; (3) engaging in the economic development necessary to fund such Tribal government programs and to support a strong Tribal government; (4) providing employment opportunities for members; (5) building housing for Tribal elders; (6) building a Tribal cultural center to preserve and strengthen Tribal culture and identity; (7) becoming eligible for certain beneficial federal programs; and (8) becoming economically self-sufficient.  In particular, Plaintiffs seek to deny the Tribe its sovereign right to engage in gaming-related economic development on its own reservation land – plans that are crucial to the Tribe's economic goals and self-determination.  Clearly, the Tribe would be substantially affected, in a very real and practical sense, by any determination made in this action, and thus is entitled to intervene.

### C. The Tribe's Interests Are Not Adequately Represented by Any Party.

The Tribe's important interests in this case are not adequately represented by any of the current parties.  First, as the Supreme Court has made clear, the burden of making this showing is "minimal"; the movant must simply show that representation "may be" inadequate. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972).  Second, "although there may be a partial congruence of interests" between the Tribe and the federal government, "that does not guarantee the adequacy of representation." *Fund for Animals*, 322 F.3d at 737.  To be sure, the United States has an interest in defending the Department's decision, but as Magistrate Judge Kay pointed out in a similar case, "the United States has, at most, a negligible financial interest in the outcome of this litigation whereas the Tribe's goals of economic development and self-sufficiency are at stake." *Butte*

15

*County, CA v. Hogen*, 2008 WL 2410407 at *2 (June 16, 2008). *See also Dimond v. District of Columbia*, 792 F.2d 179, 192-93 (D.C. Cir. 1986) (explaining that "[a] government entity . . . is charged by law with representing the public interest of its citizens," not the interests of a private intervenor); *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 15 (D.D.C. 2010) ("it is well-established that governmental entities generally cannot represent the "more narrow and parochial financial interest" of a private party). For this reason, courts "often conclude[ ] that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals*, 322 F.3d at 736. This is particularly true here, where the Tribe has vitally important sovereign, proprietary and financial interests at stake in having the Cowlitz Parcel acquired in trust. These interests are different from, and far more direct and immediate than, the United States' more general interest in defending its agencies' decisions, and only the Tribe can adequately represent them.

Third, even assuming that the United States could adequately protect the Tribe's interests in this suit, that factor is outweighed by the Supreme Court's strong preference for encouraging Indian tribes to "participat[e] in litigation critical to their welfare." *Arizona v. California*, 460 U.S. 605, 615 (1983). In addition, the United States' trust obligations to the Tribe does not guarantee that it will adequately represent the Tribe's interests within the meaning of Rule 24(a). This is particularly true in this case, where there are Indian tribes on both sides of this dispute and the Secretary has responsibilities to both tribes. *Cf. Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992) (holding, in the context of Rule 19, that the United States would not adequately represent the interests of absent tribes even though it "might share the same ultimate goal" because the presence of tribes on both sides of the suit created a "potential conflict of interest").

**D. The Motion To Intervene Is Timely.**

The Tribe's motion is timely. "[T]imeliness is to be judged in consideration of all the circumstances'" including "the time elapsed since the inception of the suit, the purpose for which

16

5180779

intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case.'" *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 5 (D.D.C. 2008) (internal quotations omitted). The critical factor is whether any delay in moving for intervention will prejudice the existing parties to the case. *See Me-Wuk Indian Community of the Wilton Rancheria v. Kempthorne,* 246 F.R.D. 315, 319 (D.D.C. 2007). Here, the parties would suffer no prejudice. Each party has stated that they will not oppose the Tribe's intervention in this case. The Defendants have just recently filed Answers and no scheduling order has been entered by the Court. When the Court grants the Tribe's intervention and the Proposed Answer (attached as Exhibit D) is deemed filed, the Tribe will be in the same position as every other party. Therefore, the Tribe's motion is being filed before the "existing parties have joined issue in the pleadings" and must be "regarded as clearly timely." 7C Wright & Miller, *Federal Practice & Procedure* § 1916 (3d ed. 2010).

## II. THE TRIBE SHOULD BE ALLOWED PERMISSIVE INTERVENTION.

If this Court determines that intervention of right is not appropriate, the Tribe requests that the Court grant permissive intervention under Rule 24(b). Under 24(b), on timely motion, "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact. . . . In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b). As explained above, its motion is clearly timely. Furthermore, the Tribe seeks to assert defenses that "squarely respond to the challenges made by plaintiffs in the main action." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 (9th Cir. 2002). In other words, the Tribe's defenses share common questions of law and fact with this action.

Once these threshold requirements are satisfied, permissive intervention is committed to the broad discretion of the court. Here, the Court's discretion should favor the Tribe, because the

17

Tribe's intervention will not cause undue delay or prejudice in this case. Indeed, tribes are routinely permitted to intervene to defend the Secretary's decisions to accept land in trust on their behalf. *See, e.g., Michigan Gambling Opposition v. Kempthorne,* 525 F.3d 23, 28 (D.C. Cir. 2008); *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 137 (D.D.C. 2002). Because the Tribe's intervention will cause no delay or prejudice to the present parties, and because the Tribe has a vital interest in the subject matter of this litigation, the Court should exercise its discretion to permit permissive intervention in this case.

## CONCLUSION

For the foregoing reasons, we respectfully request intervention of right under Rule 24(a)(2) or, in the alternative, permissive intervention under Rule 24(b).

Dated: July 13, 2011

Respectfully Submitted,

/s/Robert D. Luskin
Robert D. Luskin (DC Bar No. 293621)
V. Heather Sibbison (DC Bar No. 422632)
Edward D. Gehres, III (DC Bar No. 478565)
Suzanne Schaeffer (DC Bar No. 429735)
PATTON BOGGS LLP
2550 M Street NW
Washington DC  20037
P: 202.457.6000
F: 202.457.6315
rluskin@pattonboggs.com
hsibbison@pattonboggs.com
egehres@pattonboggs.com
sschaeffer@pattonboggs.com

## CERTIFICATE OF SERVICE

      I hereby certify that I electronically filed the foregoing **Motion to Intervene as a Defendant** on July 13, 2011, using the CM/ECF system which will send notification of such filing to all counsel of record.

      By : /s/Edward D. Gehres, III
      Edward D. Gehres, III

5180779