

# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

IN REPLY REFER TO:

**Memorandum**

OCT 0 1 2012

To: Acting Assistant Secretary – Indian Affairs

From: Associate Solicitor, Division of Indian Affairs, Office of the Solicitor

Subject: Revised Initial Reservation Opinion for the Cowlitz Indian Tribe

## I. Introduction

This Revised Initial Reservation Opinion for the Cowlitz Indian Tribe is a revised
version of the opinion that was issued by the Department of the Interior (Department)
on December 14, 2010. This opinion has been revised to reflect the Department's
review of documents submitted to the Department that raised concerns regarding the
Restored Lands Opinion issued by the National Indian Gaming Commission (NIGC) on
November 22, 2005.

On January 4, 2002, the Cowlitz Indian Tribe (Cowlitz Tribe or Tribe) applied to have
land near the Lewis River in Clark County, Washington, (the Cowlitz Parcel) taken into
trust for gaming purposes. The Tribal headquarters are located in Longview,
Washington.[1] The Tribe's recorded presence in what would become the State of
Washington dates back to the early 1800s.

Because the Cowlitz Parcel would be acquired in trust after October 17, 1988, gaming
would be lawful only if the Tribe meets one or more of the exceptions to the general
prohibition against gaming on newly acquired lands as found in the Indian Gaming
Regulatory Act (IGRA).[2] Here, the Tribe requested that the Department of the Interior
accept the Cowlitz Parcel into trust as the Tribe's initial reservation, making the parcel
eligible for gaming pursuant to 25 U.S.C. § 2719(b)(1)(B)(ii) (the initial reservation
exception).

The initial reservation exception of IGRA states that the general prohibition against
gaming on newly acquired lands does not apply when: "lands are taken into trust as
part of the initial reservation of an Indian tribe acknowledged by the Secretary under
the Federal acknowledgment process."[3] The statute and its implementing regulations at
25 C.F.R. Part 292 require two inquiries for the initial reservation analysis: (1) was the

---

[1] *See* Figure 1.
[2] 25 U.S.C. § 2701 *et seq.* The general prohibition against gaming is found in § 2719.
[3] 25 U.S.C. § 2719(b)(l)(B)(ii).

Tribe acknowledged through the Federal acknowledgment process; and (2) is the subject land eligible to be taken into trust as part of the Tribe's initial reservation?

In this case, the answer to the first question is yes. The Cowlitz Tribe was acknowledged in 2002 through the Federal acknowledgment process prescribed at 25 C.F.R. Part 83.[4]  Therefore, this opinion focuses on the second inquiry.  As explained below, the answer to that question also is yes – the Cowlitz Parcel is eligible to be taken into trust by the Secretary as the initial reservation of the Tribe.

## II.   Background

### A.   Procedural Setting

On December 14, 2010, the Office of the Solicitor determined in its Initial Reservation Opinion that the Cowlitz Parcel met the initial reservation exception in IGRA.[5]  On December 17, 2010, the Assistant Secretary-Indian Affairs announced his determination that the Department would acquire the Cowlitz Parcel in trust and that the land would be eligible for gaming under IGRA.[6]  The December 2010 Record of Decision specifies that the Cowlitz Parcel would be proclaimed the Tribe's initial reservation.[7]

On January 31, 2011, several plaintiffs, including Clark County and the City of Vancouver, filed suit in Federal District Court for the District of Columbia challenging the Assistant Secretary's determination.[8]  On February 1, 2011, the Confederated Tribes of the Grand Ronde Community of Oregon also filed suit in Federal District Court for the District of Columbia challenging the Assistant Secretary's determination[9] (collectively, the Plaintiffs).  The two cases have been assigned to the same judge who has established a joint briefing schedule.[10]

On July 19, 2012, the Department requested a voluntary remand from the court so that the Department could consider documents previously submitted to the Department. These documents primarily relate to the NIGC Restored Lands Opinion that was issued on November 11, 2005.[11]  The NIGC Opinion addressed whether the Tribe met the

---

[4]  *See* 67 Fed. Reg. 607 (Jan. 4, 2002).

[5]  Cowlitz Indian Tribe - Initial Reservation Opinion (December 14, 2010); AR001335.

[6]  76 Fed. Reg. 377 (Jan. 4, 2011).

[7]  AR064656.

[8]  *Clark County et al. v. U.S. Department of the Interior et al.*, No. 1:11-cv-00278 (D.D.C.).  The additional plaintiffs were Citizens Against Reservation Shopping (CARS), Alvin Alexanderson, Greg and Susan Gilbert, Dragonslayer, Inc. and Michels Development, LLC.

[9]  *Confederated Tribes of the Grand Ronde Community of Oregon v. Salazar et al.*, No. 1:11-cv-00284 (D.D.C).

[10]  The Department produced one administrative record that is being used for both cases.  Citations that begin with AR are to the Department's administrative record, unless otherwise noted.  Because the Clark County plaintiffs also sued the NIGC, that agency produced an administrative record.  Citations to that administrative record include a parenthetical identifying the records as belonging to the NIGC.

[11]  AR013906.

"restored lands" exception of IGRA.[12]  Following the issuance of the NIGC Opinion in 2005, opponents of the Tribe's application to have the Cowlitz Parcel acquired in trust submitted reports and documentation to the Department disputing the NIGC's findings (collectively, Opponents' historical submissions).  The Opponents' historical submissions include:

- Perkins Coie submissions: Response to the Request of the Cowlitz Indian Tribe for a Restored Lands Determination (November 15, 2005);[13] Request to the Associate Deputy Secretary to Reject the National Indian Gaming Commission's Restored Lands Finding for the Cowlitz Indian Tribe (June 7, 2006);[14] Request for Reconsideration of the National Indian Gaming Commission's 2005 Restored Land Opinion for the Cowlitz Tribe (September 3, 2008);[15]
- The Michael L. Lawson, Ph.D., submission: Analysis Of The Cowlitz Tribe's Historical Presence In Clark County, Washington (July 13, 2006);[16]
- Citizens Against Reservation Shopping (CARS) submission: The Case Against the Cowlitz Casino Proposal; The View from Southwest Washington (September 2009);[17]
- Alvin Alexanderson letter to Rich Meyers (undated);[18]
- Daniel L. Boxberger, Ph.D., submission:  Comments on The Cowlitz Indian Tribe Request for a Restored Lands Opinion (October 31, 2005).[19]

The Opponents' historical submissions are relevant to our current review because both the initial reservation exception and the restored lands exception require that the Cowlitz Tribe have significant historical connections with the Cowlitz Parcel.  The Department has fully reviewed and evaluated these documents.

On August 29, 2012, the Court denied the Department's motion for a voluntary remand, but instead extended the briefing schedule to allow the Department time to review and reconsider its initial reservation determination.[20]

### B.     Legal Framework

The question of whether the Cowlitz Parcel qualifies as the initial reservation for the Tribe is governed by IGRA and its implementing regulations.  The relevant provisions are outlined below.

---

[12] 25 U.S.C. § 2719(b)(1)(B)(iii).
[13] AR004315.
[14] AR004383.
[15] AR006440.
[16] AR004967.
[17] AR131692.
[18] AR135988 (this letter is probably from late 2006 or 2007).
[19] AR 136672.
[20] *Clark County et al. v. U.S. Department of the Interior et al.*, No. 1:11-cv-00278 (D.D.C. Aug. 29, 2012) (order denying motion for remand and stay, extending deadline).

3

### 1.    The Indian Gaming Regulatory Act

The IGRA was enacted "to provide express statutory authority for the operation of such tribal gaming facilities as a means of promoting tribal economic development, and to provide regulatory protections for tribal interests in the conduct of such gaming."[21] In general, IGRA prohibits gaming activities on land acquired into trust by the United States on behalf of a tribe after October 17, 1988.[22] There are several exceptions, commonly referred to as the "Section 20" exceptions, to this general prohibition, including when:

> (B)    lands are taken into trust as part of –
>> (i)    a settlement of a land claim,
>> (ii)    the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or
>> (iii)    the restoration of lands for an Indian tribe that is restored to Federal recognition.[23]

### 2.    The Department's Section 20 Regulations

The Department's regulations implementing Section 20 of IGRA, 25 C.F.R. Part 292, became effective on August 25, 2008.[24] The initial reservation exception allows for gaming on newly acquired lands if the following conditions are met:

> (a)    The tribe has been acknowledged (federally recognized) through the administrative process under part 83 of this chapter.
> (b)    The tribe has no gaming facility on newly acquired lands under the restored land exception of these regulations.
> (c)    The land has been proclaimed to be a reservation under 25 U.S.C. 467 and is the first proclaimed reservation of the tribe following acknowledgment.
> (d)    If a tribe does not have a proclaimed reservation on the effective date of these regulations, to be proclaimed an initial reservation under this exception, the tribe must demonstrate the land is located within the State or States where the Indian tribe is now located, as evidenced by the tribe's governmental presence and tribal population, and within an area where the tribe has significant historical connections and one or more of the following modern connections to the land:
>
>> (1)    The land is near where a significant number of tribal members reside; or

---

[21] *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan*, 198 F. Supp. 2d 920, 933 (W.D. Mich. 2002); *see* 25 U.S.C. § 2702.
[22] 25 U.S.C. § 2719(a)(1).
[23] (emphasis added) 25 U.S.C. § 2719(b)(1)(B).
[24] 73 Fed. Reg. 29,354 (May 20, 2008); corrected 73 Fed. Reg. 35,579 (June 24, 2008).

(2)     The land is within a 25-mile radius of the tribe's headquarters or other tribal government facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust; or

(3)     The tribe can demonstrate other factors that establish the tribe's current connection to the land.[25]

Because the Tribe had no proclaimed reservation on the effective date of the Part 292 regulations, we must apply 25 C.F.R. § 292.6(d). In order to meet the requirements set forth under paragraph (d), three criteria must be satisfied: (1) the land must be located in the state or states where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population; (2) the land must be within an area where the tribe has significant historical connections; and (3) the tribe must demonstrate one or more modern connections to the land.

## C.     Prior Proceedings

The facts surrounding the history of the Tribe have been adjudicated in two formal proceedings: the Indian Claims Commission (ICC), which issued its decision on June 25, 1969,[26] and a Federal acknowledgment determination by the Branch of Acknowledgment and Research (BAR),[27] an office then within the Bureau of Indian Affairs (BIA), which resulted in the Tribe's federal acknowledgement on January 4, 2002.[28]

### 1.   Indian Claims Commission

In 1946, Congress enacted the Indian Claims Commission Act of 1946 (ICCA)[29] to resolve all existing pre-1946 Indian claims, both legal and moral, against the United States government. Prior to that time, Congress had to enact special jurisdictional statutes before tribal claims against the United States could be heard in the Court of Claims. The ICC interpreted the ICCA provision allowing claims for taking of lands "owned or occupied" by a tribe to authorize recovery of damages only where the tribe could show that it had "aboriginal title" to lands.[30]

The ICC adopted the strict standard for establishing aboriginal title announced by the Supreme Court in 1941 in *United States v. Santa Fe Pacific R.R.*[31] Claimant tribes

---

[25] 25 C.F.R. § 292.6.

[26] *Simon Plamondon on Relation of the Cowlitz Tribe of Indians v. United States*, 21 Ind. Cl. Comm. 143 (1969) [hereinafter ICC Decision]; AR131964.

[27] The BAR is now known as the Office of Federal Acknowledgment, and is located within the Office of the Assistant Secretary – Indian Affairs.

[28] 67 Fed. Reg. 607 (Jan. 4, 2002).

[29] Pub. L. No. 726; 60 Stat. 1049.

[30] Aboriginal title is the right of occupancy in its territory even though there is no treaty or other legal recognition of the tribe's right to the lands, in contrast to recognized title which is based on treaty or statute recognizing legal right to the land. *See* Felix S. Cohen, Handbook of Federal Indian Law § 15.04[2] (2012).

[31] 314 U.S. 339 (1941).

were required to show <u>actual</u>, <u>exclusive</u>, and <u>continuous</u> use and occupancy prior to loss of the land in order to be compensated for a taking of their aboriginal titles.[32]

On August 8, 1951, Simon Plamondon, a member of the Cowlitz Tribe, filed a petition on behalf of the Tribe seeking compensation for Cowlitz lands taken by the United States in the nineteenth century.[33] The ICC, in *Simon Plamondon, On Relation of the Cowlitz Tribe of Indians v. The United States of America*,[34] reviewed the area claimed by the Tribe to determine whether the Tribe held aboriginal title to it:

> The instant action is concerned with aboriginal title to a tract of land in the southwest part of the State of Washington. The area contains the entire drainage of the Cowlitz and Lewis Rivers, and that of several smaller streams. It entails most of present Clark, Cowlitz, and Lewis counties and parts of Skakamia, Pacific, and Thurston counties.[35]

The ICC identified approximately 2,500 square miles of land primarily in Lewis and Cowlitz counties that the Tribe exclusively used and occupied, and determined that the Tribe held aboriginal title to these lands. The area described by the ICC generally included the entire drainage of the Cowlitz River and extended south to the Toutle River drainage.[36] The southern boundary of the Tribe's aboriginal title area, as found by the ICC, is approximately 14 miles north of the Cowlitz Parcel.[37]

While the ICC found that these lands along the lower and middle Cowlitz River constituted the main areas of Cowlitz occupation, this determination does not preclude a finding here that the Tribe occupied and used lands in the vicinity of the Cowlitz Parcel for subsistence and likely villages and/or camps, and therefore, has significant historical connections to the Cowlitz Parcel.

The ICC findings are based on the Commission's review of detailed historical information, as well as factual and legal arguments from the United States and the Tribe. Therefore, these findings are highly reliable.[38] As such, we rely on the findings of the ICC in the *Plamondon* case as they relate to the history of the Cowlitz Tribe.

## 2.    Federal Acknowledgement Proceedings

The Cowlitz Tribe applied for federal acknowledgment in September 1975.[39] In February 1983, the Tribe submitted an application pursuant to the Part 83

---

[32] In practice, this standard meant that many tribes were not compensated by the ICC for the loss of much of their traditional territory, even if they were the dominant presence there, because the area was shared with other tribes.

[33] AR131964.

[34] ICC Decision at 143; AR131964.

[35] *Id.* at 152; AR131973.

[36] *Id.* at 145; AR 131966; see Figure 1.

[37] AR014786.

[38] *Cf. Seminole Nation of Oklahoma v. U.S.*, 498 F.2d 1368, 1375 (Fed. Cl. 1974) (ICC is "the expert" with respect to Indian Claims).

[39] AR136117.

acknowledgment regulations.[40]  The Assistant Secretary-Indian Affairs issued a final determination acknowledging the Tribe in February 2000.[41]  In December 2001, the Assistant Secretary reaffirmed his final determination.[42]  The Cowlitz Tribe has been deemed a federally recognized tribe since January 4, 2002.[43]

The acknowledgment process was managed by the Branch of Acknowledgment and Research.  The BAR staff conducted in depth independent research into the Cowlitz Tribe's legal and political history and issued several technical reports in support of its final determination.  These reports include:  the Historical Technical Report; the Genealogical Technical Report; and the Anthropological Technical Report (collectively, the BAR technical reports).[44]

The factual findings contained in the BAR technical reports, many of which rely on the findings of the ICC, relating to Cowlitz federal recognition are also entitled to deference.[45]  In reviewing the BAR determinations concerning federal recognition of tribes, courts commonly defer to the BAR's expertise on tribal recognition and associated issues.  As explained by the D.C. Circuit Court of Appeals in *James v. United States Department of Health and Human Services*:

> The Department of the Interior's Branch of Acknowledgment and Research was established for determining whether groups seeking tribal recognition actually constitute Indian tribes and presumably to determine which tribes have previously obtained federal recognition . . . [T]he Department has been implementing its regulations for eight

---

[40]  *Id.*

[41]  65 Fed. Reg. 8,436 (Feb. 18, 2000).  After the Tribe submitted its petition in February 1983 the Department sent an obvious deficiency (OD) letter to the Tribe, dated June 15, 1983.  The Tribe withdrew the 1983 petition and on February 10, 1987, submitted a second petition, dated January 20, 1987, responding to the OD.  The BIA reviewed the 1987 petition and sent the Tribe a second OD letter, dated October 21, 1988.  The Tribe submitted a response to the second OD, dated January 29, 1994.  After reviewing this response the BIA determined the petition to be ready for active consideration in April 1994.  The revised acknowledgment regulations became effective March 28, 1994.  The Tribe was determined eligible to proceed under the provisions of section 83.8 by letter dated May 1995.  The petition was placed on active consideration July 11, 1995, and decided in 2000.

[42]  An objecting party, the Quinault Indian Nation, requested review of the 2000 final determination by the Interior Board of Indian Appeals (IBIA).  36 IBIA 140 (May 29, 2001).  The IBIA affirmed the Department's Final Determination, but referred three issues back to the Secretary for further consideration:  1) whether an error by the Final Technical Report relating to the enumeration of the Cowlitz "metis" (descendants of marriages between French Canadian trappers and Cowlitz Indians) affected the BIA's analysis and/or the Assistant Secretary's decision sufficient to warrant reconsideration; 2) whether BIA misapplied the relevant burden of proof; and 3) whether BIA's analysis of the evidence was arbitrary and inconsistent.  *See* 36 IBIA at 151.  On December 31, 2001 the Assistant Secretary-Indian Affairs signed a reconsidered final determination that affirmed the prior determination and supplied additional factual analysis and reasoning regarding the role of the metis during the time period when the Tribe was first recognized by the United States.

[43]  67 Fed. Reg. 607 (Jan. 4, 2002).

[44]  The Historical Technical Report is found at AR136162; the Genealogical Technical Report is found at AR136486; and the Anthropological Technical Report is found at AR136329.

[45]  *Miami Nation of Indians of Indiana v. Babbitt*, 112 F. Supp. 2d 742, 751 (N.D. 2000).

years, and as noted, it employs experts in the fields of history,
anthropology and geneology [sic], to aid in determining tribal
recognition. This ... weighs in favor of giving deference to the
agency by providing it with the opportunity to apply its expertise.[46]

### 3.    Fee-to-Trust Application

On January 4, 2002, the Cowlitz Tribe, which is landless, submitted a fee-to-trust
application requesting that the Department accept trust title to the Cowlitz Parcel.  The
Tribe detailed its plans to construct a casino-resort complex, as well as Tribal
government buildings, Tribal elder housing, a Tribal cultural center, parking facilities, a
recreational vehicle park, and a wastewater treatment plant.  The federal actions
proposed in the Tribe's application (acquisition of the land in trust and proclaiming it a
reservation for the Tribe) were analyzed in an Environmental Impact Statement (EIS)
prepared pursuant to the National Environmental Policy Act, under the direction and
supervision of the BIA Northwest Regional Office.  The draft EIS was issued for public
review and comment on April 12, 2006.[47]  After an extended comment period, two
public hearings, and consideration and incorporation of comments received on a draft
EIS, the BIA issued the final EIS on May 30, 2008.[48]  The EIS considered a reasonable
range of alternatives that would meet the purpose and need for the proposal, and
analyzed the potential effects of those alternatives, as well as feasible mitigation
measures.[49]

On December 17, 2010, the Assistant Secretary-Indian Affairs determined that the
Department would accept the Cowlitz Parcel into trust for the Tribe.[50]  This
determination included declaring the Cowlitz Parcel to be the Tribe's initial
reservation.  The determination also included a finding made on December 16, 2010,
that the Tribe was under federal jurisdiction in 1934, and that the Secretary had
authority to acquire the Cowlitz Parcel pursuant to the Indian Reorganization Act of
1934.[51]  As discussed below, this determination also included a finding made in the
December 14, 2010, Office of the Solicitor Initial Reservation Opinion that the Tribe
was eligible to game on the Cowlitz Parcel pursuant to the initial reservation exception
of IGRA.[52]

---

[46] *James v. United States Department of Health and Human Services*, 824 F.2d 1132, 1138 (D.C. Cir.
1987).
[47] *See* Cowlitz Indian Tribe Trust Acquisition, Reservation Proclamation and Gaming Development
Project, BIA Decision Package. AR064652, AR064656.
[48] *Id.*
[49] *Id.*
[50] *Id.* at AR064652 – AR064777; 76 Fed. Reg. 377 (January 4, 2011).
[51] 25 U.S.C. § 465. *See Carcieri v. Salazar*, 555 U.S. 379 (2009).
[52] AR001335.

### 4.   NIGC Restored Lands Opinion

In 2005, the Tribe requested that the NIGC approve a site-specific gaming ordinance for the Cowlitz Parcel pursuant to IGRA.[53]  As part of its review of the request, NIGC prepared a Restored Lands Opinion analyzing whether the Cowlitz Parcel met the restored lands exception of IGRA.[54]  On November 22, 2005, the NIGC Opinion found that, "the historical record establish[es] that the Cowlitz Tribe, throughout its history, used the Lewis River Property [Cowlitz Parcel] area for hunting, fishing, frequent trading expeditions, occasional warfare, and if not permanent settlement, then at least seasonal villages and temporary camps."[55]  The NIGC Opinion included a detailed discussion of specific historical connections between the Cowlitz Tribe and the Cowlitz Parcel.[56]

### 5.   Solicitor's Office Initial Reservation Opinion

On December 14, 2010, the Office of the Solicitor provided its Initial Reservation Opinion[57] (2010 Opinion) to the Assistant Secretary in response to the request from the Tribe that the Cowlitz Parcel should be analyzed pursuant to the initial reservation exception of Section 20.[58]  The 2010 Opinion concluded that the Tribe had a significant historical connection to the Cowlitz Parcel, and, therefore, is eligible to game on the Cowlitz Parcel pursuant to the initial reservation exception of IGRA.[59]

## III.   Initial Reservation Analysis

As discussed above, and in light of the concerns raised in documents submitted to the Department critical of the NIGC Restored Lands Opinion, the Office of the Solicitor has reviewed its conclusions reached in the 2010 Opinion.  Upon further review of the Opponents' historical submissions, and in applying the criteria found in 25 C.F.R. Part 292, the Office of the Solicitor now confirms its original conclusion that the Cowlitz Parcel qualifies for the initial reservation exception.

### A.   Federal Acknowledgment

When applying the criteria of the initial reservation exception, we first determine whether the Tribe was acknowledged through the administrative process prescribed in 25 C.F.R. Part 83. Through the Assistant Secretary's Reconsidered Final Determination and its publication in the *Federal Register* on January 4, 2002, the Tribe satisfies section 292.6(a).[60]

---

[53] AR064194.

[54] AR013906.

[55] AR013916.

[56] AR013916-19.

[57] AR001335.

[58] AR016007

[59] 2010 Opinion at 4.

[60] *See* 67 Fed. Reg. 607 (Jan. 4, 2002).

9

### B.    No Other Gaming Facility

The Cowlitz Tribe also satisfies section 292.6(b).  The Tribe has no current trust lands and no current gaming operation.  Therefore, it follows *a fortiori* that the Tribe "has no gaming facility on newly acquired lands under the restored land exception of the Part 292 regulations."[61]

### C.    First Proclaimed Reservation

Under 25 C.F.R. § 292.6(c), the particular land at issue must be proclaimed to be a reservation under 25 U.S.C. § 467, and it must be the first proclaimed reservation of the Tribe following its federal acknowledgment.  The statutory text referenced in the regulation is found in Section 7 of the Indian Reorganization Act, which provides:

> The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by this Act, or to add such lands to existing reservations: *Provided*, That lands added to existing reservations shall be designated for the exclusive use of Indians entitled by enrollment or by tribal membership to residence at such reservations.[62]

The Assistant Secretary has determined that the Department will proclaim the Cowlitz Parcel to be the Tribe's first reservation under 25 U.S.C. § 467.[63]  Such a reservation proclamation is a necessary element for the Tribe to conduct gaming activities under the initial reservation exception.

Since the Tribe had no proclaimed reservation on the effective date of the Part 292 regulations, we must apply 25 C.F.R. § 292.6(d).  In order to meet the requirements set forth under paragraph (d), three criteria must be satisfied: (1) the land must be located in the state or states where the Tribe is now located, as evidenced by the Tribe's governmental presence and tribal population; (2) the land must be within an area where the tribe has significant historical connections; and (3) the Tribe must demonstrate one or more modern connections to the land.  The Cowlitz Parcel meets all three of these requirements.

### 1.    In-State Requirement

The Cowlitz Parcel is located in the state where the Tribe is now located.  The Cowlitz Parcel is located in Clark County, Washington.  The Tribe's recorded presence in what would become the State of Washington dates back to the early 1800s.  The Tribal headquarters are located in Longview, Washington.  Of the approximately 3,544 members of the Cowlitz Tribe, approximately 64% live in the State of Washington.[64]

---

[61]   25 C.F.R. § 292.6(b).

[62]   25 U.S.C. § 467.

[63]   AR064656.

[64]   *See* BIA Final Environmental Impact Statement for the Cowlitz Indian Tribe Trust Acquisition and

These facts sufficiently demonstrate that the Cowlitz Tribe and the Cowlitz Parcel are both within the State of Washington and satisfy the regulation's in-state requirement.

### 2. Significant Historical Connections

The term "significant historical connections" is defined in the regulations to mean: "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."[65]  We determine that the Cowlitz Tribe has significant historical connections to the land in the vicinity of the Cowlitz Parcel.

As noted above, following the issuance of the NIGC Opinion in 2005, opponents of the Tribe's application to have the Cowlitz Parcel acquired in trust submitted reports and documentation to the Department disputing the NIGC's findings and asserting, among other things, that the Cowlitz Parcel was not within an area where the Tribe has significant historical connections.  The Opponents' historical submissions contend that the Tribe historically has been located substantially north of the Cowlitz Parcel.  These reports attempt to refute the conclusions of the NIGC Opinion using some of the evidence and findings of the BAR technical reports, ICC proceedings, and the opponents' own research.  The CARS report, for example, concludes that the Tribe was located substantially to the north of the Cowlitz Parcel.[66]  Similarly, the Lawson and Perkins Coie submissions attempt to refute any Cowlitz presence near the Lewis River.[67]  The Alexanderson and Boxberger submissions similarly dispute the Tribe's historical connections near the Lewis River.[68]  The Department has fully reviewed and evaluated these documents.  In addition, Perkins Coie submitted a draft report dated December 2007, written by Dr. Robert T. Boyd.[69]  The report, titled "Cathlapotle and Its Inhabitants, 1792-1860," prepared for the U.S. Fish and Wildlife Service, thoroughly reviews the history of the area of the Columbia River tribes and provides significant detail about the location of the Cowlitz Tribe.[70]

---

Casino Project at 3.7 (May 30, 2008).

[65] 25 C.F.R. 292.2.

[66] *See, for example,* AR131710, 13, 35.

[67] *See, for example,* AR004982-5076 (Lawson); AR004334-52 (Perkins Coie 2005); AR004410-17 (Perkins Coie 2006); AR006451-57 (Perkins Coie 2008).

[68] *See, for example,* AR135988-92, 6722-67 (Alexanderson); AR136673-79 (Boxberger).

[69] AR004725. Boyd is an adjunct professor at Portland State University.
http://www.anthropology.pdx.edu/boyd.html.  Perkins Coie submitted the draft report in 2008.  The final 2011 report is on file at the Department of the Interior library.  The draft report's conclusions discussed here did not change in the final report.

[70] Boyd states: "This report has two purposes: first, a history of Cathlapotle village and its environs from first contact with whites until shortly after the removal of most of the area's inhabitants to the Yakama Reservation; and second, an investigation of who those inhabitants were, in an ethnic sense, during the first sixty-eight year period of their contact history. The target audiences for the report include, first of all, members of the general public who visit the Cathlapotle longhouse and the Ridgefield National Wildlife Reserve on which it is situated, and want to know more about its history and original inhabitants; second, several interested parties who have an association with the area, including Indian tribes (Chinook, Cowlitz, and secondarily Grand Ronde and Yakama); neighbors of the refuge in Ridgefield, LaCenter, Woodland and western Clark county; regional academicians, especially

We have reviewed these materials and others in the existing administrative record in making our determination that the Cowlitz Tribe has significant historical connections to the land in the vicinity of the Cowlitz Parcel.

### a. Historical documentation demonstrating the existence of Cowlitz villages, burial grounds, occupancy, or subsistence use in the vicinity of the Cowlitz Parcel

We find here, as first determined in the 2010 Opinion, that there is sufficient evidence of historic use and occupancy in the vicinity of the Cowlitz Parcel to conclude that the Tribe has significant historical connections to the parcel pursuant to the regulations.

**Indian Claims Commission Finding of Use and Occupancy**

A finding of use and occupancy is a fact-intensive inquiry. As noted above, the ICC found that the Tribe exclusively used and occupied approximately 2,500 square miles of land primarily in Lewis and Cowlitz counties.[71] The southern boundary of the Tribe's aboriginal title area, as found by the ICC, is approximately 14 miles north of the Cowlitz Parcel.[72]

In its May 17, 2012, Restored Lands Opinion regarding the Scotts Valley Band of Pomo Indians (Scotts Valley Band), the Department discussed the term "vicinity," which is part of the regulatory definition of "significant historical connections."[73] Significant historical connections are established when "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty," or when "a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."[74]

The Department's Scotts Valley Opinion explains that, "a determination of whether a particular site with direct evidence of historic use or occupancy is within the vicinity of newly acquired land depends on the nature of the tribe's historic use and occupancy, and whether those circumstances lead to the natural inference that the tribe also made use of" the parcel in question.[75] "This analysis is, necessarily, fact-intensive, and will vary based on the unique history and circumstances of any particular tribe."[76]

Prior Indian Lands Opinions by the Department and the NIGC are consistent with our analysis regarding the Cowlitz Parcel. For example, an April 9, 2012, NIGC opinion regarding the Karuk Tribe of California found restored lands where the parcel owned

---

in anthropology, history and Native American Studies; and most broadly, the general reading public in Washington and Oregon interested in Native American history and culture." AR004730.

[71]  ICC Decision at 145 (1969); AR 131966; see Figure 1.

[72]  AR014786.

[73]  Scotts Valley Opinion at 16-17; attached hereto as Exhibit A.

[74]  25 C.F.R. 292.2 (emphasis added).

[75]  Scotts Valley Opinion at 16-17.

[76]  *Id.* at 17 n.59.

by the Tribe was 38 miles from the tribal headquarters and not in an area of exclusive use by the tribe.[77]  The Commission found that the applicant tribe need not show historical exclusive use in the vicinity of the parcel at issue, noting that, "IGRA's restored lands exception does not require the Karuk Tribe to demonstrate that it was the only tribe with historical connections to the area, or that the subject area was the only place where the Karuk Tribe has historical connections."[78]  This is very similar to our finding that the Cowlitz Parcel – also in an area where other tribes also have historic connections – qualifies as Indian lands.[79]

Therefore, in assessing whether the use and/or occupancy by the Cowlitz Indians of areas near to the Cowlitz Parcel is in the "vicinity," we must look at how the Cowlitz Indians used and/or occupied the lands to the south of the exclusive use and occupancy area determined by the ICC.  That inquiry must focus on the "unique history and circumstances" of the Cowlitz Indians.

### i.   Cowlitz Use of the Columbia River

As discussed below, historical accounts describe a large tribal presence, including the Cowlitz, in and around the Columbia River and its tributaries.[80]  These accounts note

---

[77]  Karuk Op. at 10, 12.

[78]  *Id.* at 12.

[79]  *Id.* Prior Indian Lands Opinions demonstrate that 14 miles is consistent with a finding of significant historical connection. In its May 19, 2008 opinion regarding the Poarch Band of Creek Indians the NIGC found that the parcel in question was restored land and suitable for gaming under IGRA. Although the parcel is twelve miles from the Poarch Reservation, it is within the Creek Nation's former territory (from whom the Poarch Band descend), ceded land, the site of a former Creek village and contains historic burial mounds. Poarch Band Op. at 23-26. The NIGC's October 25, 2007 opinion regarding the Mooretown Rancheria found a parcel fifteen miles from the original rancheria to be Indian lands. The parcel was within fifteen to twenty miles of several villages utilized by the Tribe's ancestors; in each of these villages, ancestors of Mooretown Rancheria members would have supported themselves through subsistence activities within a twenty mile radius from the village. Mooretown Op. at 10-11. In a July 31, 2006 opinion, the NIGC found that a parcel owned by the Sault St. Marie Tribe of Chippewa Indians qualified as Indian lands. The parcel, though approximately fifty miles from the Tribe's center at Sault St. Marie, was ceded land within the Tribe's last treaty reservation and land that had been used by the Tribe for subsistence purposes for centuries past. Sault St. Marie Op. at 11-14. In a September 10, 2004 opinion, the NIGC found that a parcel owned by the Wyandotte Nation near Kansas City did not qualify as Indian lands. The parcel is 175 miles from where the Nation is actually located in Wyandotte, Oklahoma and was only occupied by the Nation for eleven years from 1843-1855. Wyandotte Op. at 10-12. In a March 14, 2003 opinion the NIGC found that a parcel owned by the Mechoopda Indian Tribe of the Chico Rancheria qualified as Indian lands. The parcel, about ten miles from the Tribe's original rancheria, was within the boundaries of the Tribe's historic villages, land promised to the Tribe in an unratified treaty, and close to cultural and historic sites including a trail that runs across the parcel. Mechoopda Op. at 9-11. In an August 5, 2002 opinion the NIGC found that a parcel owned by the Bear River Band of Rohnerville Rancheria qualified as Indian lands. The parcel, though six miles from the boundary of the historic rancheria and outside the boundary of a negotiated but unratified treaty with the Tribe, was within one mile of an important cultural site, two aboriginal villages and two major Indian trails. Bear River Op. at 11-13. Other important cultural and historic sites were slightly farther away from the parcel: five aboriginal villages were three miles away, a major cultural site was three to four miles away, and eleven aboriginal villages and the rancheria were six miles away. *Id.* at 12. All the opinions cited above can be found at: http://www.nigc.gov/Reading_Room/Indian_Land_Opinions.aspx.

[80]  *See infra* at 14-23.

the tribes' reliance on the natural resources of the area, especially fish and fur animals, for subsistence use and trade.

Governor George Simpson, Northern Department of the Hudson's Bay Company, has been cited by the BAR as an authoritative observer of tribal use of the Columbia River.[81]  According to Simpson, the Columbia River was an incredibly important resource for the tribes in the region.  In his 1824-1825 journal, he describes the indigenous peoples' relationship with the River:

> The population on the banks of the Columbia River is much greater than in any other part of North America that I have visited as from the upper Lake to the Coast it may be said that the shores are actually lined with Indian lodges; this I account for by the River affording an abundant provision at little trouble for a great part of the year and as they do not turn their attention to Hunting the whole of the Interior population flock to its banks at the Fishing Season.[82]

Boyd describes Governor Simpson (later Sir George Simpson), the chief factor or agent for the Hudson Bay Company, as an "astute observer,"[83] and finds his book "valuable."[84]  Governor Simpson's journal is a credible historical account of the Columbia River tribes, including the Cowlitz Tribe, on which we may rely.

The Boyd report, based on a report of an 1825 incident, also discusses the possibility of a Cowlitz presence along the Columbia River between Mount Coffin in Cowlitz County and Fort George (Fort Astoria) at the mouth of the Columbia near the Pacific Ocean.  While he is not certain of the exact location, Boyd concludes that there "may have indeed have had some sort of presence along the Columbia during this period."[85]  Mount Coffin, once a 240-foot-high hill, was located three miles downstream from the mouth of the Cowlitz River.  The Boyd report provides research indicating that the Cowlitz had a presence along the banks of the Columbia River.

Alexanderson argues that, in the 1830s and 1840s, the Cowlitz remained on the Cowlitz River upstream of the confluence with the Columbia, not venturing into hostile Chinook territory along the banks of the Columbia.[86]  However, Alexanderson's discussion relates to whether Cowlitz would have been found on the Columbia near the

---

[81] *See e.g.*, HTR AR136183 – 136220.  The Boyd Report provides background regarding Governor Simpson: Sir George Simpson was a representative of the Hudson's Bay Company and the British Crown. AR004850  In November 1824, Simpson came to the Northwest for a tour of the Columbia District and to begin transfer of company operations from Fort George to Fort Vancouver.  AR004799. Simpson's travels around the area were extensive.  AR004799; AR004800; AR004807; AR004819; AR004850; AR004854.

[82] *Fur Trade and Empire:  Remarks Connected with the Fur Trade in the Course of Voyage from York Factory to Fort George and back to York Factory 1824 – 1825, Together with Accompanying Documents* at 94 [hereinafter Fur Trade and Empire]; AR005693 (NIGC).

[83] AR004802.

[84] AR004850.

[85] AR004806 - 06.

[86] AR136725-26.

mouth of the Lewis, not downstream of Mount Coffin – much farther downstream (north).

### ii.    Evidence of Occupancy

The 2010 Opinion also reviewed the BAR technical reports that discussed treaty-time Cowlitz villages and/or hunting camp sites along the Columbia River. In his 1839 book *Across the Rockies to the Columbia*, ornithologist John K. Townsend recorded his observation of several lodges and about 100 "Kowalitsk" Indians near his camp on a plain below Warrior's Point: "encamped on a plain below Warrior's point. Near me are several large lodges of Kowalitsk Indians; in all probably one hundred persons."[87] This is a significant observation because it places Cowlitz very close to the Cowlitz Parcel. Warrior's Point is located on the Columbia River across from the mouth of the Lewis River, only about three miles northwest of the Cowlitz Parcel, and certainly within the vicinity of the Parcel.

Townsend's report of finding Cowlitz near the mouth of the Lewis River has been accepted as accurate and reliable by both the ICC and the BAR. The ICC included Townsend's account of sighting Cowlitz below Warrior's Point in its findings of fact, along with a parenthetical stating that the specific location was "near the mouth of the Lewis River."[88] The BAR Historical Technical Report relied on Townsend's account and accepted his location and identification of the Cowlitz in that area.[89]

The Lawson submission, one of the Opponents' historical submissions, evaluated Townsend's observations and opined that while Townsend himself "may have possibly been near the mouth of the Lewis River," the Cowlitz likely were elsewhere:

> The critical point is that Townsend did not state that he observed the Kowalitsk lodges near Warrior Point, rather that they were near him while he was encamped on a plain below Warrior Point. It is not known how far downriver Townsend may have camped. While he may have possibly been near the mouth of the Lewis River, it is more likely that he was farther north (downstream) on some other plain."[90]

The Lawson submission also opined:

> [T]he Cowlitz may have only had use of the area, as in crossing it enroute to other locales, such as Bellevue Point or Fort Vancouver on the Columbia River or the Willamette Valley of Oregon, without extended occupation or

---

[87] AR004830; *see also* HTR at 25; AR136190. The name "Kowalitsk" is an alternative spelling to "Cowlitz." AR004830 (Boyd treats Kowalitsk as synonymous with Cowlitz).
[88] ICC at 155; AR131976.
[89] HTR at 25; ARAR136190.
[90] AR 005019; The Perkins Coie 2008 submission addresses this point, AR006454, as does Alexanderson, AR136752-53; *see also* AR006454-55 (similar argument).

settlement. If the Cowlitz had transitional use of the lower Lewis River area, it must have been for a relatively short period during the 19th century.[91]

These statements are speculative, however, and provide no direct evidence that effectively refute or outweigh Townsend's authoritative historical observations. Both the ICC and the BAR found Townsend's reports authoritative and reliable, and the Department will continue to rely on such credible statements.

Findings in the Boyd report also support Townsend's report despite Boyd's critique of various aspects of Townsend's analysis:

> [T]here are some important questions about this passage. First, the identification of these people as "Kowalitsk." Townsend's misuse of that term, in reference to the Chinook Ramsey [who Townsend mistook for Cowlitz], has been pointed out. . . . Ditto his use of "Klikitat" for what were probably Clackamas. Both [of] these cast some doubt on his identifications here. My initial assessment of this passage was that Townsend had misidentified both, but on further research, I think not. Several times previously. . . Cowlitz were documented on the "Cathlapotle reach," so their presence here is not so surprising. The exact location is not clear: "below" Warrior Point rules out Cathlapotle, which is just above. . . . The timing -- May -- is probably significant. Cowlitz people were recorded earlier on the reach at this time, ascending to the "Willamette" for salmon, because they were short on food and had no salmon of their own yet. . . . . The possibility that these people were also somehow involved in trade with the [Hudson's Bay Company] along the southern part of "Schanaway's track" must also be considered. . . . Despite these probabilities, however, Townsend's passage must still be approached with caution. It is not as clear-cut as it appears on the surface.[92]

Notwithstanding Boyd's note of caution, because both the ICC and the BAR assessed this piece of historical evidence and found it credible and reliable, we also deem it to provide sufficient evidence of occupancy and subsistence use by the Cowlitz of the Columbia River near the Cowlitz Parcel.

### iii.    Cowlitz Trade Presence

The 2010 Opinion discusses a Cowlitz trading presence in the area of the Cowlitz Parcel dating back to the early 1800s. During that time period, Governor Simpson, of the Hudson's Bay Company, described a Cowlitz presence at Bellevue Point at the convergence of the Columbia and Willamette Rivers, approximately 10 miles south of the Cowlitz Parcel:

---

[91] AR005057 citing to Yvonne Hajda, "Southwestern Coast Salish," in *Handbook of North American Indians*, vol. 7, *Northwest Coast* (Washington: Smithsonian Institution, 1990), p. 505.
[92] AR004830.

16

> [N]early all of the fur trade pass through the hands of three Chiefs or principal Indians viz. Concomely King or Chief of the Chinooks at Point George, Casseno Chief of a tribe or band settled nearly opposite to Bellevue Point and Schannaway the Cowlitch Chief whose track from the borders of Pugets Sound strikes on the Columbia River near to Belle vue Point.[93]

The Cowlitz track, or trail, described in the journal entry encompasses that portion of the Columbia River that intersects with the Lewis River, about three miles from the Cowlitz Parcel.

The Boyd report describes the location of the "Schannaway's track" and that it extended:[94]

> [A]ll the way from the base of Puget Sound down the Cowlitz corridor, and from the mouth of the Cowlitz down along the lowlands on the east bank of the Columbia (including Kalama and Cathlapotle) all the way to Wakanasisi. Again, no shift in native populations (at this time) is implied in the description of his trade route, but it is interesting that a Cowlitz is said to have control over a route that passes in part through what must have still been largely Chinookan territory.[95]

The Boyd report further explains:

> [A] land route between the Cowlitz and Bellevue Point is Simpson's most likely meaning, although a water route cannot be ruled out. [That use of this trade route would be called] "Trespass" through what may have been Kiesno's sphere of influence by the Cowlitz Scanewa is not likely, as Northwest Indians, without land ownership concepts, had no such restrictions, and since throughout the Northwest from the 1820s on, Indians from all groups traveled to [Hudson's Bay Company] forts to trade without impediment.[96]

There also are early reports of Cowlitz Chief Schannaway at Fort Vancouver in the BAR technical reports:

> In 1821, an Act of Parliament merged the North West Company into the Hudson's Bay Company, which continued fur trade activity along the

---

[93] *Fur Trade and Empire*, Journal at 86; AR005691 (NIGC); *see also* HTR at 20; AR136185. The Boyd report also mentions Cowlitz present below the Kalama River, involving Cowlitz seeking to provide an escort to a HBC trade representative, "which indicates Cowlitz presence in the area, perhaps related to 'Schanaway's' trade zone. . . . " AR004805.

[94] "Track," means: first, physical evidence of movement as footprints, and second (synonym) trail. AR004802 n. 20.

[95] AR004802 (footnote omitted).

[96] AR004802 n.20.

Columbia River. Fort Vancouver, in modern Clark County, Washington was opened by the Hudson's Bay Company in 1825. In the mid-1820's, the Cowlitz chief Schannanay competed with the Chinook chief Concomly and his son-in-law Casino at Fort Vancouver for control of trade. The journals of David Douglas mentioned that he, "found at the Cow-a-lidsk a small boat which Schachanaway the chief, had borrowed from the establishment few days before."[97]

The Boyd report contains similar historical accounts of the Cowlitz trade route and presence in the vicinity of the Cowlitz Parcel.[98]

Alexanderson and Boxberger generally dispute the significance of these accounts. While Alexanderson does not dispute Governor Simpson's observations, he argues that it is not evidence of significant historical connections.[99] Boxberger contends that trading activities in an area are not the equivalent of territorial control. [100] Territorial control, however, is not required to demonstrate significant historical connections.[101] In fact, during the promulgation of the IGRA regulations, the Department rejected a suggestion that significant historical connections had to include "actual inhabitance."[102]

When trading activities are as extensive and intensive as those engaged in by the historic Cowlitz Indians, they rise to the level of significant historical connections, particularly when viewed in conjunction with the additional evidence discussed herein. The Cowlitz's central role in the trade along the Columbia corridor is well-documented. Boyd described pre-contact trade along the Columbia: a 1792 British expedition learned that Indians along the Cowlitz River possessed sea otter skins, "likely . . . an indication that the Indian trade route which extended up the Cowlitz River to Puget Sound, and is well documented in later years, was fully operative – and hence aboriginal – in the pre-fur trade period."[103] Boyd also reported that the spread of the horse to the region, "by 1818 (in the Cowlitz) they were abundant," increased the scope and effects of this trade: "aboriginal trails that may have been used for relatively short foot trips to scattered resource locations were now being connected, streamlined, and used more actively for long distance trade via horseback. . . . [T]he convergence of horses, trails, and expanded trade networks may have set in motion movement of peoples."[104]

Governor Simpson noted the importance of trade among the lower Columbia peoples: "[T]he principal occupation of the men during the Winter is going about among the Neighbouring Indians for the purposes of trade . . . they are quite a Nation of Traders

---

[97] HTR at 20 (citations omitted); AR136185.

[98] AR004807.

[99] AR136759-60.

[100] AR136676.

[101] 25 C.F.R. § 292.2 (significant historical connections includes "subsistence use in the vicinity of the land").

[102] 73 Fed. Reg. 29,354, 29,368 (May 20, 2008).

[103] AR004740.

[104] AR004796 (citations omitted).

and not of Hunters."[105]  As noted above, Governor Simpson's statement about "Schannaway's track," or trading route, demonstrates that the Cowlitz had a central role in the trade along the Columbia corridor.  Because this trading activity brought Cowlitz Indians close to the Cowlitz Parcel with frequency, it qualifies as a significant historical connection.

Evidence of trade and trade routes, as in the case of the Cowlitz, is a key consideration in determining significant historical connections.  As the preamble to Part 292 discusses, the definition of significant historical connection requires more than evidence that a tribe "merely passed through" the vicinity, or was a "disparate group of traveling Indians.[106]  Here, the evidence shows more than that the Cowlitz Indians merely passed through the vicinity of the Cowlitz Parcel or were a disparate group of traveling Indians.  Instead, the historical record analyzed above shows exclusive use and occupancy by the Cowlitz Indians within fourteen miles of the Cowlitz Parcel and regular and intensive use of the vicinity of the parcel for gathering resources to be used both for subsistence and for trade.  There is also evidence of use of the vicinity of the Cowlitz Parcel for regular trade activities (the Cowlitz "track" or trade route passed close to the parcel).  These activities are credible evidence of significant historical connections.

The relevance of a trading route and/or activities has been discussed in a recent restored lands opinion.  In its September 1, 2011, opinion regarding the Guidiville Band of Pomo Indians (Guidiville Band), the Department found that the Guidiville Band failed to provide evidence of connections between it and the parcel in question.[107]  The opinion discussed assertions by the tribe that use of a trade route by the tribe constituted significant historical connections with the parcel and noted that "[s]ubsistence use and occupancy [part of the regulatory definition of significant historical connections] requires something more than a transient presence in an area."[108]  The opinion also cited to the *Federal Register* preamble discussion noted above.[109]

In the Guidiville Opinion, the asserted trade route was north of San Pablo Bay, whereas the parcel was to the south of the bay.[110]  In addition, the asserted traders were Pomo Indians, a larger tribal group of which the Guidiville Band was a subset or subgroup.[111]  Notwithstanding its more general language about the scope of the regulatory definition of "significant historical connections," the Guidiville Opinion found the trade argument

---

[105] AR004802.

[106] 73 Fed. Reg. 29,354, 29,366 (May 20, 2008). The preamble states: "One comment suggested that a tribe should not be able to establish a historical connection if they are a disparate group of traveling Indians traveling through territory at some point in their distant history.  Response: We received comments pertaining to the issue raised by this comment that argue both in favor of and against a tribe's ability to establish a connection to the land when their past contacts were transitory or brief in nature. The definition of 'significant historical connection' establishes criteria which require something more that evidence that a tribe merely passed through a particular area."

[107] Guidiville Opinion at 13-19; attached hereto as Exhibit B.

[108] *Id.* at 14-15.

[109] *Id.* at 14-15.

[110] *Id.*

[111] *Id.*

insufficient specifically because the Band failed to establish that the traders were in fact the ancestors of the Guidiville Band, as opposed to Pomo Indians in general, and because the asserted trade route was north of San Pablo Bay and, thus, distant and separated by a body of water from the parcel.[112]

After consideration of the facts and circumstances of the historic Cowlitz Indians, we find that the general language in the Guidiville Opinion should not limit our finding here that the extensive and intensive trading activities of the Cowlitz Indians constitute significant historical connections to the Cowlitz Parcel, especially when viewed in conjunction with the additional evidence discussed above. In the Guidiville Opinion the Department did not conclude that activities associated with a trade route or trading activities in general can never constitute evidence of significant historical connections. However, such activities have to be substantial enough to be more than "a transient presence in an area" – as is the case with the historic Cowlitz Tribe – to be considered significant.

### iv. Battle Location

The 2010 Opinion found information regarding Indian battles in the early 1800s to be evidence of significant historical connections to the Cowlitz Parcel. The BAR technical reports cite to a major battle in 1813 or 1814 between the Cowlitz Tribe and the Chinook Tribe at the lower entrance of the Willamette.[113] The lower entrance of the Willamette refers to what is now known as the Multnomah Channel, which enters the Columbia River opposite from the Lewis River, only about three miles from the Cowlitz Parcel.

The Perkins Coie 2008 submission questions whether a battle involving the Cowlitz is evidence of significant historical connections:

> [I]t is unclear how a single battle illustrates a significant historical connection to the area. Intertribal conflict usually involved "home" and "away" participants. NIGC failed to note that Alexander Henry's report indicates that following the battle, it was the Cowlitz who "returned home". . . . One excursion by a war party into the territory of another tribe does not constitute a significant historical connection to land.[114]

While the Perkins submission questions the importance of this incident, it does not question whether the battle took place. We therefore continue to rely on this incident recounted in the BAR Historical Technical Report as additional evidence of a Cowlitz presence near the Lewis River.

The BAR technical reports also discuss an incident during the 1855-1856 Indian war, in which a Cowlitz Indian named Zack, who was hunting near the Chelatchie Prairie on

---

[112] *Id.* at 14-15, n.70.
[113] HTR at 19; AR136184.
[114] AR006456.

the Lewis River (about 6 miles upstream from the Cowlitz Parcel), hurried downstream to warn American settlers of approximately 200 approaching Indian warriors.[115]

The Alexanderson submission disputes Zack's affiliation with the Cowlitz Tribe. It contends Zack was Yakima, not Cowlitz.[116] The BAR Historical Technical Report, however, refers to the Cowlitz who received allotments on the Yakima reservation, including Zack.[117] It appears that the Alexanderson submission overlooks this discussion. This likely explains Alexanderson's reference to Zack as Yakima and not Cowlitz. Thus, we may rely on the BAR Historical Technical Report's conclusion that Zack, as a Cowlitz Indian, used the Lewis River area for subsistence hunting, thereby placing him in the vicinity of the Cowlitz Parcel – another historical connection to the Cowlitz Parcel.

Both of these incidents have been accepted as reliable by the BAR. They provide additional evidence of historical connections between the Cowlitz Tribe and the Cowlitz Parcel.

### v.     Additional Evidence of Occupancy

In the middle 1800s, many Cowlitz boatmen were hired by travelers to transport them up the Cowlitz River because of their expertise guiding large boats carrying goods through the rapids.[118] Boyd concludes that Cowlitz boatmen "may well have manned the boats between the Cowlitz and Fort Vancouver as well, passing the mouth of the Lewis River on their way."[119] The mouth of the Lewis River on the Columbia is less than three miles from the Cowlitz Parcel.

The 2010 Opinion reviewed reports relating to the period of treaty negotiations in 1855.[120] According to minutes taken during 1855 treaty negotiations, a Cowlitz delegate stated:

> Formerly the King Georges (English) came. They only paid them a shirt to go from Cowlitz to Vancouver. The Indians were very much ashamed at their treatment. They just now find out what the land was worth by seeing the French sell to the Whites. Several hundred dollars for a small piece with a house on it. It was not their land, but the Indians after all.[121]

Alexanderson argues that the most plausible reading of this passage is that it refers to a toll levied by the Cowlitz for passage through their Cowlitz River territory.[122]

---

[115] HTR at 99 n.86; AR136264.
[116] *See, for example,* AR136746-48. *But see* Alexanderson's submission "Clark County Indians Were Not Cowlitz" which is inconclusive about Zack's tribal affiliation. AR014741 at 01474-01475.
[117] HTR at 99; AR136264.
[118] AR004890 (quoting a manuscript by Judith Irwin).
[119] AR004890.
[120] Cowlitz Indian Tribe - Initial Reservation Opinion (December 14, 2010) at 5; AR001335.
[121] HTR at 40; AR136205.
[122] AR136761-62.

However, he appears to be unaware of the role of Cowlitz Indians as expert boatmen for hire. Based on Boyd's discussion of this topic we conclude the statement from the 1855 treaty negotiations refers to Cowlitz boatmen being hired to navigate from some location on the Cowlitz River to Fort Vancouver.

Consistent with the 2010 Opinion, we find that whether the Cowlitz delegate was describing a purported land sale or perhaps a type of river toll on the Columbia, the geography he describes is in the area of the Cowlitz Parcel and constitutes further evidence of historic connections between the Tribe and the parcel.

Additional evidence of Cowlitz occupation of lands in the vicinity of the Cowlitz Parcel comes from census information. Cowlitz members were included in the federal census for Clark County, the county in which the Cowlitz Parcel is located, as early as 1850.[123] Federal censuses of Clark County from 1870 to 1900 also included Cowlitz people.[124] As the Department explained in the context of the Tribe's petition for federal acknowledgment, the 1870 Clark County census includes the important Cowlitz lineal family of Lucy (Skloutwout) Garrand Weaser (spelled Weser).[125] Over 20% (173/818) of Cowlitz members with Lower Cowlitz ancestry trace to Lucy Skloutwout as the first qualifying ancestor.[126] The total number of Cowlitz members with Lower Cowlitz ancestry that trace to Lucy Skloutwout is presumably much higher given that "[m]any of the petitioners members trace to more than one Cowlitz ancestor. These current members were not double-counted in the following computation. Each was traced to the historical Cowlitz individual listed as the first qualifying ancestor on the membership application." [127]

Cowlitz occupancy within Clark County is also well documented after the turn of the 20th Century. In 1916, the Assistant Commissioner of Indian Affairs instructed Charles A. Roblin to investigate applications for Quinault enrollment and allotment and to prepare a list of "unattached Indians of northwest Washington and the Puget Sound area."[128] The Roblin Roll designated the tribal affiliation of those "unattached" Indians, by which it meant landless Indians unattached to a reservation.[129] The 1919 Roblin Roll recorded that Cowlitz members lived in the towns of Ridgefield, Battle Ground and Vancouver, Washington, all within Clark County and that 51 Cowlitz members lived even further south in Oregon.[130] Ridgefield is one mile south, Battle Ground is seven miles southeast and Vancouver is twelve miles south of the Cowlitz Parcel.[131]

---

[123] GTR at 51; AR136542.
[124] GTR at 51-52; AR136542-43.
[125] GTR at 51; AR136542.
[126] GTR at 104; AR136595.
[127] *Id.*
[128] HTR at 117; AR136282.
[129] GTR at 68-69; AR136559-60.
[130] ATR at 150, 152; AR136480, -82.
[131] AR003330 (NIGC).

### vi.    Conclusion

Based on our review of the BAR and ICC proceedings, the Opponents' historical submissions and other material in the administrative record, including the Boyd Report, we conclude that the Tribe has significant historical connections with the Cowlitz Parcel. These sources provide historical evidence of occupancy and use by the Cowlitz of lands in the vicinity of the Cowlitz Parcel. We continue to rely on the ICC and BAR findings given the evidence gathering and deliberative nature of each proceeding and the expertise of the participants. We also find the Boyd Report to be scholarly, informative and reliable. We find the assertions and arguments made in the Opponents' historical submissions discussed above to be unpersuasive.

While the ICC found that the area of exclusive use and occupation included approximately 2,500 square miles primarily in Lewis and Cowlitz counties, this finding was for the purpose of establishing aboriginal lands. The ICC finding does not preclude a finding here that the Tribe occupied and used lands in the vicinity of the Cowlitz Parcel for subsistence and likely villages and/or camps and therefore, has significant historical connections to the Cowlitz Parcel. As noted above, this is consistent with the NIGC Indian Lands Opinion regarding the Karuk Tribe of California where the parcel at issue was in an area used by the historic Karuk but also by other local tribes.[132]

### 3.    Modern Connections

In order to establish a modern connection to the land, the tribe must demonstrate one or more of the following:

> (1)    The land is near where a significant number of tribal members reside; or
>
> (2)    The land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust; or
>
> (3)    The tribe can demonstrate other factors that establish the tribe's current connection to the land.[133]

The Cowlitz Tribe has satisfied the modern connection test by demonstrating that a significant number of tribal members reside near the Cowlitz Parcel. According to information supplied by the Tribe, as of March 2006, there are 104 tribal members living in Clark County, where the Cowlitz Parcel is located.[134] Cowlitz County, which sits directly to the north of Clark County, is home to 268 tribal members. The neighboring counties of Multnomah, Skamania, Columbia, and Washington are home

---

[132] Karuk Op. at 12.

[133] 25 C.F.R. § 292.6(d).

[134] Enrolled Cowlitz Members by County (March 2006), *enclosed in* The Cowlitz Indian Tribe: Application of 25 C.F.R. Part 292 to the Tribe's Fee-to-Trust Application and Reservation Proclamation Request (Jan. 12, 2008).

to an additional 171 tribal members. A larger number of Tribal members have moved to the urban centers of Olympia, Tacoma, and Seattle in order to take advantage of greater economic opportunities.[135] This type of dispersion is common among tribes without a designated land base and does not weigh against finding that the Tribal population near the Cowlitz Parcel is significant. In fact, the preamble to the Part 292 rulemaking acknowledges that modern tribal populations are subject to wide dispersion.[136] Given the factual circumstances here, we conclude that a significant number of Cowlitz Tribal members reside near the Cowlitz Parcel.

Moreover, the Cowlitz Tribe also satisfies the modern connections requirement under the alternative criterion in paragraph (d)(2). Since 1990, the Tribe has maintained its governmental headquarters office in Longview, Washington, approximately 22 miles from the Cowlitz Parcel. Because the Tribe filed its initial fee-to-trust application for the Cowlitz Parcel in 2002, the Cowlitz Parcel is "within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust" in satisfaction of 25 C.F.R. § 292.6(d)(2).

## Conclusion

Based on our review of documents submitted to the Department that raised concerns regarding the NIGC Restored Lands Opinion, this Office revises its December 14, 2010, opinion. However, as before, the Department concludes that the Cowlitz Parcel, once accepted into trust, would qualify as the Tribe's initial reservation under 25 U.S.C. § 2719(b)(1)(B)(ii).

The key question is whether the historic Cowlitz Indians had significant historical connections with the Cowlitz Parcel. The Department answers this in the affirmative. First, the ICC concluded that the Cowlitz had exclusive use and occupancy of a large area that includes land a mere fourteen miles to the north of the Cowlitz Parcel. Second, the historic record – particularly as found by the ICC and the BAR – demonstrates many connections between the Cowlitz Tribe and the Cowlitz Parcel. These connections primarily involve subsistence use (and concomitant trade) throughout a large area along the Columbia River, including lands in the vicinity of the Cowlitz Parcel.

---

[135] AR102556.
[136] 73 Fed. Reg. 29354, 29360 (May 20, 2008).