# Exhibit A



# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

IN REPLY REFER TO:

MAY 1 7 2012

**MEMORANDUM**

TO:        Del Laverdure, Acting Assistant Secretary – Indian Affairs

FROM:    Patrice Kunesh, Deputy Solicitor – Indian Affairs *Patrice H Kunesh*
             Michael Berrigan, Associate Solicitor, Division of Indian Affairs *Michael Berrigan*
             Jeffrey Nelson, Assistant Solicitor, Branch of General Indian Legal Activities
             Kaitlyn Chinn, Attorney-Advisor

RE:        Scotts Valley Band of Pomo Indians – Indian Lands Opinion

## Introduction

The Scotts Valley Band of Pomo Indians (Scotts Valley Band or Band) filed an application for the Department of the Interior (Department) to acquire six parcels of land (Richmond Parcels or Parcels) in trust for gaming purposes.  In connection with that application, the Department must first determine whether the Parcels, if taken into trust, would qualify as "restored land" under the Indian Gaming Regulatory Act (IGRA)[1] and the regulations set forth in 25 C.F.R. Part 292.  As discussed further below, our legal opinion is that the Parcels cannot be taken into trust as restored lands because the Band has not demonstrated a significant historical connection to the Parcels.

## Background

The Richmond Parcels consist of approximately 29.87 acres in the unincorporated area of Contra Costa County, California, adjacent to the City of Richmond.  They include six contiguous parcels located at 81 Parr Boulevard, 155 Parr Boulevard, 177 Parr Boulevard, and 2701 Goodrick Avenue.  The Parcels are on the southern side of San Pablo Bay, in the San Francisco Bay area.  They are approximately 78 miles south of the Band's current tribal headquarters and former Scotts Valley Rancheria, both located in the Clear Lake area in Lake County, California.  See map, below.

---

[1] 25 U.S.C. § 2719(b)(1)(B)(iii).

1



Figure 1: Richmond Parcels and Scotts Valley Tribal Headquarters and Former Rancheria

On January 22, 2005, the Band filed its fee-to-trust application for the Richmond Parcels. Several months later, on November 9, 2005, the Band requested an Indian Lands Determination, seeking the Department's determination that the Richmond Parcels are eligible for gaming pursuant to IGRA's restored lands exception.[2] Thereafter, the Band and the County of Contra Costa (County) submitted extensive information to the Department arguing, respectively, for and against a restored lands determination and refuting the other's claims.[3] The Department has carefully reviewed and considered these submissions, as well as other materials now within the administrative record.

---

[2] Request for Indian Lands Determination from the Scotts Valley Band of Pomo Indians to the Bureau of Indian Affairs, U.S. Dep't of Interior (Nov. 9, 2005) [hereinafter Band's Nov. 9, 2005 Request for Indian Lands Determination].

[3] *See* Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to Kenneth Salazar, Sec'y, U.S. Dep't of Interior (Oct. 18, 2011) [hereinafter Band's Oct. 18, 2011, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to Pilar Thomas, Deputy Solicitor of the Division of Indian Affairs, U.S. Dep't of Interior (Oct. 18, 2010) [hereinafter Band's Oct. 18, 2010, letter]; Letter from Paul Filzer, Attorney, Scotts Valley Band of Pomo Indians, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (May 18, 2009) [hereinafter Band's May 18, 2009, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (Oct. 21, 2008) [hereinafter Band's Oct. 21, 2008, letter]; Letter from Federal Glover, Chair of the Board of Supervisors, Contra Costa County, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (Sept. 30, 2008) [hereinafter County's Sept. 30, 2008, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (Sept. 2, 2008) [hereinafter Band's Sept. 2, 2008 letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (Aug. 25, 2008) [hereinafter Band's Aug. 25, 2008, letter]; Letter from Federal Glover, Chair of the Board of Supervisors, Contra Costa County, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (July 23, 2008) [hereinafter County's July 23, 2008, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (June 10, 2008) [hereinafter Band's June 10, 2008, letter]; Letter from Paul Filzer, Attorney, Scotts Valley Band of Pomo Indians, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, Jane Smith, Attorney-Advisor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (May 16, 2008) [hereinafter Band's May 16, 2008, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to Carl Artman, Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (April 30, 2008) [hereinafter Band's April 30, 2008, letter]; Letter from Cathy Christian, Attorney, Contra Costa County, to George Skibine, Dir. of the Office of Indian Gaming Mgmt., U.S. Dep't of Interior (April 22, 2008) [hereinafter County's April 22, 2008, letter]; Second Supplement to the Request for Indian Lands Determination from the Scotts Valley Band of Pomo Indians to the Bureau of Indian Affairs, U.S. Dep't of Interior (Oct. 10, 2007) [hereinafter Band's Oct. 10, 2007, Second Supplement to Request for Indian Lands Determination]; Supplement to the Request for Indian Lands Determination from the Scotts Valley Band of Pomo Indians to the Bureau of Indian Affairs, U.S. Dep't of Interior (Mar. 31, 2007) [hereinafter Band's March 31, 2007, Supplement to Request for Indian Lands Determination]; Letter from John Gioia, Board of Supervisors Chair, to Carl Artman, Assoc. Solicitor, U.S. Dep't of the Interior, and Scott Keep, Assistant Solicitor, U.S. Dep't of Interior (Dec. 11, 2006) [hereinafter County's Dec. 11, 2006, letter]. These are the major submissions of the Band and the County; not a complete list of the materials submitted and considered.

Pursuant to section 2719 of IGRA, "land acquired by the Secretary in trust for the benefit of an Indian tribe after the [October 17, 1988] date of enactment of [IGRA]," commonly referred to as "newly acquired land," is eligible for gaming only if the land meets one of the statutory exemptions or exceptions.[4]   The "restored lands exception" dictates that IGRA's general prohibition against gaming on newly acquired land does not apply to land taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition."[5]   The regulations set forth in Part 292, effective on August 25, 2008, implement section 2719 of IGRA, including the restored lands exception.[6]   Part 292 requires two inquiries for determining whether newly acquired land qualifies as restored land: (1) whether the tribe is a "restored tribe"[7] and (2) whether the newly acquired land meets the "restored land" criteria set forth in section 292.11.[8]

**Analysis**

I.      **The Band qualifies as a "restored tribe."**

A tribe must first demonstrate that it is a "restored tribe" in order for its newly acquired land to qualify as restored land eligible for gaming purposes.  Part 292 dictates that a tribe qualifies as restored if the following conditions are met:

> (a) The tribe at one time was federally recognized, as evidenced by its meeting the criteria in § 292.8;
>
> (b) The tribe at some later time lost its government-to-government relationship by one of the means specified in § 292.9;
>
> (c) At a time after the tribe lost its government-to-government relationship, the tribe was restored to Federal recognition by one of the means specified in § 292.10 . . . ."[9]

In a memorandum dated November 18, 2008, the Solicitor's Office determined that the Band "satisfied the requirements of 25 C.F.R. § 292.7(a)–(c) and thus qualifies as a 'restored tribe' for purposes of [the restored lands exception]."[10]   That memorandum, hereby incorporated by

---

[4] 25 U.S.C. § 2719(a).  Department regulations define "newly acquired land" as "land that has been taken, or will be taken, in trust for the benefit of an Indian tribe by the United States after October 17, 1988." 25 C.F.R. § 292.2.

[5] 25 U.S.C. § 2719(b)(1)(B)(iii).

[6] 73 Fed. Reg. 35,579 (June 24, 2008) (amending the effective date); 73 Fed. Reg. 29,354 (May 20, 2008) (publishing the final rule).

[7] 25 C.F.R. § 292.7(a)–(c).

[8] *Id.* § 292.7(d).

[9] *Id.* § 292.7(a)–(c).

[10] Memorandum from Edith Blackwell, Assoc. Solicitor, U.S. Dep't of the Interior, to George Skibine, Acting Dep. Asst. Sec'y for Policy and Econ. Dev. 4 (Nov. 18, 2008).

reference, found that the Band was restored to federal recognition pursuant to a Stipulation for Entry of Judgment in *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria v. United States*, No. C-86-3660 WWS (N.D. Cal. Mar. 15, 1991).[11] The Department published the notice of the Band's federal recognition status in the Federal Register on February 12, 1992.[12]

## II.   The Band has not demonstrated that the Richmond Parcels, if taken into trust, would qualify as "restored land."

According to Part 292, "[i]f [a] tribe was restored by a Federal court determination in which the United States is a party or by a court-approved settlement agreement entered into by the United States," the tribe must establish connections to the land by meeting the requirements set forth in section 292.12 in order for its newly acquired land to qualify as restored.[13] As the Band was restored to federal recognition in the *Scotts Valley* litigation, it must establish that the Richmond Parcels qualify as restored land pursuant to the requirements set forth in section 292.12.[14]

Section 292.12 requires a tribe to demonstrate three independent connections to its newly acquired land: (1) a "modern connection" to the land; (2) a "significant historical connection" to the land; and (3) a "temporal connection" between the date of the acquisition of the land and the date of the tribe's restoration.[15]

---

[11] *Id.*

[12] 57 Fed. Reg. 5,214 (Feb. 12, 1992).

[13] 25 C.F.R. § 292.11(c).

[14] The County argues that the Stipulated Judgment limits the federal government's ability to take land into trust for the Band—only allowing land within the boundaries of the former Scotts Valley Rancheria and land outside the boundaries that meet specific qualifications. County's July 23, 2008, letter at 23. According to the County, in agreeing to the Stipulated Judgment, the Band recognized that its rights to acquire trust land were limited and, therefore, the Band does not have significant modern or temporal connections to the Richmond Parcels, as they are not included in the land set out in the Stipulated Judgment. *Id.* The Band asserts that this argument contradicts precedent. Band's Sept. 2, 2008 letter at 11. Although the Stipulated Judgment dictates that the government "agree[s] to accept in trust status any land within the boundaries of the former" Scotts Valley Rancheria and certain other land previously held in trust that meets certain requirements, Stipulation for Entry of Judgment at 5–11, *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria v. United States*, No. C-86-3660 WWS (N.D. Cal. Mar. 15, 1991), it does not limit the Band's restored land to those parcels.

[15] 25 C.F.R. § 292.12(a)–(c). These criteria incorporate concepts from judicial opinions authored prior to the promulgation of Part 292, which instructed that "land that could be considered [restored] might appropriately be limited by the factual circumstances of the acquisition, the location of the acquisition, or the temporal relationship of the acquisition to the restoration." *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp. 2d 155, 164 (D.D.C. 2000) (quoting *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Attorney for the W. Dist. of Mich.*, 198 F. Supp. 2d 920, 935 (W.D. Mich. 2002)).

### A. The evidence does not demonstrate that the Band has a "significant historical connection" to the Richmond Parcels.

One of the three connections a tribe is required to demonstrate under section 292.12 is a "significant historical connection to the land."[16] Part 292 defines "significant historical connection" to mean either: (1) "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty" or (2) the tribe has "demonstrate[d] by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."[17] This definition provides two methods by which a tribe may establish a significant historical connection to newly acquired land—either by the last reservation method or by the use or occupancy method.

#### 1. The Richmond Parcels are not located within the boundaries of the Band's last reservation under a ratified or unratified treaty.

The first method for establishing a significant historical connection to newly acquired land is to show that such land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty.[18] The Richmond Parcels are not located within the Band's last reservation under a ratified or unratified treaty; nor does the Band assert that they are. Therefore, the Band cannot use this particular method to establish a significant historical connection to the Richmond Parcels.

#### 2. The Band did not provide adequate historical documentation demonstrating the existence of its villages, burial grounds, occupancy, or subsistence use in the vicinity of the Richmond Parcels.

Another way that a tribe can establish a significant historical connection to newly acquired land is to "demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."[19] In support of its request for "restored lands" status, the Band presented five general categories of claimed historical connections:

    (1) Possible Ca-la-na-po use and occupancy of lands south of San Pablo Bay;
    (2) Suisin Patwin use and occupancy of lands south of San Pablo Bay;
    (3) Ca-la-na-po use and occupancy of lands immediately north of San Pablo Bay;
    (4) Suisin Patwin use and occupancy of lands immediately north of San Pablo Bay; and

---

[16] 25 C.F.R. § 292.12(b).

[17] *Id.* § 292.2.

[18] *Id.*

[19] *Id.*

(5) Relocation of citizens of the Scotts Valley Band to the San Francisco Bay area from the 1920s through the 1960s as a result of federal policies.

Each of these historic connection categories are analyzed below.  After a thorough review and analysis of the record, we conclude that each of the Band's claimed historical connection categories fails to demonstrate the "existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the [Richmond Parcels]."  Therefore, the Scotts Valley Band has not demonstrated a significant historical connection to the land sufficient to qualify for the restored lands exception under 25 C.F.R. Part 292.

### a. The Band has not established that the Ca-la-na-po were located at the San Pablo Rancho, which included the Richmond Parcels.

The Scotts Valley Band's first proffered significant historical connection to the Richmond Parcels is based on its claim that its Ca-la-na-po ancestors used and occupied lands south of San Pablo Bay, including the Parcels themselves.  Specifically, the Band claims that its Ca-la-na-po ancestors were among the Indians in the Clear Lake area who were captured, transported to, and then enslaved on, San Pablo Rancho in the mid 1800s, which included the Richmond Parcels.[20] For purposes of Part 292, an applicant tribe's historical references must be specific to the applicant tribe.  Here, the Band has not satisfied its burden to demonstrate that the references in the historic documentation to the Indians at San Pablo Rancho are references to the history of this particular Band.

Part 292 requires a tribe to establish a significant historical connection to newly acquired land based on evidence of "the tribe's" historic use and occupancy.[21]  Whether demonstrating restored tribe status or a significant historical connection, a tribe must use history that is its own.[22]  The

---

[20] *See, e.g.,* Band's Oct. 18, 2011, letter at 41; Band's May 18, 2009, letter at 1; Band's Oct. 21, 2008, letter at 3–5; Band's May 16, 2008, letter at 3; Band's Oct. 10, 2007, Second Supplement to Request for Indian Lands Determination at 10.  It should be noted that prior to its October 2011 submission, the Band claimed that San Pablo Rancho was located in what is today the City of Richmond, contiguous to the Richmond Parcels.  Band's Oct. 18, 2010, letter at 10.

[21] 25 C.F.R. § 292.2.

[22] *See, e.g.,* Letter from Larry Echo Hawk, Assistant Sec'y – Indian Affairs, to Merlene Sanchez, Chairperson, Guidiville Band of Pomo Indians 19 (Sept. 1, 2011) [hereinafter Guidiville Lands Determination] In the Guidiville Lands Determination, the Department considered whether the Guidiville Band established a significant historical connection to land located in the Richmond area through its ancestor language group, the Pomo, who had various connections to land in the San Francisco Bay area, concentrated most heavily north of San Pablo Bay. *Id.*  The Department determined that, since "the majority of the Band's evidence document[ed] connections of Pomo Indians or indigenous populations, generally, to lands north of San Pablo Bay," "the [Guidiville] Band ha[d] [not] provided documentation sufficient to demonstrate that its ancestors, as opposed to other Pomo Indians or Indian peoples in the area, engaged in subsistence use or occupancy upon or in the vicinity of the [newly acquired land]." *Id.* "[W]ithout more," the Department explained, "such vague and speculative evidence [could not] support the arguments and claims advanced in the Band's voluminous submissions." *Id.*

tribe's history of use and occupancy inherently includes the use and occupancy of its tribal predecessors, even if those tribes had different political structures and were known under different names.[23] Due to the reality that tribal names and political structures change over time, an applicant tribe is not limited to the historical sources that bear its current name. However, the applicant tribe must demonstrate, for example through a line of political succession or significant genealogical descent, that a particular historical reference is part of the applicant tribe's history. Once that is established, a tribe may rely on the historic use and occupancy of a predecessor tribe from which it succeeds to establish a significant historical connection to newly acquired land.[24]

The Band offers evidence that it is a political successor to the Ca-la-na-po Indians and relies on the Ca-la-na-po's history for the purposes of establishing a significant historical connection to the Richmond Parcels. According to the Band, Shuk Augustine was a Ca-la-na-po Chief when the Ca-la-na-po signed an unratified 1851 Treaty, which would have ceded land from eight signatory tribes to the federal government.[25] The Band claims a direct political descent from the Ca-la-na-po Tribe—through an "unbroken connection between the Ca-la-na-po Tribe, led by Shuk Augustine, through the Yimba, led by Joe Augustine, through the present day federally-recognized Tribe."[26] According to the Band, leadership of Chief Shuk Augustine's Ca-la-na-po Band was passed from him to his brother Peter Augustine, and to Peter's son Joe Augustine, who called the Band the Yimba. When the United States purchased the Scotts Valley Rancheria for

---

[23] *See* 73 Fed. Reg. 29,345, 29,362 (May 20, 2008). The regulations in section 292.8 do not include specific language requiring a tribe to prove that it is the political and genealogical successor of a tribe that was previously federally recognized, because as the Department explained, these concerns are "addressed and inherent in the restored lands analysis under §§ 292.9-12 [sic—should be 292.7-12]". *Id.* The Band interprets the Federal Register's language as not requiring proof of political succession or genealogical descent from a tribe with historical connections to newly acquired land. Band's Aug. 25, 2008, letter at 2. Such specific language, however, was not included because the requirement is inherently understood, not because the Department was adopting a less stringent standard.

[24] In other Indian lands opinion, the Department and NIGC have permitted tribes to rely on historic use and occupancy of tribes from which they politically succeed in establishing a significant historical connection to newly acquired land. *See, e.g.,* Memorandum from John Hay, Staff Attorney, Nat'l Indian Gaming Comm'n, to Philip Hogen, Chairman, Nat'l Indian Gaming Comm'n 10–11 (Oct. 18, 2007) [hereinafter Mooretown Indian Lands Determination] (permitting the Tribe to rely on the historic use and occupancy of the tribe for which the Rancheria was set aside); Memorandum from Penny Coleman, Acting General Counsel, Nat'l Indian Gaming Comm'n, to Chairman, Nat'l Indian Gaming Comm'n 10–11 (Mar. 14, 2003) [hereinafter Mechoopda Indian Lands Determination] (permitting the Tribe to rely on the historic use and occupancy of a predecessor tribe of whom the Tribe was the sole surviving group in establishing a significant historical connection to newly acquired land). Similarly, a tribe may claim treaty rights of a predecessor tribe by demonstrating that it is the modern political successor of such a tribe. *See, e.g., United States v. Washington,* 520 F.2d 676, 693 (9th Cir. 1975), *cert. denied,* 423 U.S. 1086 (1976); *United States v. Michigan,* 471 F. Supp. 192, 218, 249 (W.D. Mich. 1979) (acknowledging that the plaintiff Tribes were the successors in interest to the Indians who were party to the Treaty of 1836 and, thereby, retained the fishing rights protected in that treaty).

[25] The 1851 Treaty is also referred to as the Ca-la-na-po Treaty and the Camp Lu-Pi-Yu-Ma Treaty.

[26] Band's Oct. 21, 2008, letter at 5.

the Band, Joe Augustine ensured that the Band received its own land so that it could continue its existence as a unified political entity.[27]  The Band claims that, according to lineal descent traced in 2007, 92% of its citizens are direct lineal descendants of Chief Shuk Augustine.

The Band has provided evidence of political and genealogical descent from the Ca-la-na-po. This evidence, however, has not sufficiently established that the Indians who were forced into labor on San Pablo Rancho, south of San Pablo Bay, were Ca-la-na-po.  The Scotts Valley Band relies primarily on an 1853 report from the office of Edward F. Beale, Superintendent of Indian Affairs for the State of California.[28]  This report included information relayed from Indian Agent Jenkins regarding his investigation of San Pablo Rancho in Contra Costa County.  Agent Jenkins had reported that Indians were brought into Contra Costa County from "some place near Clear Lake."[29]  The District Attorney of Contra Costa County also had reported that various individuals from Napa County were "in the habit of kidnapping Indians in the mountains near Clear Lake."[30]  He said that 136 such Indians had been captured and brought into Contra Costa County to serve as slaves, and that they were in the possession of the Napa County individuals who captured them and "sundry other persons who ha[d] purchased them in [Contra Costa] county."[31]

Agent Jenkins further relayed that he was asked to return Indian children, who had been captured and taken as slaves, to the Yo-Kei Tribe.[32]  According to the Band, the term "Yo Kei" referred to the Big Valley,[33] and when used by Superintendant Beale, "Yo-Kei Tribe" specifically referred to the Indians in the Big Valley.[34]  At the time of Superintendant Beale's report, the Ca-la-na-po were living in the Big Valley area of Clear Lake.[35]  The Band thus extrapolates from

---

[27] *See e.g.,* Band's Aug. 25, 2008, letter at 5–6 (explaining that Joe Augustine requested that the federal government acquire the Scotts Valley Rancheria for the Band).  A letter from the Scotts Valley Indians to the Commissioner of Indian Affairs requesting land is attached as Exhibit 9 of the Band's August 2008 submission.

[28] Band's Oct. 18, 2011, letter at 41–42 (citing EDWARD F. BEALE, SUPERINTENDENT OF INDIAN AFFAIRS IN CALIFORNIA, S. DOC. NO. 32-57 (1853) [hereinafter 1853 Beale Report]).

[29] *Id.* at 41(citing 1853 Beale Report at 9).

[30] *Id.* (citing 1853 Beale Report at 10).

[31] *Id.*

[32] *Id.* at 41(citing 1853 Beale Report at 9–10).

[33] *Id.* (citing RUTH LEWIS ET. AL., STORIES AND LEGENDS OF LAKE COUNTY 3 (Press Democrat 1949) (1935) [hereinafter Lewis, Stories and Legends of Lake County]).

[34] *Id.* at 41–42.  The Band does not cite any sources for this assertion.

[35] *Id.* at 41–42 (citing Sally McLendon & Robert L. Oswalt, *Pomo: Introduction, in* SMITHSONIAN HANDBOOK vol. 8 286 fig.6 (ed. Robert F. Heizer 1978) [hereinafter McLendon & Oswalt, Smithsonian Handbook]).  It should be noted that the Band also claims its ancestors, under the leadership of Chief Shuk Augustine, were employed on the Vallejo Ranchos in the 1840s and signed the 1851 Treaty ceding land north of San Pablo Bay. *See infra* Part II.A.2.c.

Superintendant Beale's report and the correspondence contained therein that "[b]ecause at least some, and perhaps all, of the Indians at San Pablo Rancho were from Big Valley, and because the Ca-la-na-po was the Tribe located in, and controlling access to, the Big Valley, it would be unreasonable to conclude that there were <u>not</u> Ca-la-na-po Indians among those kidnapped and working at San Pablo Rancho."[36]

The Band's contention is based on a negative inference, rather than any positive evidence. It proffers that it would be unreasonable not to conclude that the Ca-la-na-po were among those individuals who were taken to the San Pablo Rancho. There is no actual evidence in the record to support such an assumption. The Department will not draw any firm conclusions from such inferences. Part 292 requires reliable historical documentation of use or occupancy; inferences are insufficient to establish a significant historical connection.[37] The Scotts Valley Band has not established with the necessary degree of certainty that the Ca-la-na-po were among the Indians taken to the San Pablo Rancho. First, several tribes were located in the Clear Lake area in 1853.[38] The Indians taken from Clear Lake could have come from any one or more of those tribes. Second, we cannot ascertain whether Indian Agent Jenkin's specific reference to the "Yo Kei" relates to the Ca-la-na-po. The only evidence cited by the Band for the term "Yo Kei" as being a reference to the Big Valley is a 1935 compilation of stories and legends, which explained that the Indian name for the largest valley in the Clear Lake area, Big Valley, was "Yo-Ka-Koi."[39] Additionally, the Band has not shown that the Ca-la-na-po alone inhabited the Big Valley. The Smithsonian Handbook relied upon by the Band indicates that there was at least one

---

[36] Band's Oct. 18, 2011, letter at 42; *see also* Band's Oct. 18, 2010, letter at 9 (stating that Indians kidnapped from Big Valley and enslaved on San Pablo Rancho were likely from Chief Shuk Augustine's Band and citing to the same 1853 Beale Report).

[37] For example, in the Guidiville Indian Lands Determination, the Guidiville Band similarly claimed that members of its ancestors' linguistic group, the Pomo, were taken from Ukaih, the location of the Band's Rancheria, and forcibly removed to San Pablo Rancho. Guidiville Indian Lands Determination at 17. The Department determined that the evidence was inconclusive as to whether the Guidiville Band's ancestors were among those Indians relocated to San Pablo Rancho, and without reliable historical documentation, the Band did not establish a significant historical connection to its newly acquired land. *Id.* The NIGC similarly determined in the 2004 Karuk Indian Lands Opinion that an ethnologist's statement that it was "likely" there existed tribal settlements in the area of the Tribe's newly acquired land was not sufficient evidence to establish a significant historical connection with the land. Letter from Penny Coleman, Acting General Counsel, Nat'l Indian Gaming Comm'n, to Bradley Bledsoe Downes, Attorney, Karuk Tribe of California 8 (Oct. 12, 2004) [hereinafter 2004 Karuk Indian Lands Opinion]. The Tribe later submitted more conclusive evidence of its significant historic connections to the vicinity of its newly acquired land, and obtained a different result. Memorandum from John Hay, Senior Attorney, Nat'l Indian Gaming Comm'n, to Tracie Stevens, Chairwoman, Karuk Tribe of California (April 3, 2012) [hereinafter 2012 Karuk Indian Lands Determination].

[38] *See* McLendon & Oswalt, Smithsonian Handbook at 283-288 (discussing Yima, She-Kom, Dah-no-habe, Xowalek, Ca-la-na-po (qu-la-na-po), and Xa-be-na-po, among others, surrounding Clear Lake.

[39] Lewis, Stories and Legends of Lake County at 3.

other tribe inhabiting the Big Valley at the time.[40]   This evidence does not provide reliable historical documentation establishing Ca-la-na-po presence at San Pablo Rancho.

The Band has not provided sufficient evidence that its Ca-la-na-po ancestors were among those forced into labor on San Pablo Rancho.  Therefore, the Band has not demonstrated a significant historical connection to the Richmond Parcels through its claim that the Ca-la-na-po used and occupied lands south of San Pablo Bay.

> **b.  The Band has not established that it is the successor of the Suisin Patwin Indians, and so may not rely on those connections south of San Pablo Bay.**

The Band next claims a significant historical connection to the Richmond Parcels through possible genealogical connections to the Suisin Patwin Indians.  According to the Band, the Suisin Patwin Indians made subsistence use and occupancy of lands south of San Pablo Bay, including Contra Costa County, in which the Richmond Parcels are located.[41]   The Band, however, fails to establish a significant historical connection to the Richmond Parcels based on this claimed connection because it has not sufficiently demonstrated that it is a successor of the Suisin Patwin Indians.

According to evidence submitted by the Band, Victoria Frese, daughter of Mary and Fernando Frese, married Chief Shuk Augustine's son, Robert, in the early 1880s.[42]   The Band contends that Mary and Fernando Frese were Suisin Patwin, but the evidence is not conclusive.[43]   The Band

---

[40] *See* McLendon & Oswalt, Smithsonian Handbook at 286 fig.6, 306.

[41] Band's Oct. 18, 2011, letter at 45.

[42] *See, e.g., id.* at 38.  The Band relies on 1900 and 1910 census reports for its assertion.

[43] *See, e.g., id.* at 8–9; Band's May 16, 2008, letter at 3.  *But see* Band's Oct. 18, 2011, letter at 43; Band's March 31, 2007, Supplement to Request for Indian Lands Determination at 2 (alleging that Mary and Fernando were most likely either Patwin or Wappo).  At best, the Band's evidence indicates that Mary and Fernando were probably Suisin Patwin.  According to a 1910 census, attached as Exhibit 18 to the Band's October 2011 submission, Mary was born in the early 1940s in Cameros Valley, near the City of Napa in southern Napa County, and Fernando was born near Sonoma City, Sonoma County.  Band's Oct. 18, 2011, letter at 43 (citing Thirteenth Census of the United States: 1910—Indian Population, at 23A-25B); Band's Sept. 2, 2008 letter at 9.  According to the Band, which cites the Vallejo Memoirs attached as Exhibit 12 to its October 2011 submission, the Vallejo Ranchos subsumed the area in the 1840s and the Suisin Patwin were the dominant Indians in the area at that time.  Band's Oct. 18, 2011, letter at 43 (citing DR. PLATON M. G. VALLEJO, MEMOIRS OF THE VALLEJOS 11–12, 13–15, 26–27, 29–30 (ed. James H. Wilkins 1915).  The Band further asserts, based on an 1880 census attached as Exhibit 19 to its October 2011 submission, that Mary and Fernando lived in a Suisin Patwin community in Long Valley after leaving the Bay area.  *Id.* at 43 (citing Tenth Census of the United States: 1880—Indian Population, Household of Indian Fernand).  The County disputes this evidence and the Band's conclusion that Mary and Fernando were Suisin Patwin.  County's July 23, 2008, letter at 18 (claiming Fernando was not Indian at all and that Mary was Pomo); *id.* (stating there is no evidence for Mary and Fernando's birthplace); *id.* (stating there is evidence that Victoria was Mexican and Yacqui Indian); *id.* at 21

states that when the Scotts Valley Rancheria was established, 94% of its citizens were members of the extended Frese-Augustine family, and that as of 2007, 92% of its citizens were Mary and Fernando's direct lineal descendants.

While it may be true that many of the Band's current citizens descend from the union between Victoria and Robert, and therefore from Mary and Fernando Frese, the record is not conclusive that Mary and Fernando Frese were Suisin Patwin Indians.  Moreover, even if they were Suisin Patwin Indians, there is no evidence in the record to suggest that the marriage of Victoria Frese into the Ca-la-na-po Band created any political union between the Ca-la-na-po and the Suisin Patwin, or that the two tribes combined.  Under these circumstances, such possible genealogical descent alone is not sufficient to demonstrate succession from the Suisin Patwin.

Some Indian lands opinions issued prior to promulgation of the Part 292 regulations allowed tribes to demonstrate significant historical connections to newly acquired land through the documented history of a former tribe from which the applicant tribe can show significant *genealogical* descent, without discussion of political succession.[44]  These opinions are distinguishable, not only because they preceded the promulgation of the statute's implementing regulations, but also because they do not identify any countervailing evidence of political succession from a different tribe.  According to the record, when the Scotts Valley Rancheria was established in 1911, the Band existed as a strong political entity led by the Augustine family, both politically and genealogically descended from the Ca-la-na-po.[45]  Although the Band itself

---

(indicating that Victoria claimed she was born at sea). *But see* Band's Sept. 2, 2008 letter at 9, 10 (pointing out that a 1910 census shows Victoria as Clear Lake and born on San Francisco Bay).  The County also points to early 1900 census information in which Band citizens stated that they were Pomo or from Clear Lake, claiming this as proof that the Band and its ancestors were not Suisin Patwin.  County's July 23, 2008, letter at 19 (asserting that census information identifies members as Clear Lake or Pomo); *see also id.* (stating that Band citizens' affidavits gathered in 1910 and 1928 claimed that they and their grandparents lived in the Clear Lake area).

[44] *See, e.g.,* Memorandum from Kaush Arha, Assoc. Solicitor – Indian Affairs, U.S. Dep't of Interior, to Carl Artman, Chairman, Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior 7–8 (July 13, 2007) [hereinafter Tolowa Indian Lands Determination] (permitting the Tribe to rely on the historic use and occupancy of a preexisting tribe from which 86 of the Tribe's 98 citizens traced their ancestry); Memorandum from Penny Coleman, Acting General Counsel, Nat'l Indian Gaming Comm'n, to Montie Deer, Chairman, Nat'l Indian Gaming Comm'n 12–13 (Aug. 5, 2002) [hereinafter Bear River Indian Lands Determination] (permitting the Tribe to rely on the historic use and occupancy of a tribe from which some of its ancestors genealogically descend to establish a significant historical connection to newly acquired land).  The D.C. Circuit affirmed this practice when it acknowledged that restored land can include land occupied by a tribe's ancestors. *City of Roseville v. Norton*, 348 F.3d 1020, 1027 (D.C. Cir. 2003).  In that case, the court reasoned that, if the Tribe were required to prove a historical connection to its newly acquired land, it could rely on the historic use and occupancy of ancestors of "the surviving families" of two tribes that were placed on the Rancheria. *Id.* at 1022, 1027.

[45] *See, e.g.,* Band's Oct. 18, 2011, letter at 36; Band's Oct. 18, 2010, letter at 6 (recognizing the Scotts Valley Rancheria was purchased for a distinct group of Indians rather than a disparate group of people, which is often the case for California Rancherias).  The Band in its most recent submission even called

recognizes the importance of evidence related to political succession in this case,[46] it has not demonstrated that Victoria's marriage into the already existing Ca-la-na-po Band created a political tie to the Suisin Patwin or combined the two tribes.[47]

Accordingly, the Band has not established a sufficient nexus between itself and the Suisin Patwin Indians, and it may not use the Suisin Patwin's history of subsistence use and occupancy to establish a significant historical connection to the Richmond Parcels for purposes of Part 292.

---

Joe Augustine's early 1900s Band the "Ca-la-na-po." Band's Oct. 18, 2011, letter at 38; *see also* Band's June 10, 2008, letter at 2 (explaining that the Scotts Valley Rancheria was purchased for the Augustine Band of the Ca-la-na-po, and was distinguishable from other Rancherias that effectively created a new tribe); Band's Oct. 10, 2007, Second Supplement to Request for Indian Lands Determination at 4 ("The Scotts Valley Rancheria was established solely and exclusively for the remnant Augustine Band of the Ca-la-na-po Tribe."). Further, in claiming that it qualifies as a restored tribe, the Band points to the Ca-la-na-po's government-to-government relationship with the federal government established in the 1851 Treaty as evidence that it was at one time federally recognized. Band's Oct. 18, 2011, letter at 13–14.

[46] *See, e.g.,* Band's Sept. 2, 2008 letter at 8 (claiming that successorship involves both genealogical and political succession and that "political successorship is demonstrated by remarkably consistent succession of leadership"). In its October 2010 submission, the Band argued for the first time that it succeeded from the Suisin Patwin and, in doing so, no longer stated political succession was necessary. Band's Oct. 18, 2010, letter at 7.

[47] In one submission, the Band asserted that Victoria became the matriarch of the Band. Band's Oct. 10, 2007, Second Supplement to Request for Indian Lands Determination at 33. The Band did not, however, support this assertion with any evidence that she led the Band in such a way as to succeed from the Suisin Patwin politically. The Band acknowledges that Victoria's parents, Mary and Fernando Frese, were not Suisin Patwin leaders and that, "[u]nlike chief Augustine, who was a significant historic figure . . ., Mary and Fernando Frese were simple Indians." Band's Oct. 18, 2011, letter at 43. [48] *See, e.g.,* Band's Oct. 18, 2011, letter at 33, 38; Band's Oct. 18, 2010, letter at 8; Band's Sept. 2, 2008 letter at 2. It should be noted that in other submissions the Band claims that its ancestors served as cattle drivers for Salvador Vallejo. *See, e.g.,* Band's May 16, 2008, letter at 3; Band's April 30, 2008, letter at 9, 10. The Band in past submissions has claimed that its Ca-la-na-po and Suisin Patwin ancestors participated in a "regional interface center" in which Wappo, Patwin, Coast Miwok, Costanoan, and Pomo interacted socially, culturally, and economically while working on the Ranchos. *See, e.g.,* Band's May 18, 2009, letter at 2 ("Prior to 1850 the Bay Area and the lands to the immediate north of the Bays were a 'regional Interface Center' in which Wappo, Patwin, Coast Miwok, Costanoan, and yes, Pomo, interacted socially, culturally and economically for their daily existence, and Chief Augustine and his Band of the historic Ca-la-na-po Tribe were part of this social, cultural and economic system."); Band's Sept. 2, 2008 letter at 4; Band's Aug. 25, 2008, letter at 11–12; Band's April 30, 2008, letter at 18. The County argued that this theory was unsubstantiated. County's July 23, 2008, letter at 6–8. The Department in the Guidiville Indians Lands Determination found the "regional interface center" theory to be unfounded and insufficient to establish a significant historical connection. Guidiville Indian Lands Determination at 15. The Band also previously presented evidence of Pomo baptisms during the 1820s and 1830s at Mission San Rafael located north of San Pablo Bay. Band's April 30, 2008, letter at 10. The Guidiville Determination similarly found such evidence insufficient, as it pertained only to Pomo-language speakers generally and was located north of the Bay. Guidiville Indian Lands Determination at 16–17.

c. **The Ca-la-na-po's use and occupancy of Vallejo Rancho lands north of San Pablo Bay was not in the vicinity of the Richmond Parcels.**

The Band also claims a significant historical connection to the Richmond Parcels based on the Ca-la-na-po's use and occupancy of land north of the San Pablo Bay. The Band has submitted evidence it claims demonstrates that the Ca-la-na-po were integral to the operation of two ranchos, the Vallejo Ranchos, owned by Mariano Vallejo in the 1840s.[48] The Band fails to establish a significant historical connection to the Richmond Parcels based on this claimed connection because these activities were not within the vicinity of the Richmond Parcels.

It is first important to understand that subsistence use and occupancy requires something more than a transient or occasional presence in an area. Activities that would tend to show a tribe was using land for subsistence purposes might include sowing, tending, harvesting, gathering, fishing and hunting. "Occupancy" can be demonstrated by a consistent presence, supported by the existence of dwellings, villages or burial grounds, as alluded to in the regulations.[49]

According to the Band, in 1841, a detachment of Mexican soldiers traveled to Clear Lake and brought Chief Shuk Augustine and his followers to the Vallejo Ranchos, located north of San Pablo Bay. The principal industry of the Vallejo Ranchos was the export of hides and tallow. Chief Shuk Augustine served as the lead vaquero, or cattle driver, for the Vallejo Ranchos, and he regularly drove cattle between Clear Lake and the Vallejo Ranchos. He also led a band of the Ca-la-na-po from the Clear Lake area to the Vallejo Ranchos to assist with planting and

---

[48] *See, e.g.,* Band's Oct. 18, 2011, letter at 33, 38; Band's Oct. 18, 2010, letter at 8; Band's Sept. 2, 2008 letter at 2. It should be noted that in other submissions the Band claims that its ancestors served as cattle drivers for Salvador Vallejo. *See, e.g.,* Band's May 16, 2008, letter at 3; Band's April 30, 2008, letter at 9, 10. The Band in past submissions has claimed that its Ca-la-na-po and Suisin Patwin ancestors participated in a "regional interface center" in which Wappo, Patwin, Coast Miwok, Costanoan, and Pomo interacted socially, culturally, and economically while working on the Ranchos. *See, e.g.,* Band's May 18, 2009, letter at 2 ("Prior to 1850 the Bay Area and the lands to the immediate north of the Bays were a 'regional Interface Center' in which Wappo, Patwin, Coast Miwok, Costanoan, and yes, Pomo, interacted socially, culturally and economically for their daily existence, and Chief Augustine and his Band of the historic Ca-la-na-po Tribe were part of this social, cultural and economic system."); Band's Sept. 2, 2008 letter at 4; Band's Aug. 25, 2008, letter at 11–12; Band's April 30, 2008, letter at 18. The County argued that this theory was unsubstantiated. County's July 23, 2008, letter at 6–8. The Department in the Guidiville Indians Lands Determination found the "regional interface center" theory to be unfounded and insufficient to establish a significant historical connection. Guidiville Indian Lands Determination at 15. The Band also previously presented evidence of Pomo baptisms during the 1820s and 1830s at Mission San Rafael located north of San Pablo Bay. Band's April 30, 2008, letter at 10. The Guidiville Determination similarly found such evidence insufficient, as it pertained only to Pomo-language speakers generally and was located north of the Bay. Guidiville Indian Lands Determination at 16–17.

[49] *See* Guidiville Indian Lands Determination at 14.

harvesting.[50]  The Band claims that Chief Shuk Augustine and his band of Ca-la-na-po built
many of the adobe houses of old Sonoma while working on the Vallejo Ranchos.  By the 1880s,
the Ca-la-na-po had migrated from the Vallejo Ranchos back to the Clear Lake area.  According
to the Band, the Ca-la-na-po's work on the Vallejo Ranchos constituted significant use and
occupancy of the land.

The Band attempts to bolster its claim that its Ca-la-na-po ancestors used and occupied land
north of San Pablo Bay through the unratified 1851 Treaty.[51]  The eight signatory tribes to the
treaty would have ceded land to the federal government beginning in the Clear Lake area and
continuing south to the northern shores of San Pablo Bay.[52]  The Band asserts that Mariano
Vallejo and his brother directed the three Indian agents charged with negotiating treaties with the
California tribes to the Ca-la-na-po because "the Indians the Vallejos were most familiar with
were the Ca-la-na-po, having employed Chief Augustine and his Band of Ca-la-na-po as
vaqueros and laborers for more than a decade."[53]  According to the Band, the treaty signifies the
United States' recognition of the Ca-la-na-po as possessing aboriginal title to lands just north of
San Pablo Bay, where the Vallejo Ranchos were located.

The 1851 Treaty does not demonstrably add to the Band's claims of significant use and
occupancy of the vicinity.  First, eight tribes signed the treaty ceding territory to the federal
government.  The land that the Band's Ca-la-na-po ancestors' thus ceded could exist anywhere in
Royce Area 296, which extends south to the San Pablo Bay, but also extends north to the Clear
Lake area.[54]  Additionally, even if the Ca-la-na-po's ceded lands extended to the southern
boundary of Royce Area 296, there is no dispute that the Parcels lay outside of that ceded
territory, and the Band has not provided any evidence to indicate that the Band made use of any
lands beyond that southern boundary.

Even assuming Ca-la-na-po use and occupancy of land immediately north of San Pablo Bay,
such land is not within the vicinity of the Richmond Parcels.  The Band asserts that land within a

---

[50] In previous submissions, the Band claimed that evidence of a historic Indian trail between Clear Lake
and San Pablo Bay supported its assertion that the Augustine Band herded cattle between Clear Lake and
San Pablo Bay and provided seasonal farm labor on the Vallejo Ranchos.  Band's Sept. 2, 2008 letter at 5;
Band's April 30, 2008, letter at 9; Band's March 31, 2007, Supplement to Request for Indian Lands
Determination at 15.

[51] Treaty with Ca-la-na-po, etc. (Aug. 20, 1851), *in* 4 INDIAN AFFAIRS, LAWS AND TREATIES (Charles J.
Kappler ed. 1927) [hereinafter the 1851 Treaty].

[52] In the late 1800s, Charles Royce compiled 67 maps outlining Indians' land cessions to the United States
between the creation of the United States and 1894.  He depicted the land that would have been ceded
under the 1851 Treaty in California Map 2.  USGenWeb Archives, United States Digital Map Library,
Indian Land Cessions, California 2, Map 7, http://usgwarchives.net/maps/cessions/ilcmap7.htm (last
visited April 20, 2012).

[53] Band's Oct. 18, 2011, letter at 40.

[54] *See* note 52, *supra*.

25 mile radius from newly acquired land qualifies as within the vicinity of such land.[55]  It bases this position on the use of such a distance marker in other sections of Part 292.  We disagree with the Band's application of a 25 mile radius to define the term "vicinity."  Where the Department intended to use 25 miles as a relevant distance in the regulations, it did so explicitly.[56]  As to the term "vicinity," the Department chose no such bright line.

The Department used the word "vicinity" in the Part 292 regulations to permit a finding of restored land on parcels where a tribe lacks any direct evidence of actual use or ownership of the parcel itself, but where the particular location and circumstances of available direct evidence on other lands cause a natural inference that the tribe historically used or occupied the subject parcel as well.[57]  Part 292's inclusion of the word "vicinity" was not meant to expand IGRA's definition of "restored land," which always has been limited to lands that a tribe used or occupied.[58]  It was included because it would be unduly burdensome and unrealistic to require a tribe to produce direct evidence of actual use or occupancy on every parcel within a tribe's historic use and occupancy area.  A definition of "vicinity" based solely on proximity would expand "restored land" beyond land that was historically used or occupied by a tribe.  Instead, a determination of whether a particular site with direct evidence of historic use or occupancy is within the vicinity of newly acquired land depends on the nature of the tribe's historic use and

---

[55] *See, e.g.,* Band's Oct. 18, 2010, letter at 8; Band's Aug. 25, 2008, letter at 11.

[56] 25 C.F.R. § 292 (defining "appropriate state and local officials" to mean "the Governor of the State and local government officials within a 25-mile radius of the proposed gaming establishment"); *id.* (defining "nearby Indian tribe" to mean "an Indian tribe with tribal Indian locations located within a 25-mile radius of the location of the proposed gaming establishment, or, if the tribe has no trust lands, within a 25-mile radius of its government headquarters"); *id.* § 292.6(d)(2) (permitting a tribe that does not have a reservation to establish a modern connection to newly acquired land by demonstrating that "[t]he land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust" to meet the "initial reservation" exception); *id.* § 292.12(a)(3) (permitting a tribe to establish a modern connection to newly acquired land by demonstrating that "[t]he land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust" to meet the "restored lands" exception).

[57] During the promulgation of Part 292, the Department received a suggestion that it include a requirement that a tribe submit "evidence of an aboriginal or significant historical connection to the land, including cultural ties based upon actual inhabitance." 73 Fed. Reg. 29,354, 29,368 (May 20, 2008).  In response, the Department explained that such a requirement was inconsistent with IGRA. *Id.*

[58] *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney*, 198 F. Supp. 2d 920, 935 (W.D. Mich. 2002); *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp. 2d 155, 162 (D.D.C. 2000) ("Under a natural (and broad) reading of the provision, restored tribes which reacquired lands previously held by the tribe would qualify for the exemption.").  An exception to this general rule is in the context of some tribal specific restoration acts where Congress identifies certain lands that must be considered restored, irrespective of any prior use or occupancy.

occupancy, and whether those circumstances lead to the natural inference that the tribe also made use of the newly acquired land.[59]

Even assuming the Band's history is accurate as it relates to the Ca-la-na-po's use of the Rancho land north of San Pablo Bay, and that this use represents significant use and occupancy, there is no natural inference that the Band used and occupied lands south of San Pablo Bay.   Petaluma Rancho, granted to Mariano Vallejo in 1834, encompassed some 66,622 acres.  Its boundaries were the Petaluma Creek to the west, the Sonoma Creek to the east, and the Salt Marsh, near San

---

[59] This analysis is, necessarily, fact-intensive, and will vary based on the unique history and circumstances of any particular tribe.  Past Indian lands determinations by the Department and the NIGC are instructive.  A number of those decisions have found that a tribe established a significant historical connection to newly acquired land by providing evidence of historic use and occupancy of land other than the newly acquired land at issue, but implicating use of the newly acquired parcels.  In the NIGC's Bear River Indian Lands Determination, in addition to the Tribe's ancestors living in the area, the Tribe had provided evidence of numerous instances of historic use and occupancy  (e.g., historic villages, sacred sites, and the Tribe's rancheria) surrounding its newly acquired land.  Bear River Indian Lands Determination at 12 ("[W]ithin a one (1) mile radius of the parcel are: a mythic pond that is the setting of an old tribal story; two (2) aboriginal villages . . . that were major [tribal ancestor] settlements in 1850; and two major trails . . . that ran from the Eel River towards the North.  Within a three (3) mile radius of the parcel are: five (5) aboriginal villages . . . and a town founded in 1870 after European contact . . . . Between three (3) and four (4) miles from the parcel is Table Bluff, the site of a mythic flood in a [tribal ancestor] story telling of the re-population of the world.  Within a six (6) mile radius of the parcel are: the first [tribal ancestor] town established after European contact; eleven aboriginal villages . . . and the Rohnerville Rancheria.") (internal citations omitted).  The NIGC concluded that "[b]ecause the parcel is located in the middle of these many sites that were used by the [tribe's ancestors], we can assume that the parcel, too, was used by the [tribe's ancestors]." *Id.* at 13.  Similarly, in its Cowlitz Indian Lands Determination, the NIGC found that "while the documentation does not specifically identify the [newly acquired land] as a historically important parcel, this lack of a specific nexus is not determinative in light of the other factors weighing in favor of the Tribe's assertion that these lands are restored lands." Memorandum from Penny Coleman, Acting General Counsel, Nat'l Indian Gaming Comm'n, to Philip Hogen, Chairman, Nat'l Indian Gaming Comm'n 11 (Nov. 22, 2005) [hereinafter Cowlitz Indian Lands Determination].  The fact that the Cowlitz Tribe established that it used the surrounding area "for hunting, fishing, frequent trading expeditions, occasional warfare, and if not permanent settlement, then at least seasonal villages and temporary camps" was sufficient to create an inference that it had used and occupied its newly acquired land. *Id.* at 11.  Among evidence of other historical use and occupancy sites, the Tribe established that within three miles of the newly acquired land there existed the site of a historical Cowlitz tribal battle, a Cowlitz fur trading track, and a village or summer encampment. *Id.* at 11–12.  In its 2012 Karuk Indian Lands Determination, the NIGC similarly found that the Tribe's newly acquired land qualified as restored, despite lacking evidence of use and occupancy on the land, because the Tribe provided direct "evidence of historical connections between the Tribe and the vicinity of [its newly acquired land] sufficient to weigh in the Tribe's favor." 2012 Karuk Indian Lands Determination at 10.

Pablo Bay, to the south.[60] Suscol Rancho, granted to Mariano Vallejo in 1843, encompassed some 84,000 acres located east of Rancho Petaluma. Its southern and western boundaries were San Pablo Bay and its eastern boundary was present day Benecia.[61] Both Ranchos, which together constitute the Vallejo Ranchos, were located on the northern side of San Pablo Bay. The Band's Richmond Parcels are located on the southern side of San Pablo Bay. The Band has provided no evidence that its ancestors working at the cattle ranches on the north side of the Bay ever crossed the Bay.[62] Rather, the evidence in the record shows that the Ca-la-na-po frequently traveled north from the Ranchos, driving cattle and visiting their homeland near Clear Lake. Thus, no natural inference can be gleaned that the Ca-la-na-po ever visited the Richmond Parcels. Moreover, even if the Band's ancestors did occasionally visit the Richmond Parcels, this would not be enough to demonstrate subsistence use of the land in order to qualify as a *significant* historical connection.

Therefore, the Band has not established a significant historical connection to the Richmond Parcels by virtue of this claimed connection.

---

[60] *See* Band's Oct. 18, 2011, letter at 33–34 (citing Calisphere, Plat of the Petaluma Rancho, http://content.cdlib.org/ark:/13030/hb15800396/ (last visited May 3, 2012)). The map of Petaluma Rancho was created for the United States Northern District of California land case number 321 and is attached as Exhibit 9 to the Band's October 2011 submission.

[61] *See id.* at 34 (citing Vacaville Heritage Council, Map Number Seven: Napa County, http://www.solanohistory.net/maps/view/813 (last visited May 3, 2012)). The map of Suscol Rancho is reflective of the Historical Atlas Map of Solano County, California, and is attached as Exhibit 10 to the Band's October 2011 submission.

[62] The Band references the Ca-la-na-po's tule boats, which it claims were capable of navigating the Bay, and speculates that the Tribe may have used them to cross the Bay to fish, hunt, and gather. Band's Oct. 18, 2010, letter at 9; Band's Sept. 2, 2008 letter at 4. The Band produces no such evidence to that effect, however. The Band also claims that all participants in the "regional interface center," especially rancho workers, fished in the waters of San Pablo Bay. *See, e.g.,* Band's April 30, 2008, letter at 8, 15; Band's Oct. 10, 2007, Second Supplement to Request for Indian Lands Determination at 12. For this assertion, the Band's ethnologists rely on Silliman's book on the archaeology of Rancho Petaluma, which states that "fish occupied an important place in the menu for Native American people." HEATHER A. HOWARD & JAMES M. McCLURKEN, HISTORICAL BACKGROUND FOR RESPONSE TO SOLICITOR INQUIRY 10 (2007) [hereinafter Howard & McClurken, Second Supplement to Use and Occupancy Report] (citing STEPHEN W. SILLIMAN, LOST LABORERS IN COLONIAL CALIFORNIA: NATIVE AMERICANS AND THE ARCHAEOLOGY OF RANCHO PETALUMA 163–64 (2004)). The researchers also rely on the work of ethnologist Barret, who said that there was "no definite knowledge obtainable concerning fishing and other rights on the waters of San Francisco and San Pablo Bays, but from all that can be gathered it seems probable that these were neutral grounds and that the Indians in the region had equal rights in these waters off shore." *Id.* at 16 (citing S.A. Barrett, *The Ethno-Geography of the Pomo and Neighboring Indians, in* AMERICAN ARCHAEOLOGY AND ETHNOLOGY 7, 306–07 (Frederic Ward Putnam ed., 1908)). Such evidence is not tribe specific and, without more, does not demonstrate the Band's use or occupancy of land south of San Pablo Bay.

**d. The Band has not established a sufficient nexus with the Suisin Patwin's historical use and occupancy, and so may not rely on those connections north of San Pablo Bay.**

The Band also alleges a significant historical connection to the Richmond Parcels based on Suisin Patwin subsistence use of land north of San Pablo Bay. The Band claims that in the late 1830s, the Suisin Patwin, under the leadership of Chief Solano, provided the labor force for the Vallejo Ranchos. As previously discussed, the Band has not demonstrated that it may rely on historic use and occupancy of the Suisin Patwin in order to establish a significant historical connection. Therefore, the Band fails to establish a significant historical connection to the Richmond Parcels based on these claimed connections.

**e. The Band's citizens' relocation to the San Francisco Bay area between the 1920s and the 1960s does not constitute the Band's significant historical use or occupancy.**

The Band's last claimed significant historical connection to the Richmond Parcels is that, from the 1920s through the 1960s, the federal policies of relocation and termination resulted in the relocation of the Band to the San Francisco Bay area.[63]

The Scotts Valley Band claims that, due to unsuitable conditions at the Scotts Valley Rancheria, only three of the original 46 distributees under the Band's Distribution Plan owned and resided on land within the former Rancheria at the end of the termination era in 1972. Of those 46 distributees, 30 had relocated to the San Francisco Bay area. Some citizens' relocation was due to their involvement in the BIA's employment assistance program provided under the Rancheria Act, which allowed them to receive job training in the San Francisco Bay area. The Band further states that the California Rancheria Task Force assembled to study the termination of California tribes under the Rancheria Act in its 1972 report suggested relocating the Band.[64]

This category of claimed historical connection fails for several reasons. First, individual citizens' migration to the San Francisco Bay area does not constitute the Band's relocation or a significant activity of the Tribe itself. Additionally, the San Francisco Bay area is quite large,[65] and the Band has not established that the individuals' new homes were located on or within the vicinity of the Richmond Parcels. Finally, evidence of the Band's citizens' movements as late as

---

[63] Band's Oct. 18, 2011, letter at 45–46.

[64] The Band does not claim that the Task Force's suggestion was ever acted upon, which implies that the Band was not relocated away from the Clear Lake area.

[65] According to the Band, its references to the "San Francisco Bay area" encompass nine counties that border San Francisco Bay and San Pablo Bay. Band's Aug. 25, 2008, letter at 3 n.4.

the 1960s is more of a *modern* era activity, as opposed to *historic,* as those two terms are used in the Part 292 regulations.[66]

### B. The Department does not address whether the Band has established modern or temporal connections to the Richmond Parcels.

As previously stated, Section 292.12 requires a tribe to demonstrate three independent connections to its newly acquired land: (1) a "modern connection" to the land; (2) a "significant historical connection" to the land; and (3) a "temporal connection" between the date of the acquisition of the land and the date of the tribe's restoration.[67] As the Band has failed to establish a significant historical connection to the Richmond Parcels, the land does not qualify as restored land. Therefore, there is no present need to address whether the Band has established modern or temporal connections to the Parcels.

### Conclusion

The Band has not demonstrated a significant historical connection to the Richmond Parcels. Therefore, the Band cannot qualify for the restored lands exception to IGRA's prohibition against gaming on newly acquired land.

If the Band wishes to continue to pursue this site for gaming purposes, it will need to submit an application pursuant to the Secretarial Determination at 24 U.S.C. § 2719(b)(1)(A). Alternatively, the Band may amend its trust application for a non-gaming purpose.

---

[66] The Band itself asserts that the evidence it has presented that relates to federal policies during the termination era is intended to explain why such large numbers of Band citizens reside in the San Francisco Bay area now. *See* Band's April 30, 2008, letter at 13 ("The Tribe's discussion of Federal policies during the Termination Era in the context of the modern nexus between the Tribe and the Richmond Property was an explanation of why such large numbers of tribal members now reside in close proximity to the Richmond Property, not an attempt to equate modern residency with historic use and occupancy."); *id.* at 14 ("The Tribe's discussion of the Federal Government's failure to maintain operable systems on the Rancheria is offered as an explanation of why tribal members were forced to abandon the Rancheria, and not as an attempt to equate modern residency with historic use and occupancy."); *id.* at 20 ("The Beckham Report simply fails to understand that the Tribe's discussion of these Federal policies is not offered to establish a historic nexus, but instead, to demonstrate the Tribe's modern day nexus to the area in which the Property is located, and perhaps most importantly, that the Tribe's modern day presence in the Bay Area is the direct result of the Federal policies of Termination and Relocation.").

[67] 25 C.F.R. § 292.12(a)–(c).