# Exhibit B



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

**SEP 0 1 2011**

The Honorable Merlene Sanchez
Chairperson, Guidiville Band of Pomo Indians
401 B Talmage Road
Ukiah, California, 95482

Dear Chairperson Sanchez:

I am writing concerning the Guidiville Band of Pomo Indians' (Band) application for the Department of the Interior to acquire a parcel of land in Richmond, California (Point Molate Parcel or Parcel) in trust for gaming purposes. In connection with that application, I must first determine whether the parcel would qualify as "restored lands" of the Tribe, under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 719(b)(1)(B)(iii), commonly referred to as IGRA's Restored Lands Exception, and the regulations set forth in 25 C.F.R. Part 292.[1]

## Decision

I have considered the Band's application, pursuant to IGRA and the Department of the Interior's (Department) regulations at 25 C.F.R. Part 292, which implement § 2719 of IGRA. I have also carefully reviewed the Band's voluminous submissions[2] supporting its request and the submissions from many supporters and opponents of the Band's proposal, including detailed analyses from Contra Costa County and the City of Richmond.

I regret to inform you that the Department has determined that the 425-acre parcel in Richmond, California, does not qualify as restored lands of the Tribe under IGRA.

The Band has not claimed that the parcel would be eligible for gaming under any other exception to IGRA's general prohibition against gaming on newly acquired lands. Therefore, it is my determination that the Parcel, if acquired in trust, would not be eligible for gaming under IGRA. I have set forth the basis for my decision below.

## Background

In December 2004, the Guidiville Band of Pomo Indians requested to have approximately 425 acres of land in Richmond, California taken into trust, in part, for the purpose of gaming.[3] Under

---

[1] 25 C.F.R. Part 292, which implements § 2719 of IGRA, went into effect on August 25, 2008.
[2] The Band submitted an advocacy memorandum and accompanying documentation in February 2006 (and has supplemented that submission with additional material since that time. The Band's request and supplemental submissions delineate its restored tribe status and present its rationale for taking the lands into trust as part of the Band's restoration. The submissions also include detailed descriptions of the Parcel.
[3] By letter dated December 6, 2004, the Band requested that the Bureau of Indian Affairs (BIA) Regional Director take action to acquire the Point Molate Parcel in trust for the Band. Letter to Clay Gregory, Regional Director, Pacific Region, BIA from Donald Duncan, Vice Chair, Guidiville Band of Pomo re Land Acquisition of Property

the IGRA, any "lands acquired by the Secretary in trust for the benefit of [the Band] after October 17, 1988," are eligible for gaming only if the lands meet one of the exemptions or exceptions within 25 U.S.C. § 2719. The Band seeks a determination from the Department that the Parcel is eligible for gaming pursuant to 25 U.S.C. §2719(b)(1)(B)(iii), commonly referred to as IGRA's Restored Lands Exception, and the regulations set forth in 25 C.F.R. Part 292.[4]

The Restored Lands Exception provides that IGRA's general prohibition of gaming on lands acquired after October 17, 1988 (commonly referred to "newly acquired lands")[5] does not apply to lands taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition."[6]  The Department's regulations implementing the Restored Lands Exception require two inquiries: (1) is the tribe a "restored tribe," 25 C.F.R. §292.7 (a)-(c); and (2) do the newly acquired lands meet the criteria of "restored lands" in §292.11." *Id.* at §292.7(d).

## Analysis

### I.     The Band qualifies as a "restored tribe" pursuant to 25 C.F.R. §§292.7(a - c).

In a Memorandum dated December 5, 2008, the Solicitor determined that the Guidiville Band is a "restored tribe." That memorandum and its findings are incorporated herein by reference.[7]  Having affirmed the Band's status as a restored tribe, the next inquiry requires a determination of whether the Parcel qualifies as "restored lands" pursuant to 25 C.F.R. §292.7(d).

### II.    The Point Molate Parcel is not "restored lands."

The Guidiville Band was restored to recognition by a court approved settlement with the United States in *Scotts Valley Band of Pomo v. U.S.,* No. C-86-3660-VRW (N.D. Cal 1991) (corrected order for entry of judgment and judgment).  Therefore, in order for the Parcel to qualify as "restored lands," the Band must prove it meets the regulatory requirements set forth in 25 C.F.R.

---

Located in City of Richmond, CA (Dec. 6, 2004) [hereinafter Letter to Clay Gregory], included as Exhibit 4 to "Memo in Support of the Request for the NIGC to Concur with the Determination by the Guidiville Band of Pomo Indians that Certain Land to be Taken into trust for the benefit of the Guidiville Band, Point Molate, qualify as the restoration of lands for an Indian tribe that is restored to federal recognition," submitted to Phil Hogan, Chairman, National Indian Gaming Commission (NIGC) (Feb. 21, 2006) [hereinafter Feb. 2006 GBP Memo].  That letter was accompanied by a tribal council resolution entitled "Authorization Requesting BIA Pacific Regional Office to Begin Fee-to-Trust Process and Accompanying NEPA Process for the Restored Lands Acquisition of Former Point Molate Naval Fuel Depot, City of Richmond, California"  Resolution #04-18 (Dec. 2, 2004), included as Exhibit 4 to Feb. 2006 GBP Memo.   Together, the letter and resolution constituted the Band's request that the BIA initiate the land into trust and NEPA processes. *Cf.* discussion, *infra.* at Section II.A.3.
[4] 25 C.F.R. Part 292, which implements § 2719 of IGRA, went into effect on August 25, 2008.
[5] "Newly acquired lands" means "land that has been taken, or will be taken, in trust for the benefit of an Indian tribe by the United States after October 17, 1988."  25 C.F.R. §292.2.
[6] 25 U.S.C. § 2719(b)(1)(B)(iii).
[7] *See* Memorandum to George Skibine, Acting Deputy Assistant Secretary for Policy and Economic Development, Office of the Assistant Secretary – Indian Affairs, DOI from Edith Blackwell, Associate Solicitor, Division of Indian Affairs, SOL, DOI regarding "Guidiville Band of Pomo Indians – Restored Tribe Opinion" (Dec. 5, 2008).

§ 292.12.[8]  Pursuant to Section 292.12, the Band must establish three independent criteria: (1) a "modern connection" to the Parcel (25 C.F.R. §292.12(a)); (2) a "significant historical connection" to the Parcel (*id.* at §292.12(b)); and (3) a "temporal connection" between the date of the acquisition of the land and the date of the Band's restoration (*id.* at §292.12(c)).

### A.    The Band has not established a "modern connection" to the land.

As a threshold matter, Section 292.12(a) requires that the newly acquired lands be located within "the State or States where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population." The Band has a "governmental presence" in the state of California, which is evidenced by its main tribal office located in Ukiah, California.[9]  The Band also has a tribal population in California. Indeed, of the Band's total membership of 113, approximately 90 members are adults and 69 of those adult members live in California. The Band also has a small trust parcel in Ukiah  used for tribal housing. The Point Molate Parcel, therefore, is in a state where the Band maintains a governmental presence and a tribal population.

In addition to establishing that it is located in the same state as the Parcel, the Band must also demonstrate a modern connection to the Parcel in at least one of four ways: (1) the land is within reasonable commuting distance of the tribe's existing reservation; (2) if the tribe has no reservation, the land is near where a significant number of tribal members reside; (3) the land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust; or (4) other factors demonstrate the tribe's current connection to the land.

### 1.    The evidence does not establish that the Parcel is within a "reasonable commuting distance" from the Band's Reservation.

Subsection 292.12 (a)(1) provides that a tribe may establish a modern connection to a proposed trust acquisition if the subject lands are located within a reasonable commuting distance of the tribe's reservation.[10]  The Band's Rancheria is located in Ukiah, California, over 100 miles driving distance from the Parcel.[11]  Because the regulations do not define "reasonable commuting distance," I must evaluate this term in light of the unique set of facts and circumstances presented in each application.[12]

---

[8] Section §292.11(c) provides that a tribe that was restored by a "court approved settlement agreement entered into by the United States" must meet the requirements of §292.12 in order for newly acquired lands to qualify as "restored lands."

[9] *See* Letter to Sec. Dirk Kempthorne & Asst. Sec. Carl Artman, U.S. DOI, from Scott Crowell, Counsel to the Guidiville Band of Pomo regarding "Supplement to Request for Restored Lands Determination" (Feb. 25, 2008) [hereinafter Crowell Letter]. In 2004, after submitting its fee-to-trust application, the Band established a tribal office on the Parcel and another in the City of Emeryville, about ten miles from Point Molate. Because I find that the Band's Ukiah office evidences a governmental presence in California sufficient to satisfy subsection 292.12(a)'s requirement, I express no opinion regarding the relevance, if any, of the Point Molate or Emeryville offices to the inquiry under this subsection.

[10] Rancherias are included in the definition of a reservation under 25 C.F.R. §292.2.

[11] *See* Contra Costa County, Supplement to Response in Opposition to Indian Lands Determination Request Guidiville Band of Pomo Indians' Fee-to-Trust Application and Gaming Development Project, submitted to SOL DOI, at p. 3-5 (Oct. 30, 2008) [hereinafter County's 2008 Supplement].

[12] The scope of what constitutes a "reasonable commuting" distance will vary based on the circumstances.

3

Here, the 100 mile distance would likely require a two-hour drive, each way, or four hours round-trip.[13] A two hour commute is approximately five times the national average commute to work.[14] In fact, the United States Census Bureau has deemed commutes of ninety minutes or more "extreme commutes."[15] Only eight percent of American workers commute more than 60 minutes to work and only ten percent of California workers commute 60 minutes or more per day.[16] These statistics, while not conclusive evidence of an "unreasonable" commute, indicate that the commute between Ukiah and the Parcel is out of the realm of ordinary. Although the Band concludes that the Parcel is within a reasonable commuting distance from its Rancheria, it otherwise offers no explanation or evidence that tends to show that the commute is reasonable. The Band's conclusory statement regarding reasonable commutability cannot, without more, form a definitive basis for concluding that a 200 mile round-trip commute is a reasonable commuting distance for the Band.[17]

> ## 2. The Band's Reservation defeats the requirements of Subsection 292.12(a)(2).

Subsection 292.12(a)(2) requires that *if the tribe has no reservation*, the lands must be near the location where a significant number of tribal members reside. The Band has argued that the Parcel is within a "reasonable commuting distance" from its Rancheria, *i.e.* its reservation, pursuant to §292.12(a)(1). The Band has a reservation, which thus defeats to the application of §292.12(a)(2).

> ## 3. The Parcel is not located within a 25 mile radius of tribal headquarters or governmental facilities that existed at least two years prior to its trust application.

Section 292.12(a)(3) provides that a tribe may demonstrate a modern connection if the proposed acquisition is located within a 25-mile radius of the tribe's headquarters or other governmental facilities that have existed at that location for at least two years at the time of the application for land-into-trust.

---

[13] Mapping software indicates that the driving time, without accounting for traffic, from the Parcel to the Band's reservation is approximately two hours.

[14] U.S. Census Bureau, Journey to Work: 2000, Census 2000 Brief, p. 5 (March 2004).

[15] Press Release, U.S. Census Bureau, Americans Spend More Than 100 Hours Commuting to Work Each Year, Census Bureau Reports (March 30, 2005), *available at*
http://www.census.gov/newsroom/releases/archives/american_community_survey_acs/cb05-ac02.html.

[16] *See* U.S. Census Bureau, California, S0801 Commuting Characteristics by Sex, Data Set: 2005-2009 Amer. Community Survey 5-Year Estimates, Survey: American Community Survey; *see also* U.S. Census Bureau, Mendocino, California, S0801 Commuting Characteristics by Sex, Data Set: 2005-2009 Amer. Community Survey 5-Year Estimates, Survey: American Community Survey (only 6.9 percent of Mendocino County residents commute more than 60 minutes each way); U.S. Census Bureau, Ukiah CCD, Mendocino County, California, S0801 Commuting Characteristics by Sex, Data Set: 2005-2009 Amer. Community Survey 5-Year Estimates, Survey: American Community Survey (only 6 percent of Ukiah residents commute more than 60 minutes each way).

[17] "[T]he burden is on the applicant tribe to establish its eligibility for an exception" to 25 USC §2719 pursuant to 25 C.F.R. Part 292. 73 Fed. Reg. 29372-73.

As noted above, the Band's governmental headquarters is located in Ukiah, California. The Band established its Ukiah office as early as 1995,[18] approximately 9 years prior to submitting its fee-to-trust application. The Ukiah office, which is located over 100 miles from the Point Molate Parcel, is well beyond the 25-mile radius required by the regulations. Accordingly, the Band cannot rely on its Ukiah office to satisfy § 292.12(a)(3).

Unlike the Ukiah headquarters, the Band's offices in Point Molate and Emeryville are within a 25-mile radius of the Parcel, but they were not established at least two years prior to the Band's submission of its fee-to-trust application. The Band established its Point Molate and Emeryville offices in 2004. The Point Molate office is located on the Parcel and the Emeryville office is located approximately 10 miles away from the Parcel.

The Band's fee-to-trust application was submitted on December 6, 2004 through a letter from the Band's Vice-Chairman to the Pacific Regional Director of Bureau of Indian Affairs (BIA) requesting that the "BIA formally begin the land acquisition process and the companion NEPA process" for the Parcel.[19] At that time, the Band also submitted a supporting resolution entitled, "Authorization Requesting BIA Pacific Regional Office to Begin Fee-to-Trust Process and Accompanying NEPA Process for the Restored Lands Acquisition of Former Point Molate Naval Fuel Depot, City of Richmond, California."[20] The Vice Chair's letter and the supporting Tribal Council Resolution constitute the Band's "application"[21] for fee-to-trust within the meaning of §§ 292.3(b) and 292.12(a)(3). Indeed, the Tribal Council Resolution, in particular, clearly evidenced the Band's wishes and, based upon the Band's request, the Regional Director began the fee-to-trust and NEPA processes.

However, the Band has asserted that its offices qualify as evidence of a modern connection to the land, because, as of 2008, it had "yet to submit a land-into-trust application."[22] In an October 2008 letter addressed to DOI Attorney Jon Damm, the Band admits that its Emeryville and Point Molate offices opened in 2004 but, nevertheless, claims that those offices meet the criteria set forth in section 292.12 (a)(3). The Band then states that it plans to submit its fee-to-trust application on October 20, 2008 which, according to the Band, means that the two offices established in 2004 would have existed for four years prior to the Band's fee-to-trust application. *Id.* at 2. Ostensibly in support of this supposition, the Band cites to a Freedom of Information Act (FOIA) request made by Contra Costa County requesting that the Department produce all documents relating to the Band's fee-to-trust application that "ha[d] *not [already] been provided* to the [County] under separate FOIA requests." *See* Letter to Fred Doka, Regional Tribal

---

[18]   These lands were acquired in trust by the Secretary in 1999. *See* Grant Deed & BIA acceptance of Conveyance, included as Exhibit 6 to Feb. 2006 GBP Memo, *supra* footnote 3.

[19] *See* Letter to Clay Gregory, *supra* footnote 3.

[20] *See* Resolution #04-18, *supra* footnote 3.

[21] It is worth noting that the regulations at 25 C.F.R. Part 151 govern the fee-to-trust process pursuant to which the Band made its request for the acquisition of the Parcel. Those regulations make clear that a tribe requesting a fee-to-trust acquisition need only "file a written request for approval of such acquisition with the Secretary" but that "[t]he request need not be in any special form." 25 C.F.R. §151.9.

[22] Letter to Jon Damm, Attorney, U.S. DOI from Marlene Sanchez, Chairperson, Guidiville Band of Pomo (Oct. 7, 2008).

Operations Officer, BIA from Cathy Christian, Counsel for Contra Costa County (Aug. 25, 2008) (emphasis added).

The County's FOIA request also indicated that, by letter dated August 21, 2008, DOI attorney Jon Damm advised the County's counsel that "there may be *additional information*" pertaining to the Tribe's fee-to-trust application at the Regional Office. *Id*. (requesting that the Region advise if "there are *additional documents* pertaining to this matter") (emphasis added). In response, the Regional Office advised Counsel for the County that it did not have any documents that were not already provided to the County under separate FOIA requests. Letter to Cathy Christian, Counsel for Contra Costa County from Acting Regional Director, Pacific Regional Office, BIA (Sept. 30, 2008).

The Band claims that this correspondence constitutes a statement by the Department that it had no fee-to-trust "application on file" for the Band. I do not agree with the Band's contentions. First, the Department did have an application on file for the Band which application was submitted in 2004. *See* sources cited, *supra* footnote 3. Moreover, nothing in the Department's response or the County's request indicates that the Department did not have an application on file. Indeed, the correspondence confirms that the County had received information regarding the fee-to-trust application pursuant to previous FOIA requests. The Department's response to the County's request only indicates that the Department did not have any information it had not already provided to the County.

I recognize that the Acting Regional Director of the BIA Pacific Regional Office may have inadvertently contributed to the Band's confusion regarding this issue. On October 15, 2008 (one week after the Band first claimed that it had yet to submit a fee-to-trust application), the Acting Regional Director, ostensibly in response to an inquiry from the Band, sent a letter stating that "[t]his letter will confirm that the Pacific Regional Office has not yet received the Tribe's land-into-trust application, for . . . [the Parcel]. It is our understanding that your application will be submitted shortly . . . ." Letter to Merlene Sanchez, Chairperson, Guidiville Band of Pomo Indians from Acting Regional Director, Pacific Regional Office, BIA (Oct. 15, 2008). While I acknowledge that this might have been confusing for the Band, the fact remains that the Band submitted its application in 2004. Our regulations make clear that an application need not take any special form and the Department published notice of its intent to prepare an EIS for the trust acquisition on March 11, 2005. *See* 70 Fed. Reg. 12229 (March 11, 2005). The Acting Regional Director's error cannot overturn the Department's clear and publicly expressed understanding that it was processing the Band's application. And, aside from the Regional Director's erroneous statement, nothing in the record in any way suggests the absence of a fee-to-trust application for the Parcel.

Since the Band established its tribal offices within 25 miles of the Parcel the same year that it submitted the fee-to-trust application for the Parcel, the Band does not meet the modern connections test under §292.12(a)(3).

4.  **The Band has failed to establish "other factors" sufficient to show a modern connection to the Parcel under §292.12(a)(4).**

Finally, pursuant to section 292.12(a)(4),"other factors" may demonstrate a tribe's "current connection" to the land and thereby establish a modern connection. Part 292 does not define "other factors." However, the preamble to the Part 292 regulations sheds some light on factors that are appropriately considered to evidence a "current connection" to the land. The Department intended for the modern connections test to be a "mechanism to balance legitimate local concerns with the goals of promoting tribal economic development and tribal self-sufficiency, both of which are reflected in IGRA."[23] Accordingly, the restored lands exception assists restored tribes with economic development as long as the tribe has a "modern connection to the land, [which provides] the surrounding community [with] notice of the tribal presence."[24] The Department included this provision within the modern connections test as a means of evaluating whether the surrounding community had adequate prior notice, actual or constructive, of a tribe's governmental presence in or near the community.

In addition, the term "current" in this subsection refers to a tribal connection to the land existing as of the date of its fee-to-trust application, not post-application. This is consistent with the criteria set forth in the preceding subsections of §292.12(a) which require an evaluation of the tribe's connection as of, or leading up to, submission of the tribe's application. If a tribe could demonstrate a modern connection to land merely by submitting a fee-to-trust application and then establishing a presence in the community, the modern connection requirements set forth in §§292.12(a)(1)-(3) would be rendered superfluous. Indeed, such an interpretation would defeat the purpose of the "modern connection" requirement entirely by supporting a restored lands determination where the local community had no notice whatsoever of the tribe's presence prior to the fee-to-trust application.

Nonetheless, in support of its position, the Band proffers that, collectively, its offices on the Parcel and in Emeryville, its planned tribal housing development on the Parcel, cultural and intergovernmental activity in the City of Richmond, its Municipal Services Agreement with the City of Richmond, provisions for security, maintenance and environmental remediation of the Parcel, as well as its "community involvement and support," demonstrate a "modern connection" to the Parcel. While these factors arguably demonstrate the Band has a connection to the Parcel, they also establish that the Band had no governmental presence on or connection to the Parcel or lands in its vicinity until mid to late 2004, when it submitted its fee-to-trust application.[25] Nor does the record contain sufficient evidence to establish that the "surrounding community" was on or should have been on notice of the Band's presence prior to 2004.

The Band began its search for "land that met all or close to all of [its] land acquisition criteria" in July 2002.[26] The Band investigated lands in five different communities and considered up to

---

[23] 73 Fed. Reg. 29365 (May 20, 2008).

[24] *See Id.*; *see also* 73 Fed. Reg. 29366 ("inclusion of a modern connections requirement provides an element of notice to the surrounding community . . .").

[25] Declaration of Michael Derry, Tribal Contract Employee, ¶ 37, included as Exhibit H to "Guidiville Band of Pomo Indians Supplemental Materials In support of Our Request for DOI Concurrence with the Guidiville Band's Restored Lands," submitted to DOI (Feb. 26, 2008) [hereinafter GBP 2008 Supplement] (stating that "in the fall of 2004, the Tribe entered into negotiations with the City of Richmond [and the proposed developers of the Point Molate Project] for acquisition and subsequent mixed use of the former Navy Fuel Depot at Point Molate, which it continues to pursue today as the Tribe's restored reservation").

[26] *Id.* at ¶29.

seven different parcels in those cities from 2002 until 2004.[27]  In the fall of 2004, the Band and
the proposed developers of the Parcel entered into negotiations with the City of Richmond for
the acquisition and subsequent development of the Point Molate Parcel.[28]  Then, in November
2004, the Band and the City of Richmond executed a Municipal Services Agreement (MSA).[29]
The City of Richmond's City Council Resolution authorizing the execution of the MSA states
that the City understands that the Band intends to take the Parcel land into trust for gaming
development and that the City supports the project.[30]  I note, however, that the Richmond City
Council subsequently voted to reject the gaming portion of the proposed acquisition.[31]  Still, the
Band offers that through contractual obligations in the MSA, it has funded environmental
remediation and security on the Parcel.[32]  Beginning in 2004, the Band and the proposed
developers of the Point Molate Parcel have made contributions to a number of local charities.  In
addition, the Band states that the proposed Point Molate project has enjoyed the support of local
trade unions and residents since 2004.[33]  Again, while this evidence indicates the Band's current
presence and activities on the Parcel, it does not establish a modern connection between the Band
and the Parcel prior to and as of the date of its fee-to-trust application in 2004.

The Band also contends that its Emeryville and Point Molate offices are evidence of a modern
connection to the Parcel.  This contention fails for several reasons.  As discussed above, the
Band established those tribal offices only after the Band submitted its fee-to-trust application.
Whether any tribal members resided within the City of Richmond or in the surrounding
communities prior to submission of the Band's application is unclear.  Moreover, the Band
offered no evidence that any tribal members resided on the Parcel.  And while the Band held
Tribal Council meetings and a Cultural Day at its Point Molate and Emeryville offices, these
activities took place after the Band submitted its application in 2004.[34]  I am unable to find
anything in the record indicating that the Band or its members were meaningfully involved in
any social, political, or other activities on the Parcel or within the City or surrounding areas
before late 2004.

In sum, the Band contends its ongoing presence in the community since late 2004, together with
its MSA, support a conclusion that the Band has modern connections to the Point Molate Parcel.
I must disagree.  The Band's now ongoing presence in the City is incident to, not independent of,
the Band's proposed fee-to-trust acquisition and the Point Molate project.  Moreover, until the

---

[27] Id. at ¶30.

[28] *Id.* at ¶37.

[29] *See* Municipal Services Agreement ("MSA") between the Guidiville Band and the City of Richmond, California,
included as Exhibit 6 to GBP 2008 Supplement, *supra* footnote 25.

[30] City of Richmond Resolution No. 162-04, included as Exhibit 1 to Part 2 of GBP 2008 Supplement, *supra*
footnote 25.

[31] *See* Letter to Larry Echo Hawk, Assistant Secretary – Indian Affairs, DOI from Marlene Sanchez, Chairperson,
Guidiville Band of Pomo (April 27, 2011) (stating that on April 5, 2011 "the Richmond City Council took a vote to
formally reject the casino portion of our proposed land acquisition" but noting that the Band was "engaged with the
City attorneys in an effort to clarify and resolve the matter").

[32] *See* Brendan Ludwick, "Guidiville Band of Pomo Supplement for Request to Restored Lands Determination, Part
2, 25 U.S.C. §2719(b)(1)(B)(iii)" at p. 19, included as Part 2 of GBP 2008 Supplement, *supra* footnote 25.

[33] *Id.* at p. 20.  Aside from the Band's statement, there is no documentation in the record supporting this contention.
In addition, the record contains some correspondence from local citizens, counties and cities opposing the
acquisition.

[34] *Id.* at p. 17.

Point Molate project was proposed, there is little evidence in the record supporting a conclusion that the City was aware of the Band's presence in any substantial manner. In addition, while the Band offers evidence of its presence in the City since 2004, the Band does not offer evidence that the surrounding community[35] necessarily has been put on notice of the Band's presence. Indeed, the evidence suggests the Band's Emeryville office is one of the few, if not only, contacts with any local governmental entity aside from the City of Richmond. And the Band's contacts with the City began in 2004 and are a direct result of the Point Molate project and the now partially rescinded MSA. Therefore, I find that the Band has failed to meet the modern connections test under the regulations.

### B.   The evidence does not demonstrate that the Band has a "significant historical connection" to the Parcel.

The Band submitted volumes of documentation and extensive analyses in support of its argument that the Band has significant historical connections to the Point Molate Parcel and its vicinity. Contra Costa County submitted similarly detailed analyses opposing the conclusions reached by the Band's experts.[36] As noted earlier, I have thoroughly reviewed these submissions and, based on that review, I conclude that the Band does not meet the significant historical connection requirement of section 292.12(b).

Section 292.12(b) requires that a "tribe must demonstrate a significant historical connection to the land." In order to establish a "significant historical connection" to the Parcel, the Band must demonstrate that "the land is located within the boundaries of the [Band's] last reservation under a ratified or unratified treaty, or [it] can demonstrate by historical documentation the existence of the [Band's] villages, burial grounds, occupancy or subsistence use in the vicinity of the land."[37]

When interpreting and applying the definition of a "significant historical connection" in subsection 292.2, the preamble to the regulations, as well as previous Department Solicitor, NIGC, and judicial opinions, are instructive. Federal court decisions prior to the promulgation of the Part 292 regulations instruct that "land that could be considered part of such restoration

---

[35] The scope of what constitutes the surrounding community that should have been put on notice of a tribe's presence will vary from case-to-case.

[36] After the submission of those materials, the County later informed the Department that it no longer opposed the Guidiville project at Point Molate but, in fact, now supported it. Indeed, the County stated that its Board of Supervisors voted 5-0 to execute an agreement with the Band that "provides for full mitigation and additional community benefits to the County as part of the [Band's Project]." *See* Letter to Honorable Ken Salazar, Secretary, DOI from David Twa, County Administrator, Contra Costa County, CA (Nov. 12, 2009). The County also claimed that, subsequent to the submission of materials to the Department, it gained a more complete understanding of the Band's history which caused the County to change its position. *Id.* Although that may be the case, the County's submissions to the Department remain in the record and I find that they contain relevant and persuasive evidence regarding the history of the Band as well as its relationship to the Parcel. I note that the County claims its previous submissions were made without the benefit of the Band's submissions to the BIA. Nevertheless, the historical information submitted by the County is supported by evidence and includes documented sources. Moreover, the County did not submit countervailing evidence or point to particular facts that undermine or belie the statements or conclusions set forth in its historical reports opposing the Band's project. Thus, I find that the County's submissions continue to provide useful and relevant evidence that I may and, indeed, should consider in rendering our determination. This is not to say, however, that I do not recognize that the County now, apparently, supports the Point Molate project.

[37] 25 C.F.R. § 292.2.

might appropriately be limited by the factual circumstances of the acquisition, the *location of the acquisition*, or the temporal relationship of the acquisition to the restoration."[38]  Regarding the location of the land, the Solicitor has previously opined that restored lands were not "any aboriginal land that the restored tribe ever occupied."[39]  Along the same line, the use of the term "significant" in the Part 292 regulations to describe the quality of the "historical connection" is noteworthy.  Indeed, the Department intentionally utilized the term "significant" in order to "reinforce the notion that the [tribe's historical] connection must be something more than 'any' connection" in order to qualify for restored lands status.[40]

The Part 292 regulations incorporate these standards, in part, by requiring tribes to show a significant historical connection to the lands in one of two ways.  First, a tribe can meet this test by demonstrating that the lands are within the boundaries of the tribe's last reservation under a ratified or unratified treaty.  Alternatively, a tribe[41] may demonstrate a "significant historical connection" by providing documentation of the tribe's villages and burial grounds, occupancy or subsistence use in the vicinity of the land, which is akin to the aboriginal use and occupancy of a tribe.

Here, the evidence offered by the Band does not establish the requisite "significant historical connection" between the Band and the Parcel.  The Band's evidence does not demonstrate that the Point Molate Parcel is located within the reservation intended for the Band under the unratified 1851 treaty.  And, with respect to the second criteria, the evidence illustrates only that the Parcel might have been located within the aboriginal territory of Pomo Indians.  This general nexus, without more, however, is insufficient to prove that the Band, itself, has a "significant historical connection" to the Parcel.

   1.  **The Parcel is not located within the boundaries of the Band's last reservation under a ratified or unratified treaty.**

The Band fails to meet the first part of the significant historical connection test because it has not demonstrated the Point Molate Parcel is within the boundaries of the Band's reservation under a ratified or unratified treaty.  The Band also contends that it meets this test based on several treaties Redick McKee negotiated on the Russian River and at Clear Lake.[42]  Those treaties, according to the Band, sought to remove Pomo Indians from the Bay Area to a Federal

---

[38] *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp. 2d 155, 164 (D.D.C. 2000) (emphasis added).

[39] U.S. Department of Interior, Office of the Solicitor's Memorandum Re: *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt* , p. 8 ("It also seems clear that restored land does not mean any aboriginal land that the restored tribe ever occupied . . .").

[40] 73 Fed. Reg. 29366 (May 20, 2008).

[41] "*Indian tribe or tribe* means any Indian tribe, band, nation, or other organized group or community of Indians that is recognized by the Secretary as having a government-to-government relationship with the United States and is eligible for the special programs and services provided by the United States to Indians because of their status as Indians, as evidence by inclusion of the tribe on the list of recognized tribes published by the Secretary under 25 U.S.C. § 479a-1." 25 C.F.R. §292.2.

[42] Heather Howard and James McClurken, *The Guidiville Band of Pomo Indians Use and Occupancy of the San Francisco Bay Area*, at p. 134-141 (Jan. 13, 2006) [hereinafter Jan. 2006 GBP Report].

reservation in the Clear Lake region of California.[43]   Congress never ratified those treaties and no reservation was created at Clear Lake.

The Band makes several arguments relating to this subsection, but it does not argue that the Parcel falls within the Clear Lake Reservation that was to be created by the unratified treaties. Instead, the Band argues that, except for two signatories, all the names appearing on the treaties have been identified by ethnographers as Pomo Indians.[44]   In addition, the Band cites the Royce Maps, which reflect the lands ceded in those treaties, and claims that the maps indicate that Pomo Indians ceded the land surrounding the west and north coasts of San Pablo Bay.[45]   In particular, Royce Area 296 extends to the northern shore of San Pablo Bay and claims that area is within two and one-half miles of the Point Molate Parcel.[46]   This statement is inaccurate.

In the 1850s, the United States negotiated treaties with several California tribes, including Pomoan bands.[47]   In those treaties, Pomoan bands agreed to cede certain lands to the United States and, in exchange, the United States designated specific lands that were to be set aside for the treaty's tribal signatories. The lands ceded pursuant to each treaty are documented on the Royce Maps.[48]   The August 20, 1851 Treaty, also known as the Ca-La Na-Po Treaty, was signed by eight different tribes.[49]   The Treaty provided that those tribes would cede all their lands to the United States and it set forth the boundaries of a reservation to be established at Clear Lake for the signatory tribes. [50]   The Royce Maps indicate that the area ceded included the north-eastern shores of San Pablo Bay north to Clear Lake.[51]   "Pomo" is not listed among the groups that signed the Ca-La Na-Po Treaty.[52]   The "Pomo," however, are included as a signatory on the

---

[43] *Id.*

[44] *Id.* at 135.

[45] Id. at 138-139. As a general matter, the Tribe's use of the Royce maps to establish its significant historical connection to the Parcel is unavailing. While the map indicates a general territorial presence for the larger Pomoan Indians, it does not reflect any specific use and occupation by the Guidiville Band. Without more, the Royce maps do not support the Band's claim to the Parcel.

[46] Feb. 2006 GBP Memo, at 41.

[47] There is conflicting evidence in the record regarding how many Pomo Bands executed treaties with the United States and regarding whether the Band's ancestors were among those that treated. *See* Contra Costa County, Response in Opposition to Indian Lands Determination Request of the Guidiville Band of Pomo Indians Fee-to-Trust Application & Gaming Development Project, p. 41 (Feb. 2008) [hereinafter County's Initial Opposition] ("[t]he contention that Charles Royce attributed ownership of the lands on the north shore of San Francisco Bay to the Pomo is false. Royce listed by name the many different bands of Indians who entered into the unratified treaties with Redick McKee. Pomo was but one of the more than twenty named, most of them not subsequently identifiable by linguists or anthropologists").

[48] Charles C. Royce compiled the Schedule of Indian Land Cessions in sixty-seven (67) maps outlining those land cessions in the second part of the two-part *Eighteenth Annual Report of the Bureau of American Ethnology to the Secretary of the Smithsonian Institution,* 1896-1897. See The Library of Congress, Indian Land Cessions in the United States, 1784-1894, *at* http://memory.loc.gov/ammem/amlaw/lwss-ilc.html.

[49] Treaty with Ca-La Na-Po, etc., August 20, 1851, in *Indian Affairs, Laws and Treaties,* Volume IV, compiled and edited by Charles J. Kappler (1927).

[50] *Id.; see also see also* Bureau of American Ethnology, California 1, Map 7 (Charles C. Royce Map), http://www.usgwarchives.org/maps/cessions/ilcmap7.htm (last visited Aug. 26, 2011) (see map areas  295 and 295).

[51] *See* Bureau of American Ethnology, California 1, Map 7 (Charles C. Royce Map), available at http://www.usgwarchives.org/maps/cessions/ilcmap7.htm (last visited Aug. 26, 2011) (see map areas  295 and 295).

[52] In any event, it is unnecessary for us to opine on whether any of the treaty signatories could have been Pomo-speaking Indians because the land that was ceded under that treaty does not include the present location of the Parcel.

Treaty with the Sai-Nell and Yu-ki-as executed on August 22, 1851.[53]  That Treaty ceded lands north of San Francisco Bay and north up the Russian and Eel Rivers, far north of the Bay Area, that area is delineated in Royce Map 297.[54]  In exchange for the ceded lands, the tribal signatories to the Treaty with Sai-Nell and Yu-ki-as agreed to "remove with their families and property from the lands they now occupy on the Russian river, to the Indian reservation on Clear Lake" established by the Ca-La Na-Po Treaty.[55]

The Coast Miwok and Lake Miwok speakers of the Penutial language occupied the lands between the Pomo and the northern shores of San Pablo Bay and San Francisco Bay. [56] The I-o-no-hum-ne Treaty was signed by six tribes, at least five of which were Miwok tribes.[57] According to the Royce Maps those tribes ceded to the United States all the lands south of San Pablo Bay, including Contra Costa County and the City of Richmond.[58]  The I-o-no-hum-ne Treaty was not signed by the "Pomo" and Congress never ratified the other three treaties discussed above.

The Band's interpretation of the definition of "significant historical connection" is inconsistent with the plain language of the regulation.  Part 292.2 requires that the Parcel be within the "boundaries of the [Band]'s *last reservation* under the terms of a ratified or unratified treaty." It is unconcerned with the proximity of the Parcel to lands the Band ceded north of the Parcel, despite the Band's apparent argument to the contrary.[59]  The Point Molate Parcel is clearly not within the boundaries of the land ceded in the Ca-La Na-Po Treaty, which attempted to establish a reservation for the Pomo at Clear Lake, or the Treaty with the Sai-Nell, Yu-ki-as, etc., to which Pomo Indians were a signatory.  And, more importantly, the Parcel is not located within the boundaries of a reservation established for the Band pursuant to a ratified or unratified treaty. Therefore, the Band does not meet this part of the significant historical connections test.

2.   **The Band failed to provide adequate historical documentation demonstrating that the Band's villages, burial grounds or occupancy or subsistence use in the vicinity of the Parcel.**

The second way a tribe can demonstrate a significant historical connection to a parcel is to provide historical documentation of the existence of the tribe's villages, burial grounds, occupancy, or subsistence use in the vicinity of the land.  In general, the Band contends the

---

[53] Treaty with the Sai-Nell, Yu-ki-as, etc. August 22, 1851, in *Indian Affairs, Laws and Treaties*, Volume IV, compiled and edited by Charles J. Kappler (1927).

[54] *See* Bureau of American Ethnology, California 1, Map 7 (Charles C. Royce Map), available at http://www.usgwarchives.org/maps/cessions/ilcmap7.htm (last visited Aug. 26, 2011) (see map area 297).

[55] *See* Treaty with the Sai-Nell, Yu-ki-as, etc. August 22, 1851, *supra*.

[56] Stephen D. Beckham, "The Guidiville Band of Pomo Indians: Traditional Use and Occupancy Areas and Residency in Mendocino County, California," at p. 39 (Dec. 2006), included as Exhibit A to *County's Initial Opposition*.

[57] Treaty with the I-o-no-hum-ne, We-chil-la, Su-ca-ah, Co-to-plan-e-nee, Chap-pah-sim and Sage-wom-nee, May 28, 1851, in *Indian Affairs, Laws and Treaties,* Volume IV, compiled and edited by Charles J. Kappler (1927); *see also* County's Initial Opposition, at 41.

[58] *See* Bureau of American Ethnology, California 1, Map 7 (Charles C. Royce Map), available at http://www.usgwarchives.org/maps/cessions/ilcmap7.htm (last visited Aug. 26, 2011) (see map areas 280 and 281).

[59] Feb. 2006 GBP Memo, at 41 (claiming that "Point Molate sits a mere two and one-half miles from the treaty's ceded area . . .").

following examples, taken together, support its position that the Band has significant historical connections to the Point Molate parcel or its vicinity: the existence and location of Olompali Village; Pomoan use of medicinal plants found in the Bay Area;[60] Sir Francis Drake's encounter with Pomo Indians in San Francisco Bay in 1579; Pomo Indian encounters with Spanish colonizers and missionaries; Pomo Indians' trade and a so-called "Regional Interface Center" (RIC) in the Bay Area; presence of ancestors of its members who were born in or migrated through the Bay Area at various times and the fact approximately a dozen ancestors of its members participated in the Federal "Outing Program" which brought them to the Bay Area. The County responds generally by arguing that the Band's claims are misleading or otherwise unsubstantiated. The County also suggests that, even if the Band could prove that it had a historic presence in the Bay Area generally, such a presence does not equate to a significant historical connection to the Point Molate Parcel or its vicinity.

The Band relies on the common history of Pomo-speaking Indians,, and focuses its analysis on areas north of San Pablo Bay (and not to the south, where the Parcel is located).[61] It is important to note that evidence of Pomo use and occupancy does not, without more, indicate use or occupancy by this particular band of Pomo, the Guidiville Band.[62] Moreover, evidence indicating that Pomos were present in the many counties near the Parcel does not, without more, show a particular connection to any land south of Pablo Bay, where the Parcel is located. As discussed below, I find that the evidence does not support a finding that the Band meets subsection 292.12(b)'s significant historical connection requirement.

At the outset, it is important to note that the Band's ethno-historian, James McClurken, found that "[t]he preponderance of the ethnographic and historical literature about the Pomo place Pomo bands in Lake, Mendocino and Sonoma counties during the nineteenth century."[63] But the Parcel is not located in any of those three counties. McClurken admits there is little historical documentation regarding the lands near Point Molate.[64] In the absence of specific documentation regarding the Parcel or Contra Costa County, the Band's ethno-historian primarily relies on evidence regarding indigenous populations in the "Bay Area." Although McClurken does not define this term, it is generally understood that the "Bay Area" encompasses Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, Santa Clara, Solano, and

---

[60] The Band submits strings of e-mails, several pages from two different sources which apparently identify plants the Band claims are present at the Parcel and were used by its ancestors and what appears to be a declaration from Donald Duncan. I find this evidence is insufficient to support the Band's claims regarding the use of plants that, ostensibly, can only be found on the Parcel.

[61] See, generally, Jan. 2006 GBP Report, supra footnote 42.

[62] Id. at p. 4 (claiming that there is limited documentation regarding indigenous use or occupancy of Point Molate until 1872 and finding that there is more evidence regarding "the lands contiguous to the Point just across the waters of San Pablo Bay to the north and west of Point Molate . . . where ancestors of the Guidiville Band were likely present").

[63] Id. at 3.

[64] Nevertheless, he opines that the lack of evidence "does not mean that the Point was not used and occupied by Native peoples." Id. at 4. While I agree that the lack of documentation does not necessarily mean that the Point was not used by indigenous peoples, the evidence does not support a finding that the Point was used and occupied by the predecessors of the Guidiville Band. Our regulations require historical documentation of the Band's use and occupancy of the Point or lands within its vicinity. Consequently, I do not believe it is appropriate to rely on an hypothesis based on the absence of evidence.

Sonoma Counties.[65]  However, historical evidence of a general connection to any land located in any of those counties is not the equivalent of documentation of the Band's own historical connection to Point Molate, or parcels in its vicinity.  Instead, the Band must provide historical documentation of its villages and burial grounds located at, or subsistence and occupancy use of, the Parcel, or lands in its vicinity.  Alternatively, the Band must show the Parcel is located in the vicinity of specific sites or specific areas for which the Band can offer historical documentation.

### a.  Early Pomo "Use and Occupancy."

McClurken contends that Pomo use and occupancy of the Bay Area dates back approximately 6000 years.  The historic village of Olompali, McClurken asserts, was originally occupied by Pomo and is located near present-day Novato, California.  Novato is approximately 15 miles from Point Molate, across the San Pablo Bay.[66]  However, the record indicates that Olompali is believed to be a village of the Coastal Miwok, not the Pomos.[67]

McClurken also references an aboriginal trade route between the Clear Lake region and the Pacific coast and states that the Band's Pomo ancestors traveled on this trail to engage in commerce and harvest natural resources.[68]  The Band's argument regarding a trade route between the Clear Lake region and San Pablo Bay's northern shores is unsubstantiated by the sources cited by McClurken.  However, even assuming such a trade route existed (a conclusion that is not supported by the record), the Band cannot establish its subsistence use or occupancy based on the fact that its ancestors traveled to various locations to trade and interact with other peoples and then returned to the Clear Lake region.  Subsistence use and occupancy requires something more than a transient presence in an area.  "Subsistence" is defined as "a means of subsisting as the *minimum* (as of food and shelter) necessary to support life."[69]  Accordingly, activities that would tend to show a tribe was using land for subsistence purposes might include sowing, tending, harvesting, gathering and hunting on lands and waters.  "Occupancy" can be demonstrated by a consistent presence in a region supported by the existence of dwellings, villages or burial grounds, as alluded to in the regulations.  The Band's claims with respect to a trade route do not demonstrate occupancy or subsistence use or activities on the Parcel or in its vicinity.[70]  Moreover, the preamble to the regulations makes clear that "something more than

---

[65] *See* Assoc. of Bay Area Governments, Bay Area Counties, *at*
http://www.abag.ca.gov/abag/local_gov/county/county.html (last visited Aug. 20, 2011).
[66] Jan. 2006 GBP Report, at 125-28.
[67] *See* Pamela McGuire Carlson and E. Parkman, "An Exceptional Adaptation: Camillo Ynitia, The Last Headman of the Olompalis," *California History,* vol. 65, no. 4, p. 239 (December 1986) ("[t]he Spanish who arrived in the San Francisco Bay Area in the late eighteenth century found the Coast Miwok village of Olompali . . .").  It is also important to note that evidence of Pomo occupancy does not, without more, indicate use or occupancy by the Band.
[68] *See, e.g.*, Jan. 2006 GBP Report, at 31-32.
[69] Webster's New Collegiate Dictionary 1153 (G. & C. Merriam Co. 1979).
[70] McClurken's report states that the Pomo, without reference to a specific band, travel to "the coast" with only "the absolute requirements of the march to Bodega Bay" to clam and gather kelp.  *See* Jan. 2006 GBP Report, at 32-33.  But that trip was to "the coast north of San Francisco" and the source McClurken relies on for this point states that the "long promontory which projects just north of Bodega Bay, and guards its entrance, has for countless years been the favorite, in fact about the only, fish camp for Indians in all that region."  *See* John W. Hudson, "Pomo Wampum Makers an Aboriginal Double Standard," at p. 11-13, in *Seven Early Accounts of the Pomo Indians and Their Culture,* assembled and edited by Robert F. Heizer (Berkeley: Archaeological Research Facility, Department of Anthropology, University of California, 1975).  Although McClurken offers this as evidence of the Band ritually

evidence that a tribe merely passed through a particular area" is needed to establish a significant historic connection to the land.[71]   Accordingly, evidence of the Band's passing through a trade route to the Pacific coast or even the north shores of San Pablo Bay does not demonstrate the Band's subsistence use or occupancy within the vicinity of the Parcel.  In addition, even if such a trade route could form the basis for subsistence use or occupancy, the Band has not provided sufficient evidence that its ancestors, as opposed to the larger group of Pomo, utilized any such trade route.

McClurken also proposes a theory regarding what he describes as a Regional Interface Center (RIC) in the San Francisco Bay Area.  McClurken cites a paragraph of text from Lowell Bean's "Social Organization in Native California," which states that "[c]ross triblet interfacing appears to have commonly involved peoples within a radius of 50-75 miles in ritual or trade feast contexts . . . ."[72]   From there, McClurken extrapolates that "[i]n indigenous institutions, political, societal and economic spheres overlap significantly" and therefore concludes that the RIC designation "seems the most appropriate designation for areas like the lands surrounding San Francisco and San Pablo bays because a variety of activities could occur at such sites."[73] Although the record contains evidence that the various Pomo bands did trade among each other and other tribes, McClurken's conclusion regarding the existence or importance of the RIC to the Band is unfounded.  Furthermore, there is nothing in the record that shows the alleged RIC included the Parcel or lands within its vicinity.  Finally, even if McClurken's theory is valid, evidence demonstrating that Pomo-speaking people generally traded in northern California does not establish that the Band has a significant historical connection to Point Molate.

### b.     Early European Contact with Pomo (1579-1775).

The Band also claims that Sir Francis Drake encountered Pomo people during his exploration of San Francisco Bay in 1579.[74]   As an initial matter, there is conflicting evidence regarding precisely where Drake landed in California, and it is possible that Drake did not land in San Francisco.[75]   Moreover, even if Drake landed in San Francisco, the record does not demonstrate that the Indians Drake encountered were Pomo.[76]   In fact, record evidence suggests that Drake may have encountered the Pomo's southern neighbors, the Coastal Miwok.  Finally, even assuming Drake did land in San Francisco Bay and encountered Pomo Indians (and not Miwoks), the Band provided no evidence that its ancestors (as opposed to another Pomo band) were present.

---

traveled to obtain resources, he fails to acknowledge that Bodega Bay is approximately 50-60 miles north of Point Molate.  Moreover, the record indicates that the fishing encampment on Bodega Bay was the favorite "in fact about the only" for all Indians in the area.  This statement weighs against the Band's assertions that it exercised any subsistence use on the Parcel - between 50 and 60 miles south of Bodega Bay.

[71]73 Fed. Reg. 29366.

[72] Lowell J. Bean, "Social Organization in Native California," in *Native Californians: A Theoretical Retrospective*, eds. Lowell J. Bean and Thomas C. Blackburn (Ramona, CA: Ballena Press, 1976), pp. 104-105 [hereinafter Bean, Social Organization].

[73] *See, e.g.*, Jan. 2006 GBP Report, at 10.

[74] *See, e.g.*, *Id.* at 47-49.

[75] County's 2008 Supplement, at 23-24.

[76] Jan. 2006 GBP Report, at 48 (stating that a number of scholars believe that the Indians Drake encountered were Miwok); *see also* County's 2008 Supplement, at 23-24 (recognizing that the location of Drake's landing is the subject of scholarly debate).

The Band further attempts to advance claims regarding the Pomo's interactions with Spanish missionaries and colonizers exploring the Bay Area. McClurken references the journals of Friar Jon Crespi, Pedro Font and Vincente de Santa Maria;[77] and, in general, claims that each account provides evidence of Pomo use and occupancy because they provide "insight from a primary source into *aboriginal* use of the Bay Area and its resources."[78] McClurken correctly asserts that those three sources document encounters with indigenous peoples in various portions of the Bay Area, but none of the sources specifically recall any encounters with the Band or, even more generally, Pomo Indians.[79] Thus, while the sources provide useful, general background information regarding indigenous populations in the Bay Area,[80] they do not demonstrate a significant historical connection on behalf of the Band.

### c.   Pomo Colonization in Spanish Missions (1776-1840s).

McClurken describes the period from 1776 through the 1840's as "The Era of Missions and Ranchos." During this period, McClurken says that Pomo use and occupancy in the Bay Area quickly changed from autonomous enjoyment of the lands, to an existence marked by mission efforts and slavery.[81] Still, the Band claims its Pomo ancestors continued to maintain a presence in the "Bay Area" in the early 1800s.[82] McClurken discusses the Spanish colonization of the Bay Area during which time native peoples were forced to live, work and worship on Spanish missions. He states that at least 600 Pomo were baptized at Missions San Francisco de Asis Delores, San Rafael and San Francisco Solano, which are to the south, west and north of the Point Molate Parcel. Incidentally, the source McClurken cites for the proposition that 600 Pomos were baptized does not mention Mission San Francisco de Asis Delores.[83] Rather, the source identifies only Missions San Rafael and San Francisco Solano as those where Pomoans where baptized.[84] Missions San Rafel and San Francisco Solano are located on the north side of San Pablo Bay, while the Parcel is located on the southern side of San Pablo Bay.[85]

---

[77] Jan. 2006 GBP Report, at 69-88.

[78] *Id.* at 71

[79] McClurken attempts to connect the Spanish accounts of Indians in and around San Francisco Bay to the Band by comparing the Band's traditional dress and regalia to the descriptions in the Spanish accounts. *Id.* at 86-88. This argument is weak, at best, given that the tribal member McClurken quotes to describe the Band's traditional regalia states that "much of the regalia that [the Band] ha[s] is also common to Coast Miwok, Eastern Miwok, Midaiu [sic] and other groups," thus "to the casual observer it is very difficult to tell the dance regalia form one tribal group to the next" and remarking that the Band's "reddish-orange headbands . . . are [] distinctive to *Northern California Native Americans* . . ." but the member never states that they are unique to the Band. *Id.*

[80] *Cf. Id.* at 88 (admitting that "Pomo, Miwok and Wappo, and others were likely among the groups encountered by Santa Maria and Font . . .").

[81] *Id.* at 88-89.

[82] *Id.* at 89.

[83] *See* Bean, Lowell John and Dorothea Theodoratus; "Western Pomo and Northeastern Pomo," in *Handbook of North American Indians, vol.* 8, *California,* ed. Robert F. Heizer (Washington, D.C.: Smithsonian Institution, 1978).

[84] *Id.*

[85] The San Rafael Archangel Mission was founded on December 14, 1817 and was one of the last missions built by the Spanish. The San Rafael Mission was built on the Marin peninsula, the northern side of San Pablo Bay. The Mission San Francisco Solano was built in 1823 and is located approximately 20 miles from the north east side of San Pablo Bay.

After gaining its independence from Spain, Mexico exercised jurisdiction over California from 1822 until executing the Treaty of Guadalupe Hidalgo with the United States in 1848. Under Mexican rule, indigenous communities were often raided and their people enslaved on Mexican ranchos.[86] Point Molate is located within the boundaries of one such former rancho, Rancho San Pablo.[87] McClurken contends that Pomo Indians from Ukiah were forcibly removed to Rancho San Pablo where they were forced into labor. However, he is unable to conclude that the ancestors of the Guidiville Band were among those relocated to Rancho San Pablo.[88]

It is true that the mission and rancheria eras were marked by significant displacement of Indian peoples in present-day northern California. McClurken, however, does not provide reliable historical documentation of the Band's presence on the Parcel, or lands in its vicinity. And evidence of the presence of indigenous peoples and Pomos, generally, on ranchos in the Bay Area, by itself, does not demonstrate the Band's occupancy or subsistence use on or in the vicinity of the Parcel. The Band must offer historical documentation of its significant historical connection to the Parcel, not simply evidence of general Pomoan presence in the much larger Bay Area.

#### d.     United States' assumption of control over California.

After the United States assumed control of California, the Bay Area developed rapidly, the indigenous population in the area was decimated, and Indian people from all tribes fled the area. During this time, McClurken claims that the Band's ancestors migrated, and that most moved to the Ukiah area.[89] The majority of the evidence relied upon for this proposition indicates that Pomo Indians and other native Californians migrated from the area. In addition, the Band claims that its migration is evidenced by genealogical research indicating that every major Guidiville family has ancestors that were born in the southern reaches of the Pomo range, within a 50-mile radius from the Point Molate Parcel.[90]

As an initial matter, it is unclear how this "migration" establishes that the Band occupied or used the Parcel for subsistence purposes. Also, it is again important to note that general evidence

---

[86] *See, e.g.*, Pitelka, Linda Pacini, *Mendocino: Race Relations in a Northern California County, 1850-1949*, pp. 19-50 (Ph.D. diss., Massachusetts Institute of Technology, Dept. of History, 1994).

[87] Another Rancho mentioned in McClurken's report is Rancho Petaluma where "Pomo, Coast Miwok, Wappo, and Patwin peoples [] lived and worked." Jan. 2006 GBP Report, at 102.

[88] Jan. 2006 GBP Report, at vi (commenting generally on the treatment of native Californians and claiming that Pomo Indians, who "*likely*" included ancestors of the Guidiville Band," were enslaved at Rancho Pablo but never definitively concluding that the Band's ancestors were there). Moreover, the few sources McClurken cites for the proposition that members of the Band were relocated to Rancho Pablo are, at best, inconclusive. Indeed, even McClurken seems to acknowledge this fact, as he states that there is only "*some* evidence that Native peoples, most *likely* Pomo, were coerced from the Santa Rosa area to work at . . . Rancho San Pablo." *Id.* at 99 (emphasis added); *see also Id.* at 100 (noting that in the 1850s American agents conducted "investigations of Indian slavery at Rancho San Pablo . . . [that ultimately] documented that Mexican-Americans kidnapped and sold into slave labor at the Rancho San Pablo large numbers of Pomo from both Clear Lake and the Ukiah area. These kidnapped Pomo *may have* included people related to the Guidiville Band") (emphasis added). Without more, McClurken's unsubstantiated speculation regarding the Indians at San Pablo Rancho does not demonstrate that the Guidiville Band's ancestors occupied land at Point Molate or in its vicinity.

[89] *See, e.g.*, Jan. 2006 GBP Report, at 108-119.

[90] McClurken states that "[a]ncestors of every major Guidiville family were born in the southern reaches of the Pomo range and within a 50-mile radius of their present proposed restored land acquisition site at Point Molate in Richmond, California." *Id.* at 113.

regarding Pomo migration does not necessarily equal Band-specific migration, or subsistence use and occupation. Turning now to the Band's genealogical claims, its genealogical chart is not supported by analysis. Thus, I am unable to opine on the validity of the Band's claims regarding its ancestry. Even assuming the validity of the Band's claims, however, evidence that individual tribal members were born at various locales in the Bay Area is not necessarily indicative of *tribal* occupation or subsistence use of a parcel located fifty miles away. Indeed, the tribal members' birth places could just as easily indicate that the Band occupied and used different lands far to the north of the Parcel.[91]  As such, the fact that ancestors of tribal members may have been born within a 50-mile radius of the Parcel does not indicate that the Band historically occupied or utilized the Parcel, or lands in its vicinity, for subsistence purposes.[92]

In 1909, the United States purchased land for the Guidiville Band of Pomo Indians and, by 1914, the boundaries of the Guidiville Rancheria had been established.[93]  Between 1909 and 1918, the population of the Rancheria dropped from nearly 100 to only 35 members.[94]  Some of the Band's members took part in the federally-sponsored BIA Outing Program, which relocated young women to the Bay Area to work as domestic servants. The BIA's Outing Program – part of the now repudiated era of assimilation – encouraged Indians to enter the homes of white middle class families. Allegedly "voluntary," the Outing program was similar to the Native American boarding schools of the era. The Band claims that approximately 15 of its ancestors participated in the Program between 1929 and 1936.[95]

McClurken and the Band provide details regarding women's experience in the Bay Area as part of the Outing Program. For example, Guidiville women were relocated to homes in the San Francisco East Bay, in cities near the Parcel such as Berkeley, Alameda, and Oakland.[96]  Other women were placed in homes in Marin, near San Pablo Bay, and in cities such as Sausalito.[97]  One Guidiville woman, Vivian Cooper, was placed by the BIA into a home in the City of

---

[91] In addition, the Band provides no evidence that any Band members or Pomo Indians were born south of San Pablo Bay and, instead, relies only on birth places far to the north of the Parcel.

[92] The Band also makes various claims regarding its lineage in its October 21, 2008 Memorandum regarding "Guidiville/Scotts Valley Common Genealogical Linkages and Additional BIA Outing Program Information." Memorandum to Jonathan Damm, Attorney, Office of the Solicitor from Merlene Sanchez, Chairperson, Guidiville Band of Pomo Indians, regarding "The Relocation of Guidiville Members to the Bay Area under the BIA Outing System" (Oct. 2, 2008) [hereinafter Outing Program Memo].  Contra Costa County submitted analysis contradicting the Band's claims. *See* Contra Costa County, Second Supplement to Response in Opposition to Indian Lands Determination Request Guidiville Band of Pomo Indians' Fee-to-Trust Application and Gaming Development Project" p. 46-54 (April 14, 2009) [hereinafter County's Second Supplement]. The claims advanced in the Band's memo are vague and fail to explain whether any of these individuals resided in Contra Costa County, the City of Richmond or on the Parcel. Moreover, the "family tree" information the Band provides does not aid our understanding of the connection between Guidiville Band's ancestors and the Scott's Valley Tribe. In any event, the Memorandum does not provide sufficient explanation or analysis indicating why any of the analysis or purported supporting evidence indicates that the Band has a significant historical connection to the parcel. I am unable, especially in light of the County's conflicting analysis, to find that the Band's Memorandum and supporting evidence indicate that the Band occupied or used the Parcel or lands in its vicinity.

[93] Jan. 2006 GBP Report, at 164.

[94] Outing Program Memo, at 5.

[95] Outing Program Memo, at 1-11.

[96] *Id.* at 1.

[97] *Id.* at 5.

Richmond.[98]  The Outing Program and other efforts by the Federal government to relocate and assimilate Native Americans were indeed terribly damaging to the Band.  While the Outing Program, in particular, relocated individual Indians, many Band members remained in Ukiah on the Rancheria.  Moreover, the record indicates that sometimes these individual tribal members would only participate for a few weeks or months.  Indeed, Vivian Cooper's "Outing System" Index indicates that she was employed in Richmond between May 24-29, 1929 and again from June 4-15 1929.[99]  The rest of her time was spent in Oakland and Alameda for a total of approximately one month between the summer of 1929 and winter of 1932.[100]  As regrettable as the Outing Program was, the relocation of some of the Band's members to various locales throughout the Bay Area does not equate to the Band itself establishing subsistence use or occupancy in the region apart from its Rancheria in Ukiah.

Nor has the Band has provided documentation sufficient to demonstrate that its ancestors, as opposed to other  Pomo Indians or Indian peoples in the area, engaged in subsistence use or occupancy upon or in the vicinity of the Point Molate Parcel.  Indeed, the Band is unable to demonstrate that it had any village or burial ground anywhere in the City of Richmond or within Contra Costa County. In general, the majority of the Band's evidence documents connections of Pomo Indians or indigenous populations, generally, to lands north of San Pablo Bay.  And, without more, such vague and speculative evidence cannot support the arguments and claims advanced in the Band's voluminous submissions.  Accordingly, based on our review of the Band's analysis and supporting evidence, I am unable to conclude that there is a "significant historical connection" between the Band and the Parcel or lands in its vicinity.  Thus, the Guidiville Band has not established significant historical connections to the Point Molate Parcel and does not meet the requirements of § 292.12(b).

### C.    The Band established a "temporal connection" between the fee-to-trust application and restoration of its recognition.

Finally, section 292.12(c) requires that "[t]he tribe must demonstrate a temporal connection between the date of the acquisition of the land and the date of the tribe's restoration."  A tribe can show this by two ways: "(1) [t]he land is included in the tribe's first request for newly acquired lands since the tribe was restored to Federal recognition; or (2) [t]he tribe submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming on other lands."  Here, the Band meets subparagraph (2).  The Band's request to take the Point Molate Parcel into trust was made within 25 years of the Band being restored to Federal recognition in 1992 and the Band is not gaming on other lands.  Therefore, the Band can show a temporal connection and meets the requirements of section 292.12(c).

### Conclusion

I believe that the Point Molate parcel does not meet the regulatory requirements to qualify for the Restored Lands Exception in IGRA.  The Band has not claimed that the Parcel would be eligible

---

[98] *Id.* at 6.
[99] *See* Index – Outing System for Vivian Cooper, included as Exhibit E to Outing Program Memo.
[100] *Id.*

for gaming under any other exception to IGRA's general prohibition against gaming on newly acquired lands. Therefore, it is my determination that the Parcel, if acquired in trust, would not be eligible for gaming under IGRA.

This decision does not preclude the Band from considering alternative, non-gaming uses for the land. The limitation imposed by Congress on lands to be acquired in trust for gaming purposes should not be interpreted as a prohibition against acquiring the land in trust for any other purpose. Therefore, if the Band wishes to have the Department acquire the land in trust for other non-gaming purposes, please amend the application accordingly. Please be advised that the Department would review such an application pursuant to our regulations at 25 C.F.R. Part 151, which requires us to examine, among other factors, the purpose for which the land would be used, the distance from the Band's existing reservation, and environmental concerns.

Should the Band wish to continue to pursue this site for gaming purposes, it will need to submit an application pursuant to 25 U.S.C. § 2719(b)(1)(A) – the Secretarial Determination exception to IGRA's prohibition on gaming on lands acquired in trust after October 17, 1988.

I regret that our decision could not be more favorable at this time.

Sincerely,

Larry Echo Hawk
Assistant Secretary – Indian Affairs