Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 11-cv-00284-RWR |
| v. | ) ) | |
| KEN SALAZAR, *et al.*, | ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| THE COWLITZ INDIAN TRIBE, | ) ) | |
| Intervenor Defendant. | ) ) ) | |

**BRIEF OF *AMICUS CURIAE* THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON IN SUPPORT OF DEFENDANT'S AND INTERVENOR DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................ii

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ...................................................................................... 3

    I.     BACKGROUND ON THE ICC AND THE WARM SPRINGS AND
          COWLITZ ICC CASES ............................................................. 3

         A.    Overview of the Indian Claims Commission ................................ 5

         B.    The Cowlitz Tribe's ICC Case ................................................ 7

         C.    The ICC's "Exclusive Use" Standard of Proof ............................ 8

         D.    The Warm Springs ICC Case ................................................. 9

    II.    THE SECRETARY PROPERLY RELIED ON THE COWLITZ TRIBE'S ICC
          ADJUDICATION IN DETERMINING THAT THE PARCEL IS ELIGIBLE
          FOR GAMING UNDER THE "INITIAL RESERVATION" EXCEPTION IN
          IGRA ................................................................................. 11

CONCLUSION .................................................................................. 15

i

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Carcieri v. Salazar,*
  555 U.S. 379 (2009)............................................................ 3, 7

*Certified Color Mfrs. Ass'n v. Mathews;*
  543 F.2d 284 (D.C. Cir. 1976) ........................................... 15

*Confederated Tribes of Warm Springs Reservation of Ore. v. United States,*
  12 Ind. Cl. Comm. 664 (1963)............................................10

*Confederated Tribes of the Warm Springs Reservation of Ore. v. United States,*
  177 Ct. Cl. 184 (Ct. Cl. 1966).......................................... 8, 10

*Confederated Tribes of the Warm Springs Reservation of Ore. v. United States,*
  18 Ind. Cl. Comm. 354 (1967)........................................... 10

*Confederated Tribes of Warm Springs Reservation of Ore. v. United States,*
  18 Ind. Cl. Comm. 361-a (1967) .........................................11

*Quapaw Tribe v. United States,*
  120 F.Supp. 283, 128 Ct. Cl. 45 (1954) ................................. 8

*Sac and Fox Tribe of Indians of Okla. v. United States,*
  383 F.2d 991 (Ct. Cl. 1967) ........................................... 6, 8

*Simon Plamondon, on Relation of the Cowlitz Tribe of Indians v. United States,*
  21 Ind. Cl. Comm. 143 (1969)...........................................7, 12

*Simon Plamondon, on Relation of the Cowlitz Tribe of Indians v. United States,*
  25 Ind. Cl. Comm. 442 (1971), *aff'd*, 199 Ct. Cl. 523, 467 F.2d 935 (1972).............. 7

*Snake or Piute Indians of Former Malheur Reservation in Ore. v. United States,*
  112 F. Supp. 543 (Ct. Cl. 1953) ......................................... 6

*Sohappy v. Smith,*
  302 F. Supp. 899 (D.C. Or. 1969)........................................10

*Strong v. United States,*
  207 F.2d 556 (Ct. Cl. 1975) ............................................. 9

*Thomas Jefferson Univ. v. Shalala,*
  512 U.S. 504 (1994).................................................... 15

W1101.5(e)/515291.doc

## TABLE OF AUTHORITIES – Con't.

**Page(s)**

*United States v. Pueblo of San Ildefonso,*
  513 F.2d 1383 (Ct. Cl. 1975) .................................................................. 9

**Statutes and Regulations**

Indian Claims Commission Act, Pub. L. No. 79-726, 60 Stat 1049 (1946) ...................... 5

Act of Oct. 8, 1976, Pub. L. No. 94-465, 90 Stat. 1990 (1976) ............................................ 6

5 U.S.C. § 706(2) .................................................................................................. 15

25 U.S.C. § 70a ....................................................................................................... 5

25 U.S.C. § 70s ....................................................................................................... 5

25 U.S.C. § 465 ....................................................................................................... 3

25 U.S.C. § 479 ....................................................................................................... 3

25 U.S.C. § 2719(b)(1)(B)(ii) ................................................................................... 3

28 U.S.C. § 1505 ..................................................................................................... 5

25 C.F.R. Part 151 .................................................................................................. 2

25 C.F.R. § 292.2 .................................................................................................... 4

25 C.F.R. § 292.6 ................................................................................................. 3,4

**Other Authorities**

73 Fed. Reg. 29354 (May 20, 2008) ....................................................................... 13

Nell Jessup Newton, *Compensation, Reparations & Restitution: Indian Property Claims
  in the United States*, 28 GA. L. REV. 453 (1994) ................................................... 6

Treaty with the Tribes of Middle Oregon of June 25, 1855, 12 Stat. 963 ......................... 1

United States Indian Claims Commission, August 13, 1946-September 30, 1978: Final
  Report (1979) ..................................................................................................... 6

Webster's Third New Int'l Dictionary (3d ed. 1986) ...................................................... 12

Michael Leider & Jake Page, *Wild Justice: The People of Geronimo v. The United States*
  (1997) ................................................................................................................ 6

W1101.5(e)/515291.doc

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amicus Curiae* The Confederated Tribes of the Warm Springs Reservation of Oregon ("Warm Springs Tribe" or "Warm Springs") is a sovereign governmental and corporate entity that is the legal and political successor in interest to the seven tribes and bands that were signatories to the Treaty with the Tribes of Middle Oregon of June 25, 1855, 12 Stat. 963 ("Treaty of 1855"). Pursuant to Section 17 and Section 18 of the Indian Reorganization Act of 1934 ("IRA"), the Warm Springs Tribe in 1938 adopted a constitution and bylaws and also adopted a federal corporate charter, both of which were approved by the Secretary of the Interior. These organic documents establish tribal membership criteria, objectives, power and authority, and provisions for a tribal council to exercise legislative, executive and judicial powers of the Warm Springs Tribe and also to exercise the corporate powers of the Warm Springs Tribe.

Consistently with its organic documents and its unique sovereign status, the Warm Springs Tribe exerts primary governmental authority over the Warm Springs Reservation ("Reservation"), a beautiful but remote expanse of approximately 644,000 acres in northern Central Oregon reserved for the exclusive use of the Warm Springs Tribe by the Treaty of 1855. The Reservation consists almost entirely of trust land. The Treaty of 1855 also reserved important off-reservation rights including the right to hunt, pasture livestock, gather roots and berries on unclaimed lands, and to fish at usual and accustomed stations. In exchange for those reserved rights, the signers of the Treaty of 1855 ceded title to approximately 10 million acres of land ("Warm Springs ceded lands"). See Exhibit A (map of Reservation and Warm Springs ceded lands).

For several years, the Warm Springs Tribe has been pursuing a fee-to-trust application for the Secretary of the Interior to take into trust a 25-acre parcel of land

located in Cascade Locks, Oregon ("Cascade Locks parcel") for the purpose of constructing a gaming facility and resort pursuant to 25 C.F.R. Part 151 and Section 20(b)(1)(A) of the Indian Gaming Regulatory Act ("IGRA"). Cascade Locks is within the Warm Springs ceded lands and is within the area determined by the Indian Claims Commission ("ICC") to be the Warm Springs Tribe's aboriginal lands exclusive of the claim of any other tribe or tribes – *viz.*, the Warm Springs Tribe demonstrated it had actual, exclusive, and continuous use and occupancy of the area for an extended time prior to the loss of the property. *Confederated Tribes of the Warm Springs Reservation of Ore. v. United States*, ICC Docket No. 198 ("Warm Springs ICC case"). The Cascade Locks parcel is approximately 45 miles from Downtown Portland and 64 miles from the parcel at issue in this case ("Parcel" or "Cowlitz Parcel"). The Warm Springs Tribe currently operates a Class III gaming facility on the Reservation in Warm Springs, Oregon.

Similar to Warm Springs, the Cowlitz Tribe adjudicated its aboriginal lands claims in an ICC proceeding. *Simon Plamondon, on Relation of the Cowlitz Tribe of Indians v. United States*, ICC Docket No. 218 ("Cowlitz Tribe ICC case"). Plaintiff erroneously relies on the Cowlitz Tribe's ICC Case to refute the Secretary's finding that the Cowlitz Tribe has significant historical connections to the Parcel in satisfaction of the Department of the Interior's regulations implementing IGRA. Plaintiff misconstrues the effect of the Cowlitz Tribe's ICC case because Plaintiff fails to appreciate the high standard imposed by the ICC in its aboriginal land adjudication cases when determining exclusive use and occupancy areas. For this reason, the Warm Springs Tribe appears as *amicus curiae* in support of the Secretary of the Interior's Record of Decision for the

Trust Acquisition of, and Reservation Proclamation for the 151.87-acre Cowlitz Parcel in Clark County, Washington, for the Cowlitz Indian Tribe issued on December 17, 2010, ("ROD").[1]  The Warm Springs Tribe's experience with the ICC illustrates that the Cowlitz Tribe's ICC adjudication is indeed supportive of the Secretary of the Interior's finding that the Cowlitz Tribe has significant historical ties to the Parcel.

## ARGUMENT

I.     **BACKGROUND ON THE ICC AND THE WARM SPRINGS AND COWLITZ ICC CASES**

Under IGRA, a tribe may conduct gaming activities on lands taken into trust after October 17, 1988, if it meets one of several exceptions set forth in Section 20 of IGRA. The Secretary determined that the Parcel was eligible for gaming under the "initial reservation exception," 25 U.S.C. § 2719(b)(1)(B)(ii), which requires that the Cowlitz Tribe demonstrate certain factors relating to the geographic location of the land, as well as the Tribe's historical and modern connection to the land.  25 C.F.R. § 292.6(d). Specifically, if a tribe does not have a proclaimed reservation on the effective date of the regulations, to be proclaimed an initial reservation under this exception, the tribe must demonstrate the following:

> [T]he land is located within the State or States where the Indian tribe is now located, as evidenced by the tribe's governmental presence and tribal population, and within an area where the tribe has significant historical connections and one or more of the following modern connections to the land:

---

[1] Although the Warm Springs Tribe's submission is limited to Plaintiff's interpretation of the Cowlitz Tribe's ICC case, the Warm Springs Tribe is generally supportive of the ROD, including the Secretary's construction of Sections 5 and 19 of the Indian Reorganization Act, 25 U.S.C. §§ 465, 479 (2006), in light of *Carcieri v. Salazar*, 555 U.S. 379 (2009).  As discussed in detail by Intervening Defendant Cowlitz Tribe, Plaintiff's interpretation of the IRA is far more restrictive than the holding of *Carcieri* dictates, and is inconsistent with the text, legislative history, and remedial purpose of the IRA.  Contrary to Plaintiff's position, the Secretary correctly determined—both as a matter of law and as a matter of fact—that the Cowlitz Tribe was "under federal jurisdiction" in 1934 as required by the IRA.

> (1) The land is near where a significant number of tribal members reside; or
>
> (2) The land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust; or
>
> (3) The tribe can demonstrate other factors that establish the tribe's current connection to the land.

25 C.F.R. § 292.6(d).

In determining that the Tribe had met the criteria outlined in this section, the

Secretary found that:

> The Cowlitz Parcel meets the geographic location requirement because, as explained in the Tribe's amended fee-to-trust application and the Final EIS, the Cowlitz Parcel is located in the same state (Washington) where the Tribe is currently located. The Tribe's current location is demonstrated by the presence of the Tribe's headquarters in Longview, Washington, and the residence of a majority of its member population in Washington State. Further, the parcel is located within an area in which the Tribe has significant historical connections, as explained in detail in the Tribe's amended fee-to-trust application, the Tribe's request for a restored lands opinion, and the NIGC Restored Lands Opinion, which relies heavily on facts already adjudicated by the BIA in the Tribe's acknowledgment proceedings and by the ICC in the Tribe's land claim litigation. These facts demonstrate "significant historical connections" within the meaning of Sections 292.6(d) and 292.2 of the regulations governing IGRA's "initial reservation" exception.

AR000145 (ROD at 116).

The Plaintiff asserts that the Cowlitz do not have any historical connection to the

Parcel, and thus the ROD must be vacated and remanded to the Secretary with

instructions to reject the Cowlitz's request to conduct gaming on the parcel. (Pl.'s Mot.

for Summ. J. 30-39). To support its assertion, Plaintiff relies in part on the adjudication

of an earlier Cowlitz claim by the Indian Claims Commission (ICC). Specifically, the

Plaintiff claims that "the ICC found that the southernmost edge of the land to which the

W1101.5(e)/515291.doc

Cowlitz had a legitimate ownership claim was approximately 14 miles north of the Parcel," and that the ICC "explicitly rejected" the Cowlitz claim that their ancestors lived near the Lewis River, which flows within two miles of the Parcel.  (Pl.'s Mot. 35) Plaintiff is mistaken about the effect of the ICC adjudication on the current proceeding.

### A.    Overview of the Indian Claims Commission

Congress established the ICC in 1946 to hear and resolve claims for money damages by tribes against the United States, which were previously barred by the government's sovereign immunity.  Indian Claims Commission Act, Pub. L. No. 79-726, 60 Stat 1049 (1946) (formerly codified at 28 U.S.C. § 1505, 25 U.S.C. § 70 et seq.) ("ICC Act").  The ICC Act authorized the ICC to adjudicate all historical claims of "any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska" that accrued before August 13, 1946.  ICC Act, 28 U.S.C. § 1505 (repealed 1978).  The ICC Act gave the ICC jurisdiction over five broad classes of historic claims, including "claims arising from the taking by the United States...of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant[.]"  ICC Act § 2 (formerly codified at 25 U.S.C. § 70a).  The ICC Act provided that the Court of Claims and the Supreme Court would have appellate review over the ICC's decisions.  ICC Act § 20 (formerly codified at 25 U.S.C. § 70s).

The vast majority of the cases heard by the ICC were tribal claims for the taking of Indian lands without just compensation.  Most of these claims were based on "aboriginal title," wherein the Indian claimants were required to prove that the lands in question were their aboriginal homeland, used and occupied exclusive of other Indian

peoples, for a long period of time prior to non-Indian settlement.  See *Sac and Fox Tribe of Indians of Okla. v. United States*, 383 F.2d 991, 998 (Ct. Cl. 1967).

The ICC initially was granted a life of ten years, during which it was to hear and decide all cases filed prior to August 13, 1951.  ICC Act § 23 (formerly codified at 25 U.S.C. § 70v).  This grant of authority was extended several times to allow the ICC adequate time to meet the needs of its tremendous caseload.  The ICC's authority finally terminated on September 30, 1978.  See Act of October 8, 1976, Pub. L. No. 94-465 § 2, 90 Stat. 1990 (1976).  According to the ICC's final report, the ICC completed 546 dockets during its 31 year existence.  United States Indian Claims Commission, August 13, 1946-September 30, 1978: Final Report 125 (1979).

ICC rulings set high evidentiary standards for proving aboriginal title.  Michael Leider & Jake Page, *Wild Justice: The People of Geronimo v. The United States* 90 (1997).  Those high evidentiary standards were especially difficult to meet as the issues to be proved were rarely supported by a written record.  *Id.* at 270; see also *Snake or Piute Indians of Former Malheur Reservation in Ore. v. United States*, 112 F. Supp. 543, 552 (Ct. Cl. 1953).  In addition, the Department of Justice aggressively defended every claim and maintained a policy of appealing all adverse judgments and rarely settling claims.  Leider & Page, *supra*, at 92-93; see also Nell Jessup Newton, *Compensation, Reparations & Restitution: Indian Property Claims in the United States*, 28 GA. L. REV. 453, 469 (1994).  Indeed, many commentators have argued that the ICC failed to accomplish its purpose of acknowledging and redressing past wrongs committed against tribes by the United States because of the adversarial nature of the proceedings and the difficult evidentiary standards set by the Commission.  *Id.*

W1101.5(e)/515291.doc

### B.   The Cowlitz Tribe's ICC Case

In 1951, the Cowlitz Tribe brought an action in the ICC concerning aboriginal title to a tract of land in the southwestern part of Washington containing the entire drainage of the Cowlitz and Lewis Rivers (which included the area in which the Parcel is located).[2]  See *Simon Plamondon, on Relation of the Cowlitz Tribe of Indians v. United States*, 21 Ind. Cl. Comm. 143, 170 (1969).  In its 1969 decision, the ICC judicially determined that the Cowlitz Tribe exclusively used and occupied a large tract of land in Southwest Washington extending from Naches Peak (near Mt. Rainier) in the north to the mouth of the Kalama River in the south.[3]  This adjudicated exclusive use and occupancy area lies only fourteen (14) miles to the north of the Cowlitz Parcel.

Plaintiff asserts that the 14 mile distance between the Parcel and the southernmost edge of the ICC-established exclusive use and occupancy area precludes the Secretary from determining that the Cowlitz had significant historical connections to the Parcel for the purposes of IGRA.  (Pl.'s Mot. at J. 35-38).  Plaintiff fails to appreciate the high standard imposed by the ICC in its aboriginal land adjudication cases, however.

---

[2] By adjudicating the Cowlitz Tribe's claim for the taking of its lands, the ICC recognized the Cowlitz Tribe as an "Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska" within the meaning of the ICC Act. Indeed, the ICC employed stringent standards when determining whether Indian claimants constituted a band or a tribe. Lieder & Page, *supra*, at 119.  The Cowlitz Tribe's ICC suit commenced in 1951—seventeen years after Congress passed the IRA—and lasted for over twenty years.  In compliance with the fee-to-trust provisions of the IRA as interpreted in *Carcieri*, the ICC's adjudication of the Cowlitz Tribe's suit is yet another example of the federal government's continuous recognition and assertion of jurisdiction over the Cowlitz Tribe from its first contact with the Tribe until the Cowlitz Tribe was formally acknowledged in 2002 for the purpose of receiving federal benefits available to tribes with a formal government-to-government relationship with the United States.

[3] The ICC issued a decision on rehearing in June 1971, which was affirmed by the Court of Claims in October 1972. *Simon Plamondon, on Relation of the Cowlitz Tribe of Indians v. United States*, 25 Ind. Cl. Comm. 442 (1971), *aff'd*, 199 Ct. Cl. 523, 467 F.2d 935 (1972).  These subsequent proceedings focused solely on the date of the taking, however, and neither party contested the ICC's findings as to the extent of the aboriginal title of the Cowlitz Tribe as determined by the ICC in its 1969 decision. See *Plamandon*, 467 F.2d at 935.

W1101.5(e)/515291.doc

### C.    The ICC's "Exclusive Use" Standard of Proof

The ICC was scrupulous about determinations of aboriginal title to land.  It was not enough for a tribe to show that the United States had acknowledged an area of land as its aboriginal lands through treaty language.  See *Confederated Tribes of the Warm Springs Reservation of Ore. v. United States*, 177 Ct. Cl. 184 (Ct. Cl. 1966).  In order to prove aboriginal title and be entitled to compensation from the United States, the ICC required a showing that the tribe in question had actually occupied an area for time immemorial, or at least for "a long period of time" before the treaty was signed, and with a claim of ownership.  *Sac and Fox Tribe of Indians of Okla. v. United States*, 383 F.2d 991, 998 (Ct. Cl. 1967) ("To be accepted under the Indian Claims Commission Act, aboriginal title must rest on <u>actual, exclusive and continuous use and occupancy 'for a long time'</u> prior to the loss of the property." (emphasis added)).

In addition to long usage, the tribe bringing the claim must also establish that its use of the land was <u>exclusive</u>; that is, the land was not used in common with other Indian peoples.  The court considered this exclusivity requirement in several cases before it:

> The obstacle facing the Indian claimants in this litigation is the requirement of "exclusiveness."  <u>Generally, mixed and non-exclusive use and occupancy of an area precludes the establishment of any aboriginal title by any of the users of the subject property.</u>  *Quapaw Tribe v. United States*, 120 F.Supp. 283, 128 Ct.Cl. 45 (1954).  The purpose of this requirement is fairly obvious.  In order to award compensation to the Indians for the value of land ceded to or taken by the Government, it is essential that the Commission first determine that the land in question was truly "owned" by the ancestors of the particular claimant or claimants.  Certainly, one of the primary characteristics of ownership is the desire and ability to exclude others from the area over which ownership is claimed.

*Strong v. United States*, 207 F.2d. 556, 561 (Ct. Cl. 1975) (emphasis added) (citation in original).

> Implicit in the concept of ownership of property is the right to exclude others. Generally speaking, a true owner of land exercises full dominion and control over it; a true owner possesses the right to expel intruders. <u>In order for an Indian tribe to establish ownership of land by so-called Indian title, it must show that it used and occupied the land to the exclusion of other Indian groups</u>. True ownership of land by a tribe is called in question where the historical record of the region indicates that it was inhabited, controlled or wandered over by many tribes or groups.

*United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1394 (Ct. Cl. 1975) (emphasis added).

Thus, a tribe cannot establish aboriginal title to land unless it proves that its historic use and occupancy of the land was exclusive.  Conversely, where the ICC has ruled that aboriginal title exists in a tribe, it must necessarily have found that the tribe's historic use of the land was exclusive and continuous, and no other Indian peoples have a claim of ownership to that land.

### D.    The Warm Springs ICC Case

The Warm Springs Tribe's ICC case (ICC Docket No. 198) provides a good example of the high standard of proof required by the ICC when adjudicating exclusive use and occupancy of aboriginal lands.  In the Treaty of 1855, the Indian signatories ceded to the United States approximately 10 million acres of land, reserving for their exclusive use the Warm Springs Reservation.  The minutes of the three-day treaty negotiations from July 23 to 25, 1855, as well as the final treaty language, demonstrate how the Indian signatories described their sovereign territory by referencing geographic landmarks, and specifically reserved the Warm Springs Reservation from the territory ceded, again by reference to specific geographic landmarks.  See Exhibit B (Treaty of 1855); Exhibit C (Minutes of Treaty of 1855).  In 1958, the Tribe brought a claim before

W1101.5(e)/515291.doc

the ICC asserting ownership of those ceded lands by aboriginal title and seeking just and equitable compensation for them.  Ultimately, the ICC found that the Warm Springs Tribe had established aboriginal title to slightly more than 1.6 million acres of land—only 16 percent of the lands ceded by the signatory tribes in the Treaty of 1855.  *Confederated Tribes of the Warm Springs Reservation of Ore. v. United States*, 18 Ind. Cl. Comm. 354 (1967).  This very narrow determination of aboriginal title did not alter the fact that Warm Springs tribal members from treaty time to the present day actively exercise their treaty reserved off-reservation hunting, grazing, food-gathering, and fishing rights throughout the 10 million-acre Treaty ceded area and beyond at "usual and accustomed" locations. See *Sohappy v. Smith*, 302 F. Supp. 899 (D.C. Or. 1969).

The case before the ICC, which was fiercely contested, lasted for nearly twenty years, and was appealed to the United States Court of Claims in 1966.  The Warm Springs Tribe put on extensive evidence, including the testimony of anthropologists and historians, correspondence between the U.S. Indian agents for Oregon Territory and Washington, D.C., from the 1840s through the turn of the century, journals and other writing of early explorers through the region, including extensive portions of the journals of Lewis and Clark, journals of white settlers, and sworn affidavits of tribal members who were living at treaty times.  *Confederated Tribes of Warm Springs Reservation of Ore. v. United States*, 177 Ct. Cl. 184 (1966).   In its final judgment, the ICC determined that the Warm Springs Tribe held aboriginal title to seven separate but contiguous tracts of land located along the south side of the Columbia River totaling 1,605,000 acres. *Confederated Tribes of Warm Springs Reservation of Ore. v. United States,* 12 Ind. Cl. Comm. 664, 708-710 (1963); see also Order Amending Findings of Fact and

Interlocutory Order, *Confederated Tribes of Warm Springs Reservation of Ore. v. United States*, 18 Ind. Cl. Comm. 361-a (1967).   Notably, and over the Tribe's strenuous objections, none of the lands within the boundaries of the Warm Springs Reservation as described in the Treaty of 1855 were included within the boundaries of the Warm Springs Tribe's exclusive use and occupancy area adjudicated by the ICC.   See Exhibit D (Map of Reservation and ICC Judgment Area).   To this day, Warm Springs tribal members refuse to accept as valid the ICC's determination that the Reservation their forefathers specifically negotiated for in 1855 as an exclusive tribal homeland carved out of the 10 million acres of their sovereign territory described in the 1855 Treaty was not under their exclusive use and occupancy at treaty time.

## II.   THE SECRETARY PROPERLY RELIED ON THE COWLITZ TRIBE'S ICC ADJUDICATION IN DETERMINING THAT THE PARCEL IS ELIGIBLE FOR GAMING UNDER THE "INITIAL RESERVATION" EXCEPTION IN IGRA

In its Motion for Summary Judgment, Plaintiff relies on the fact that the Cowlitz Parcel is fourteen miles south of the exclusive use and occupancy area adjudicated by the ICC as evidence that the Cowlitz Tribe does not have "significant historical connections" to the Parcel required to meet IGRA's initial reservation exception.   (Pl.'s Mot. at 37-40).   To the contrary, the close proximity of the Parcel to the ICC boundary supports the Secretary's finding that the Cowlitz Tribe does indeed have sufficient historical ties to the Parcel to satisfy the applicable regulatory standard.

Under the Department of the Interior's regulations addressing gaming on land acquired by a tribe after 1988, in order to show that the tribe has "significant historical connections" to a tract of land in order to be eligible for gaming under the "initial reservation" exception in IGRA, it must demonstrate to the Secretary that:

W1101.5(e)/515291.doc

> [T]he land is located within the boundaries of the tribe's last reservation
> under a ratified or unratified treaty, or a tribe can demonstrate by
> historical documentation the existence of the tribe's villages, burial
> grounds, occupancy or subsistence use in the vicinity of the land.

25 C.F.R. § 292.2.

Here, the Cowlitz Parcel was not reserved under a treaty, so the Cowlitz Tribe must demonstrate that it conducted certain activities within the vicinity of the Parcel. As Plaintiff points out, "vicinity" is defined as "a surrounding area or district." Webster's Third New Int'l Dictionary 2550 (3d ed. 1986). Unlike the ICC standard for proving aboriginal title—which required tribes to prove exclusive use and occupancy of lands for a long period of time—the standard set by the Department requires the Cowlitz Tribe to demonstrate that it conducted one or more of the following uses in the area surrounding the Parcel: (1) villages, (2) burial grounds, (3) occupancy, or (4) subsistence use. The Department has not required that any of these uses be exclusive, or even that these uses be on the Parcel itself.

The ICC recognized that the Lewis River area was "used by various Indian groups throughout the first half of the nineteenth century," which precluded the ICC from determining that the Cowlitz Tribe had exclusive use and occupancy of the Parcel. *Palmondon,* 21 Ind. Cl. Comm. at 147. Indeed, the evidence examined and discussed by the ICC suggests that the Cowlitz did occupy the area in which the Parcel is located. See, e.g., *id.* at 155.

Given the stringent standards imposed by the ICC when determining aboriginal title, such occupancy would be expected where the Cowlitz Tribe's area of aboriginal title as adjudicated by the ICC is only fourteen miles north of the Parcel. In other words, where a parcel is only fourteen miles away from an ICC adjudicated boundary, it is likely

12                                                W1101.5(e)/515291.doc

the affected tribe has significant historical connections with the parcel sufficient to satisfy the initial reservation exception in IGRA.[4]

Indeed, even Plaintiff claims historical connections to the Parcel, asserting that the Multnomah Chinookans who lived at the mouth of the Lewis River are among the ancestors of the Grand Ronde. (Pl.'s Mot. at 38, n. 20). The Grand Ronde never submitted land claims to the Indian Claims Commission, so their connection to the area surrounding the Parcel has never been adjudicated. The Grand Ronde's reservation is, however, located 88 miles from the Parcel, which is significantly more than the fourteen miles at issue here. By making a claim of significant historical connection to the Parcel, Plaintiff has essentially acquiesced that it is possible for a tribe to have significant historical connections to a parcel of land that is not located within a tribe's area of long-term exclusive use and occupancy.

Plaintiff warns that a broad reading of the initial reservation exception would give newly recognized tribes an advantage over preexisting tribes because they could opportunistically place their new reservations near lucrative gaming markets. The narrow reading of the initial reservation exception promoted by Plaintiff—essentially requiring that the Parcel be within the Cowlitz Tribe's ICC adjudicated exclusive use and occupancy area in order to prove that it has "significant historical connections" to the Parcel—would have the opposite effect, however. As Plaintiff recognizes, IGRA allows Indians to conduct gaming activities on their existing reservations. Plaintiff further recognizes that "those pre-existing reservations were, by definition, land to which the

---

[4] This conclusion is consistent with the Department's Final Rule, in which it clarified that the term "significant historical connection" is "not limited to the tribe's exclusive use and occupancy area" because such a limitation "would create too large a barrier to tribes in acquiring lands[.]" 73 Fed. Reg. 29354, 29360, 29366 (May 20, 2008).

W1101.5(e)/515291.doc

tribes had close historical and cultural connections." (Pl.'s Mot. at 32).  While that may

be true as a general proposition, certainly many pre-existing reservations are in locations

where the tribes have "significant historical connections" but are not within ICC

"exclusive use and occupancy" areas.  Warm Springs is an example.

Pursuant to IGRA, the Warm Springs Tribe operates a gaming facility on the

Warm Springs Reservation, which it reserved for the exclusive use of the Warm Springs

Tribe under the Treaty of 1855.  Although the Reservation is described with particularity

in the Treaty of 1855 and located entirely within the boundaries of the sovereign territory

ceded by the Warm Springs Tribe in the 1855 Treaty, it is approximately ten miles south

of the southern boundary of the Warm Springs Tribe's exclusive use and occupancy area

established by the ICC.  In other words, while Warm Springs unquestionably had at treaty

time "significant historical connections" to the Warm Springs Reservation, according to

the ICC the Reservation was not within its "exclusive use and occupancy" area.  Under

Plaintiff's misreading of IGRA and its implementing regulations, if the Warm Springs

Tribe had not treated with the United States and set aside the Reservation under the

Treaty of 1855 and had instead been limited to the ICC adjudicated boundary, it would

not have been able to establish its reservation in its current location and to conduct

gaming activities thereon.  That absurd outcome illustrates Plaintiff's misreading of the

law as equating "significant historical connections" as synonymous with an ICC

"exclusive use and occupancy" determination.  Accordingly, Plaintiff's narrow

interpretation of the IGRA regulations as they relate to the Cowlitz Tribe's ICC case

would put the Cowlitz Tribe at a distinct *dis*advantage compared to tribes with existing reservations.[5]

In sum, the Secretary properly determined that the Cowlitz Tribe has significant historical connections to the Parcel based in part on the facts adjudicated by the ICC. Thus, the Parcel is eligible for gaming under the "initial reservation exception" in IGRA.

## CONCLUSION

As acknowledged by the Plaintiff, this Court may set aside the ROD only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2) (2006); see, e.g., *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Certified Color Mfrs. Ass'n v. Mathews*, 543 F.2d 284, 293-94 (D.C. Cir. 1976). Here, the Secretary has carried out obligations mandated by the IRA and IGRA, and has interpreted the relevant provisions of those statutes consistently with the text, context, and legislative history of the statutes, and with applicable case law. Thus, the Court should deny the Plaintiff's Motion for Summary Judgment.

---

[5] In fact, Plaintiff takes a broad view of historical connections in other contexts, particularly with respect to its own historical connections to various areas within the region. Plaintiff has claimed an historical connection to the Parcel, stating that the "Multnomah Chinookans who lived at the mouth of the Lewis River are among the ancestors of the Grand Ronde." (Pl.'s Mot. at 38, n. 20). In the context of the Warm Springs Tribe's fee-to-trust application to conduct gaming activities in Cascade Locks, Oregon, Plaintiff has even claimed an historical connection to the Cascade Locks parcel, which was adjudicated by the ICC to be an area of exclusive use and occupancy of the Warm Springs Tribe. See October 27, 2008 letter to Stanley Speaks from Rob Greene (Exhibit E).

W1101.5(e)/515291.doc

DATED this ___8ᵗʰ___ day of October, 2012.

Respectfully submitted,

Howard G. Arnett, OSB# 77099
Lauren J. Lester, OSB# 060858
Karnopp Petersen LLP
1201 NW Wall Street, #200
Bend, Oregon 97701
Counsel for *Amicus Curiae* Applicant
The Confederated Tribes of the Warm
Springs Reservation of Oregon

Arlinda F. Locklear, DC Bar# 962845
Office of Arlinda F. Locklear
4113 Jenifer Street NW
Washington, D.C. 20015
Local Counsel for *Amicus Curiae*
Applicant The Confederated Tribes of the
Warm Springs Reservation of Oregon

16



The Confederated Tribes of Warm Springs
Ceded Lands and Property

**Exhibit A**

# TREATY WITH THE TRIBES

# OF MIDDLE OREGON, 1855

<table>
<tr><td>

June 25 1855<br>
12 Stats. 963<br>
Ratified Mar.8,1859<br>
Proclaimed Apr.18,<br>
1859.

</td><td>

*Articles of agreement and convention made and concluded at Wasco, near the Dalles of the Columbia River, in Oregon Territory, by Joel Palmer, superintendent of Indian affairs, on the part of the United States, and the following-named chiefs and head-men of the confederated tribes and bands of Indians, residing in Middle Oregon, they being duly authorized thereto by their respective bands, to wit: Symtustus, Locks-quis-sa, Shick-a-me, and Kuck-up, chiefs of the Taih or Upper De Chutes Band of Walla-Wallas; Stocket-ly and Iso, chiefs of the Wyam or Lower De Chutes band of Walla-Wallas; Alexis and Talkish, chiefs of the Tenino band of Walla-Wallas; Yise, chief of the Dock Spus or John Day's River band of Walla-Walla's; Mark, William Chenook, and Cush-Kella, chiefs of the Dalles band of the Wascoes; Toh-simph, chief of the Ki-gal-twal-la band of Wascoes; and Wal-la-chin, chief of the Dog River band of Wascoes.*

</td></tr>
<tr><td>

Cession of lands to the United States.

</td><td>

ARTICLE 1.  The above-named confederated bands of Indians cede to the United States all their right, title, and claim to all and every part of the country claimed by them, included in the following boundaries, to wit:

</td></tr>
<tr><td>

Boundaries.

</td><td>

Commencing in the middle of the Columbia River, at the Cascade Falls, and running thence southerly to the summit of the Cascade Mountains; thence along said summit to the forty-fourth parallel of north latitude; thence east on that parallel to the summit of the Blue Mountains, or the western boundary of the Sho-sho-ne or Snake country thence northerly along that summit to a point due east from the head-waters of Willow Creek; thence west to the head-waters of said creek; thence down said stream to its junction with the Columbia River; and thence down the channel of the Columbia River to the place of beginning. *Provided, however,* that so much of the country described above as is contained in the following boundaries, shall, until other wise directed by the President of the United States, be set apart as residence for said Indians, which tract for the purposes contemplated shall be held and regarded as an Indian reservation, to wit:

</td></tr>
<tr><td>

Reservation.

</td><td></td></tr>
<tr><td>

Boundaries.

</td><td>

Commencing in the middle of the channel of the De Chutes River opposite the eastern termination of a range of high lands usually known as the Mutton Mountains; thence westerly to the summit of said range, along the divide to its connection with the Cascade Mountains; thence to the summit of said mountains; thence southerly to Mount Jefferson; thence down the main branch of De Chutes River; heading in this peak, to its junction with De Chutes River; and thence down the middle of the channel os said river to the place of beginning. All of which tract shall be set apart, and, so far as necessary, sur-veyed and marked out for their exclusive use; nor shall any white person be permitted to reside upon the same without the concurrent permission of the agent and superintendent.

</td></tr>
<tr><td>

Whites not to reside thereon unless, etc.

</td><td></td></tr>
</table>

Treaty
Page 1

Treaty With Tribes of Middle Oregon, 1855

Lands to settle there-on within a year

The said bands and tribes agree to remove to and settle upon the same within one year after the ratification of this treaty, without any additional expense to the United States other than is provided for by this treaty; and, until the expiration of the time specified, the said bands shall be permitted to occupy and reside upon the tracts now possessed by them, guaranteeing to all white citizens the right to enter upon and occupy as settlers any lands not included in said reservation, and not actually inclosed by said Indians. *Provided however*, That prior to the removal of said Indians to said reservation and before any improvements contemplated by this treaty shall have been commenced, that if the three principal bands, to wit: The Wascopum, Tiah, or Upper De Chutes, and the Lower De Chutes bands of Walla Wallas shall express in council, a desire that some other reservation may be selected for them, that the three bands named may select each three persons of their respective bands, who with the superintendent of Indian affairs or agent, as may by him be directed, shall proceed to examine, and if another location can selected, better suited to the condition and wants of said Indians, that is unoccupied by the whites, and upon which the board of commissioners thus selected may agree, the same shall be declared a reservation for said Indians, instead of the tract named in this treaty. *Provided, also,* That [the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians; and at all other usual and accustomed stations, in common with citizens of the United States,]and of erecting suitable houses for curing the same; also the privilege of hunting, gathering roots and berries, and pasturing their stock on unclaimed lands, in common with citizens, is secured to them. *And provided, also,* That if any band or bands of Indians, residing in and claiming any portion or portions of the country in this article, shall not accede to the terms of this treaty, then the bands becoming parties hereunto agree to receive such part of the several and other payments herein named as a consideration for the entire country described as aforesaid as shall be in the proportion that their aggregate number may have to the whole number of Indians residing in and claiming the entire country aforesaid, as consideration and payment in full for the tracts in said country claimed by them. *And provided, also,* That where substantial improvements have been made by any members of the bands being parties to this treaty, who are compelled to abandon them in consequence of said treaty, the same shall be valued, under the direction of the President of the United States, and payment made therefor; or, in lieu of said payment, improvements of equal extent and value at their option shall be made for them on the tracts assigned to each respectively.

Another reservation to be selected in lieu of this, if etc.

Rights and privileges secured to Indians.

See Art.1, Treaty of Nov. 1,1865

Proviso in case any band does not accede to this treaty.

Allowance for improvements if, etc.

Payments by the United States

ARTICLE 2.  In consideration of, and payment for, the country hereby ceded, the United States agree to pay the bands and tribes of Indians claiming territory and residing in said country, the several sums of money following, to wit:

Eight thousand dollars per annum for the first five years, commencing on the first day of September, 1856, or as soon thereafter as practicable.

Six thousand dollars per annum for the term of five years next succeeding the first five.

Exhibit B

Four thousand dollars per annum for the term of five years next succeeding the second five; and

Two thousand dollars per annum for the term of five years next succeeding the third five.

**How to be expended.** All of which several sums of money shall be expended for the use and benefit of the confederated bands, under the direction of the President of the United States, who may from time to time, at his discretion determine what proportion thereof shall be expended for such objects as in his judgment will promote their well-being and advance them in civilization; for their moral improvement and education; for building, opening and fencing farms, breaking land, providing teams, stock, agricultural implements, seeds, &c; for clothing, provisions and tools; for medical purposes, providing mechanics and farmers, and for arms and ammunition.

**50,000 additional to be expended for buildings, etc.** ARTICLE 3. The United States agree to pay said Indians the additional sum of fifty thousand dollars, a portion whereof shall be applied to the payment for such articles as may be advanced them at the time of signing this treaty, and in providing, after the ratification thereof and prior to their removal, such articles as may be deemed by the President essential to their want; for the erection of buildings on the reservation, fencing and opening farms; for the purchase of teams, farming implements, clothing and provisions, tools, seeds, and for the payment of employees; and for subsisting the Indians the first year after their removal.

**United States to erect sawmills, school house, etc.** ARTICLE 4. In addition to the considerations specified the United States agree to erect, at suitable points on the reservation, one sawmill and one flouring-mill; suitable hospital buildings; one school house; one blacksmith-shop with tin and a gunsmith shop thereto attached; one wagon and ploughmaker shop; and for one sawyer, one miller, one superintendent of farming operations, a farmer, a physician, a school teacher, a blacksmith, and a wagon and ploughmaker, a dwelling house and the requisite outbuildings for each; and to purchase and keep in repair for the time specified for furnishing employees all necessary mill-fixtures, mechanics' tools, medicines and hospital stores books and stationery for schools, and furniture for employees.

**To furnish farmer mechanics, physician &c.** The United States further engage to secure and pay for the services and subsistence, for the term of fifteen years, of one farmer, one blacksmith, and one wagon and plough maker; and for the term of twenty years, of one physician, one sawyer, one miller, one superintendent of farming operations, and one school teacher.

**erect dwelling houses, etc, for head chiefs.** The United States also engage to erect four dwelling-houses, one for the head chief of the confederated bands, and one each for the Upper and Lower De Chutes bands of Walla Wallas, and for the Wascopum band of Wascoes, and to fence and plough for each of the said chiefs ten acres of land; also to pay the head chief of the confederated bands a salary of five hundred dollars per annum for twenty years, commencing six months after the three principal bands named in this treaty shall have removed to the reservation, or as soon thereafter as a head chief should be elected: *And provided, also,* That at any time when by the death, resignation, or removal of the chief selected, there shall be a vacancy and a successor appointed or selected, the salary, the dwelling, and improvements shall be possessed by said successor, so long as he shall occupy the position as head chief; so also with reference to the dwellings and improvements provided for by this treaty for the head chiefs of the three principal bands names.

**successor of head chief to take them.**

Exhibit B

Treaty with the Tribes of Middle Oregon, 1855

Lands may be allotted to individual Indians for permanent homes.

ARTICLE 5. The President may, from time to time, at his discretion cause the whole, or such portion as he may think proper, of the tract that may now or hereafter be set apart as a permanent home for these Indians, to be surveyed into lots and assigned to such Indians of the confederated bands as may wish to enjoy the privilege, and locate thereon permanently. To a single person over twenty-one years of age, forty acres; to a family of two persons, sixty acres; to a family of three and not exceeding five, eighty acres; to a family of a six persons, and not exceeding ten, one hundred and twenty acres; and to each family over ten in number, twenty acres for each additional three members. And the President may provide such rules and regulations as will secure to the family in case of the death of the head thereof the possession and enjoyment of such permanent home and the improvement thereon; and he may, at any time, at his discretion, after such

Patents to issue therefor: conditions thereof.

person or family has made location on the land assigned as a permanent home, issue a patent to such person or family for such assigned land, conditioned that the tract shall not be aliened or leased for a longer term than two years and shall be exempt from levy, sale, or forfeiture, which condition shall continue in force until a State constitution embracing such lands within its limits shall have been formed, and the legislature of the State shall remove the restrictio

Restrictions not to be removed without, etc.

*Provided, however,* That no State legislature shall remove the restrictions herein provided for without the consent of Congress. *And provided, also,* That if any person or family shall at any time neglect

Patent may be cancelled.

or refuse to occupy or till a portion of the land assigned and on which they have located, or shall roam from place to place indicating a desire to abandon his home, the President may, if the patent shall have been issued, revoke the same, and if not issued, cancel the assignment, and may also withhold from such person, or family, their portion of the annuities, or other money due them, until they shall have returned to su permanent home and resumed the pursuits of industry, and in default of their return the tract may be declared abandoned, and thereafter assigned to some other person or family of Indians residing on said reservation.

Annuities of Indians not to pay debt of individuals.

ARTICLE 6. The annuities of the Indians shall not be taken to pay the debts of individuals.

Bands to preserve friendly relations.

ARTICLE 7. The confederated bands acknowledge their dependence on the Government of the United States, and promise to be friendly with all the citizens thereof, and pledge themselves to commit no depredation on the property of said citizens; and should any one or more of the Indians violate this pledge, and the fact be satisfactorily proven

To pay for depredations.

before the agent, the property taken shall be returned, or in default thereof, or if injured or destroyed, compensation may be made by the Government out of their annuities; nor will they make war on any

Not to make war except, etc.

other tribe of Indians except in self-defence, but submit all matters of difference between them and other Indians to the Government of the United States, or its agents for decision, and abide thereby; and if any of the said Indians commit any depredations on other Indians, the same rule shall prevail as that prescribed in the case of depredations against citizens; said Indians further engage to submit to and observe all laws, rules, and regulations which may be prescribed by the United States for the government of said Indians.

Annuities to be withheld from those drinking liquor to excess

ARTICLE 8. In order to prevent the evils of intemperance among said Indians, it is hereby provided, that if any one of them shall drink liquor to excess, or procure it for others to drink, his or her proportion of the annuities may be withheld from him or her for such time as the President may determine.

Treaty
Page 4

**Exhibit B**

Treaty with the Tribes of Middle Oregon, 1855

Roads, etc, may be made through reservation.

When treaty to take effect.

ARTICLE 9.  The said confederated bands agree that whensoever, in the opinion of the President of the United States, the public interest may require it, that all roads, highways, and railroads shall have the right of way through the reservation herein designated, or which may at any time hereafter be set apart as a reservation for said Indians.

This treaty shall be obligatory on the contracting parties as soon as the same shall be ratified by the President and Senate of the United States.

In testimony whereof, the said Joel Palmer, on the part of the United States, and the undersigned, chiefs, headmen, and delegates of the said confederated bands, have hereunto set their hands and seals, this twenty-fifth day of June, eighteen hundred fifty-five.

Joel Palmer, Superintendent of Indian Affairs, O. T.   (L. S.)

WASCO:
Mark, Hix x mark
William Chenook, his x mark
Cush Kella, his x mark
LOWER DE CHUTES:
Stock-etley, his x mark
Iso, his x mark.
UPPER DE CHUTES:
Simtustus, his x mark
Locksquissa, his x mark
Shick-ame, his x mark
Kuck-up, his x mark
TENINO:
Alexsee, his x mark
Talekish, his x mark
DOG RIVER WASCO:
Walachin, his x mark
Tah Symph, his x mark
Ash-na-chat, his x mark
Che-wot-nleth, his x mark
Te-cho, his x mark
Sha-qually, his x mark
Louis, his x mark
Yise, his x mark
Stamite, his x mark
Ta-cho, his x mark
Penop-teyot, his x mark
Elosh-kish-kie, his x mark
Am. Zelic, his x mark
Ke-chac, his x mark
Tanes Salmon, his x mark
Ta-kos, his x mark
Davis, his x mark
Sowal-we, his x mark
Postie, his x mark
Yawan-shewit, his x mark
Own-aps, his x mark
Kossa, his x mark
Pa-wash-ti-mane, his x mark
Ma-we-nit, his x mark
Tipso, his x mark

Pouh-que, His x mark
Eye-eya, his x mark
Kam-kas, his x mark
Sim-yo, his x mark
Kas-la-chin, his x mark
Pio-sho-she, his x mark
Mop-pa-man, his x mark
Sho-es, his x mark
Ta-mo-lits, his x mark
Ka-lim, his x mark
Ta-yes, his x mark
Was-en-was, his x mark
E-yath Kloppy, his x mark
Paddy, his x mark
Sto-quin, his x mark
Charley-man, his x mark
Ile-cho, his x mark
Pate-cham, his x mark
Yan-che-woe, his x mark
Ya-tock-la-le, his x mark.
Alpy, his x mark
Pick, his x mark
William, his x mark
Peter, his x mark
Ischa Ya, his x mark
George, his x mark
Jim, his x mark
Se-ya-las-ka, his x mark
Ha-lai-kòla, his x mark
Pierro, his x mark
Ash-lo-wash, his x mark
Paya-talch, his x mark
Sae-pa-waltcha, his x mark
Shalquilkey, his x mark.
Wa-qual-lol, his x mark
Sim-kui-kui, his x mark
Wacha-chiley, his x mark
Chi-kal-kin, his x mark
Squa-yash, his x mark
Sha-ka; his x mark

Keani-sene, his x mark

**Exhibit B**

Treaty with the Tribes of Middle Oregon, 1855                    Page 6

Jim, his x mark                     Che-chis, his x mark
Peter, his x mark                   Sche-noway, his x mark
Na-yocht, his x mark                Scho-ley, his x mark
Wal-tacom, his x mark               We-ya-thley, his x mark
Cho-kalth, his x mark               Pa-leyathley, his x mark
Pal-sta, his x mark                 Keyath, his x mark
Mission John, his x mark            I-poth-pal, his x mark
Le-Ka-ya, his x mark                S. Kolps, his x mark
La-wit-chin, his x mark             Wallmtalin, his x mark
Low-las, his x mark                 Tash Wick, his x mark
Thomson, his x mark                 Hawatch-can, his x mark
Charley, his x mark                 Ta-wait-cla, his x mark
Copefornia, his x mark              Patoch Snort, his x mark
Wa-toi-mettla, his x mark           Tachins, his x mark
Ke-la, his x mark                   Comochal, his x mark
Pa-wo-ne, his x mark                Passayei, his x mark
Kuck-up, his x mark                 Watan-cha, his x mark
Poyet, his x mark                   Ta-wash, his x mark
Ya-wa-clax, his x mark              A-nouth-shot, his x mark
Tam-cha-with, his x mark            Hanwake, his x mark
Tam-mo-yo-cam, his x mark           Pata-la-set, his x mark
Was-ca-can, his x mark              Tash-welct, his x mark
Talle Kish, his x mark              Wesha-matolla, his x mark
Waleme Toach, his x mark            Chie-mochle-mo, his x mark
Site-we-lock, his x mark            Quae-tus, his x mark
Ma-ni-nect, his x mark              Skuilts, his x mark
Pich-kan, his x mark                Panospam, his x mark
Stolameta, his x mark               Ash-ka-wish, his x mark
Tamayechotote, his x mark           Pasquai, his x mark
Qua-losh-kin, his x mark            Wasso-kui, his x mark
Wiska Ka, his x mark                Quaino-sath, his x mark
Che-lo-tha, his x mark              Cha-ya-tema, his x mark
Wetone-yath, his x mark             Wa-ya-lo-chol-wit, his x mark
We-ya-locho-wit, his x mark         Flitch Kui Kui, his x mark
Yoka-nolth, his x mark              Walcha Kas, his x mark
Wascha-Ka-polle, his x mark         Watch-tia, his x mark
Kon-ne, his x mark                  Enias, his x mark

Signed in the presence of---

Wm. C. McKay, Secretary of Treaty, O. T.
R. R. Thompson, Indian Agent
R. B. Metcalfe, Indian sub-agent
C. Mespotie
John Flett, Interpreter
Dominick Jondron, his x mark, Interpreter
Mathew Dofa, his x mark, Interpreter

**Exhibit B**

Office Superintendent Indian Affairs

Dayton O. T. July 9th, 1855

Sir

I have the honor to enclose you herewith a triplicate copy of a treaty entered into on the 28th ultimo with the Taih of Upper Des-Chutes Band of Wallawallas, the Wyam of Lower Des Chutes Band of Wallawallas, the Tenino and Dock-Spus of John Days River Band of Wallawallas, and the serval Bands of Wascoes or Dalles Indians; all of whom have been confederated with the view of locating them upon a Reservation commencing about 45 miles south of the Dalles of the Clumbia River and extending South between the Des Chutes river and the Cascade Mountains, averaging probably a distance of twenty-five miles. A map of this reservation is herewith enclosed, but as no surveys have been made in that region it can only approximate to accuracy.

With the exception of a few families who alternately reside on either bank of the Columbia river between Dog river on the south and White Salmon river on the North, and the Cascade Falls, on the banks residing and claiming lands within this purchase, have acceded to its provisions and signed the treaty. I called upon Mal-Le-Chein who claimed to be chief of the band referred to, and who is now with most of his people residing on the North Bank of the Columbia River at the Cascade Falls, but he declined signing the Treaty, alleging as a reason that his people could not subsist away from the Columbia River, and declaring "I have said that I would not sell my country and I have but one talk."

There is but little doubt however that he and his people will ultimately desire to be embraced in this treaty. But in the event of their refusal the fourth proviso of Article first, secures to others their rights under the treaty and guards the Government against the imputation of wrong dealing with his people. The country lying in this Territory claimed by his band is between Dog River and the Cascades, embracing only a narrow margin on the bank of the Columbia, and except a small district near Dog River, where a few claims have already been taken, the country is valueless. The real cause of the band's declining to enter into the treaty is existence of personal difficulties between them and the Wascoes.

The country embraced in the purchase effected by this treaty contains about eleven thousand square miles the greater part of which is well adapted to grazing, and much of it good farming land.

Exhibit C

The Cascade Mountains on the west and the Blue Mountains on the east are the only sources from which a supply of timber can be obtained, the intervening region being entirely destitute of timber suitable for building and fencing. A narrow margin along the Columbia excepted, the whole country abounds in luxuriant grass on which domestic animals subsist throughout the year.

The reservation contains about six hundred and twenty five square miles, more than one half being rugged mountains, unsuited to cultivation. It lies immediately east of Mount Jefferson and is isolated from any country likely ever to be occupied by white settlers, being bounded on the East by the Des Chutes river which here runs between precipitous walls of basaltic rock, on the West by the Cascade Mountains, on the North by a lofty range called Mutton Mountain, and on the South by one of the Main branches of Des Chutes river approchable only at a few points on account of elevated and precipitous cliffs. The Indians seriously objected to this district on account of the small quantity of agricultural land, many of them having adopted the habits of the whites, and being engaged in farming to a considerable extent. As I had not a thorough knowledge of the amount of agricultural land, having only once passed through the district, the second proviso to Article first was incorporated, as a matter of justice to the Indians, to satisfy their doubts and convince them that we sought really to promote their good. This proviso they regarded as meeting the case, many of them presuming that a region might be found east of the Des Chutes river, about the head waters of John Day's river better adapted to an Indian settlement. I am however of a different opinion.

The consideration to be paid these Indians is believed to be the lowest possible amount adequate to meet their necessities, and consonant with humane policy of the Government. The only essential point in which it differs from the Treaty with the Cayuses, Wallawallas and Umatillas, is that in Treaty, the farmer, blacksmith & wagon and plow maker are to be paid by the Government for fifteen years instead of twenty years as in the treaty referred to: and the articles given are a part of the consideration named in the treaty. With the exception of a few suits of clothes given the Chiefs.

The reservation is well watered and timbered, and is well adapted to the growing of stock. There are no whites settled within its limits.

The goods, materials, etc., designed for those Interior Tribes, if purchased in the Eastern Markets should be shipped so as to reach our ports early in the spring. I am persuaded however that building materials and many varieties of merchandise can now be purchased in San Francisco, California upon terms as favorable as in the Eastern Markets.

Exhibit C

It may be proper to state that the Eastern Boundary of this purchase conflicts a little with that of the Cayuse purchase, for if we follow the Summit of the Blue Mountains Northerly to a point due east of the head waters of Willow Creek, we would doubtless strike the boundary of the purchase made of the Cayuses.  This however can be no objection to the ratification of the treaty as the boundaries of the Indians are not very well defined, and the entire country is included in the purchases to the Western boundary of the Snake Country.  I enclose herewith a map of the Umatilla Reservation.

I regard the plan of providing for the erection and support of shops, Schools, Mills, & C. directly by the Government as better calculated to promote the interest of the Indians than by adding a supposed adequate amount to their annuities for those objects.  The recent discovery of gold in the interior, while it enhances greatly the value of the country purchased, will add correspondingly to the cost of erecting and maintaining those establishments.  The benefits to be derived by the Indians should not be made to depend upon the fluctuating prices likely to follow the development of rich mines in that country.

The accurate enumeration of the Indians is very difficult, as an entire tribe can seldom be collected at one point.  The number at the Wasco Council becoming parties to this Treaty were 264 men, 299 women, 175 boys and 139 Girls; total 877 souls.  Exclusive of these were a part of the Dog River (a part of the band whose Chief declined to sign this treaty) and several bands from the North side of the Columbia River, whom Kamiyaken head chief of the Yakamas claims as his people, but who allege that they owe no allegiance to him.  These with the Dog Rivers may be reckoned at about 500, making a total of 1355 men, women, & children to be located on this Reservation.

|  |  |
|---|---|
| Hon. Geo. W. Manypenny | Very Respectfully, |
| Commissioner Ind. Office | Your obt. Servant, |
| Washington City, | (Sgd) Joel Palmer |
| D. C. | Superintendent |

Exhibit C

The back of Palmer's Report is endorsed

as follows:

---

Oregon Supt. #436

Joel Palmer

Dayton, O. T. July 9,      '55

---

Enc. treaty made at Wasco, near

the Dalles of the Columbia River-

Proceedings of the Wasco Council,

and Maps of Umatilla and Wasco

Reserves.

Maps - 1071 & 1072 filed with

Droughtsman Brodie

Tube 698

---

For Council proceedings ( 3 encs ) see

File box - "Indian Talks, Councils, & C."

Recvd September 11,     '55

Rept to Secy Int July 9,     '56

(Treaty not found within - Feb. 24/85.)

Exhibit C

Wasco Council

Proceedings
June 22nd, 1855

FIRST DAY OF THE COUNCIL

Dear Sir

You will proceed without delay to the Dalles of the Columbia and collect all the Indians inhabiting the country between Willow Creek and the Cascade falls, and between the Columbia River and the 44th parallel of North Latitude.

The object as you are aware in collecting these Indians is if possible to effect Treaties of purchase for the extinguishment of their title to the land claimed by them.

The point at which they are to be assembled is left at your own discretion, remarking however that it should be as convenient to the Dalles as suitable ground can be selected.

The time of assembling about the 20th of June, but of this you will be able to judge upon your arrival at the Dalles.

It is persumed we will be able to perfect arrangements with these Tribes in a few days, so that no very extensive preparations need be made for subsisting the Indians.

But you will make such purchases and preparations as you deem the circumstances will require, having in view the accomplishment of the objects sought to be obtained, and a due regard to economy.  I have already about 8,000 lbs. of Flour, 200 lbs. Sugar and 32 lbs. Tea, 168 lbs. Tobacco and half Barrel of Crackers at the Dalles designed for use of the Council.

Respectfully yours

(Sgd) Joel Palmer

Superintendent of Ind.  Affairs

O. T.

To

R. R. Thompson

Indian Agent

Exhibit C

Dalles, June 21st, 1855

Commandant
    Fort Dalles

        Sir


            Information has just been received that a man by the name
of John Edwards has been exciting the Indians in this vicinity by repre-
senting that we were about to rob them of their country and advising them
to fight for it instead of selling it and that they would be fools to en-
ter into a treaty with us, with many other inflamatory representations
well calculated to disturb the peace and quietude of this settlement as
well as to render nugatory our efforts to perfect treaties of purchase,
I have therefore to request that you will afford Agent R. R. Thompson
such aid as will enable him to arrest this individual that peace may be
maintained and the Laws of Congress regulating trade and intercourse with
Indian Tribes carried into effect.
                        I have the Honor to be
                            Dear Sir
                        Your obdt. Servt.
                    (Signed) Joel P almer
                            Superintendent of Indn. Affairs
                                Oregon Territory.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

                            WASCO COUNCIL

                    ────────────────────

Proceedings at Indian Treaties in Wasco Near the Dalles of Columbia

                Oregon Territory        June 22nd, 1855

                    ────────────────────




                            Exhibit C

Present, Indians Common to the vicinity of the Dalles viz. Wascoes
Upper & Lower De Chutes, John Day's River Indians and Dog River Indians.

Officers of the Treaty

Gen. Joel Palmer         Supt. of Indn. Affairs O. T.
R. R. Thompson          Agent
R. B. Metcalf            "  & Commissary
Wm. C. McKay            Secty. Treaties
Mathew Doffa            Interpreter
John Flett               "
Dominic Joundre         "

Also many Citizens.

Census of the Wascoes Upper & Lower De Chutes, John Days River Indians
and Dog River Indians.

Estimated at                1377

## First Day of the Council

Council opened 5 1/2 O'clock.
Present officers of the Indian Department and few citizens and
the above names Tribes and Bands of Indians amt. to about 500.

After the usual routine of smoking etc., Gen. Palmer opened the
Council by saying thus:

Gen. Palmer.
That when our great chief speaks to the Red people, he calls them
his children. I speak for him and I call you my children. I do not ex-
pect to say much to night, but we have come here to see you. We have
something to say to you. Our great chief the President of the United
States has directed me to treat with his red children and by his order
I come among you. The first thing to be done is to select good inter-
preters, men who will state correctly what I may say to you, and inter-
pret correctly what you may say to me in return, have you any person that

Exhibit C

you would wish to act as interpreter? I have selected M. Doffa and John Flett, are you satisfied with these man as interpreters, if so they will be sworn. The persons named then took the following oath—

You do each of you solemnly sware that you will well, truly and correctly interpret all that may be said to the Indians assembled in this council by Joel Palmer, Superintendent of Indian Affairs on the part of the United States, and all that may be said by the chiefs on the part of their respective tribes so help you God.

After which Gen. Palmer said. —My friends these men have called God to witness that they will interpret correctly, and should they tell a lie, our laws would punish them for it. I expect they will speak correctly:

You have been told a long time ago that by and by a chief would come to buy your lands. None has ever come until now. The President has directed me to do so and I am here. I have just returned from holding council with the Nez Perces, Walla Wallas, Cayuses and the Umatillas, they have all sold our chief their lands, except two reservations which has been designated for them to live on. Many of those people were opposed to selling their country, but after we explained fully what we wanted to do for them, and what we wanted them to do, they all agreed to sell their country, and have signed the treaty. We were there many days talking about it, until we all got tired, when the treaty was signed I gave them a few goods and I have just arrived here. Now I want you to listen to what I have to say, for it is a matter that you are all interested in, I want you to understand fully for I do not want to deceive you. We have found that the white man and Indian cannot live together in peace, that it is better that lines should be drawn, so that the white man will know where his land is and the Indian where his land is. We may then live without quarreling. The white man has come among you, others are coming. I want you to make a bargin so that we may always live in peace. I want you to sell our great chief your country and we will designate a tract of land where you may reside and no white man but such as are working for you shall be allowed to live on it, but the balance of the country will be for the whites to live on. If we can agree upon the terms of a treaty you will be permitted to fish and hunt and gather berries on all lands unoccupied by whites as heretofore, on this reservation no whites will be permitted fish or hunt but you will be permitted to do both outside the reservation in common with whites. You will also be permitted to graze your horses and cattle outside the reservation on all unclaimed land in common with whites. We will build for you on this reservation a Saw Mill, and Flouring Mill, a Blacksmith shop, a Wagon and Plow maker shop. A hospital and School house. The Mechanics, Doctor and Teacher

Exhibit C

will be paid by the Government for a number of years and their time will be devoted to your interests. The Millers and Farmers will also be paid by the Government and will labour for you. All will aid and assist you to live better than you now do. You can have bigger and better fields, better fences, better homes. You can have plenty in your houses for your women and children to eat. Clothing to cover them from the storm and cold, but I will read and have explained a treaty which I have drawn up for you. You will then know what we want and can think about it.

Here the treaty was read section by section and was interpreted to them.

Gen. Palmer then said. The reservation here described is in your own country that you would be driven away to some strange land perhaps on to an Island, where you would all starve. Now you know this is all a lie. You should pay no attention to those flying reports. We have some people running about who are great fools. They tell you lies. I have explained in part this treaty tomorrow. We will meet again and I will talk more to you. I think when you hear it all you will say it is good. A portion of you Chiefs have heard what was said at the Walla Walla Council ground. The same provisions are contained in this treaty that are in the treaties with those people. We wish to treat all alike. This is the first day that we have met. We will not say too much at this time. Mr. Thompson will supply you all with beef and flour. We have invited you here. We will feed, and shall <u>charge nothing</u> for it.

The council adjourned 7 O'clock

Approved

(Sgd) Joel Palmer

Supt. Ind. Affairs.

Second Day Council

Saturday June 23rd

Gen. Palmer                                   Council opened 2 1/2 O'clock
My Brothers. We have again met to talk to you. We met yesterday read and explained part of the treaty. As there are a few here that were not here yesterday, we will again explain. I said we had made treaties with Nez Perces, Cayuses, Walla Wallas & Umatillas. I said we had purchased their country, and made reservation for them to live upon. I have come here to make a bargain with you. As we had done with them we want

Exhibit C

to treat all the Indians in the Country alike, experience had taught us
the White and Red Man cannot always live together in peace. When I speak
of white people, I mean all people, French and Americans. When there are
but few whites then we can get along very well & not quarrel, but when
there are a great many they will have difficulty. When they live together
there will be difficulties, little difficulties will get to be great dif-
ficulties. It is not long since the White man first came among you.
There are now a good many white people living among you. There will soon
be a great many more. We cannot prevent them from coming to settle in
the country. If an Indian sees a piece of ground and wishes to live
on it, it will be but a little while when the white man comes, and sees
it. The white man says I want this land, you go away, far away. Suppose
the Indian goes away, and selectes another piece of land, it will be but
a little while before the white man will do the same as the other. In this
way the white man takes possession of the country. The agents try to pre-
vent it and protect them but cannot do it while they live together, if
there were but a few white men we could then protect you. It is wise then
before so many people come here to mark out the lines so the white man
can know where to live, and the Indian can know where to live, this is
one of the reasons why we want to make a reservation. It will be but a
few years before the whole country will be filled up with whites, then
where will the Indian have his home. If we enter into a Treaty now, be-
fore the country is filled up with whites, we can select a home for you,
where no whites live. We have done so with other tribes, why not do so
with you. I told you yesterday where I proposed to make the Reservation.
We select that because we believe it is good country for you. There is
enough of good land, that every one may have a farm. There is plenty of
grass to graze your horses & your cattle, there is plenty of timber that
might be sawed & cut to build your homes. It is your own country. You
are all acquainted with it. It is but a little way to your fisheries. It
is but a little way to your root and berry grounds. I told you that you
would always have the privilege to hunt, gather roots and berries, and fish.
If we make a Treaty now we can prevent the whites from going there; if we
wait a little longer, they will go there, and where will you go. I told
you that we would give you $150,000 that is to be paid in annuities in 20
years. I told you that we would build you a saw mill, that we would build
you a flouring Mill to grind your corn. That we would build you a black-
smith shop, tin & gun smith Shop attached to it. That we would have a man
to make your plows, harrows, & wagons, and help you to build your homes.
That we would build a Hospital and have a doctor, Medicines, & C. I said
we would build you a school house, and that we would employ millers, black-
smith and school teachers. That we would employ a farmer to show you how
to raise corn & potatoes, so that you would have plenty of provisions in
your houses. That you would have plenty of clothing. Your women and child-
ren have plenty to eat. Your old people have plenty to eant and clothing

Exhibit C

you will be supplied with guns, powder & balls. We would help you in catching fish. Give you teams. You will soon be able to live like white people. This has been the way with the Indians on the East side of the Mountains, when they have made a bargain. We would help them.

But those who refuse, they are moving about from place to place and have no houses. Their women and children are crying for bread. They have nothing to cover them from the cold and storm. It is the duty of the Chiefs and these old men to provide for their people; then let us act like wise men and make a bargain when we can.

Other Chiefs have come to talk with you, but have done nothing for you. Long time ago Mr. Perkins came and live with you. Mr. Frewer and Waller came and live amongst you. I suppose they give you a very good talk, but did they build you houses and cloth you, did they propose to buy your country, and give you homes. Perhaps they give you a little clothing, may be they showed you how to plant Corn, Potatoes, & c., maybe they sometimes give you bread.

But they did not build you houses, farms, & c., for you. They did not build you mills and furnish you tools unless you paid for it. I come to buy your country, and give you good homes and good hearts. So that you may live at peace with all the whites and with each other. We do not want to divide you, we want you all to have one heart, we come to you with good heart. I dont want you to throw my talk away or put it behind you. I shall not lie to you, what I promise you, you can rely upon. I do not come among you as a trader. I come by direction of the great chief. I talk for him and he dont lie to his people. If I did not wish to do you good, I would not come to see you. I have a wife and children. I have a field of wheat, peas, & potatoes, why should I leave them and come among you, because I have a good heart, and wish to do you good, then I hope you will receive my talk and not throw behind you! When I hear you speak then I shall know your hearts, I see among you old people, and you have left some of your people at home. They have but a few years to stay among us, and I want to do them good. If you receive my talk then I can do them good. I can do you all good. I have some goods at the Dalles for you if we make a bargin I shall let you have them, and if not I cannot do so. If we make a bargin I expect to give each of these head Chiefs a suit of clothes. We expect to give every man and woman something, and what we give it will be so much paid you towards your lands; when a trader comes among you he charges you $12.00 to $14.00 a pair for blankets. When I let you have blankets for your land I charge you $7.75 per pair for Scarlet Blankets and $6.50 per pair for the White ones. A hoe the trader would charge you $1.50 each I will let you have it on your land 42¢ each & c.

Exhibit C

As I said before it is good to get the Government to make you Laws! We want the privileges of building roads through your country on the reservation.

If we make this bargin, and you sign this paper, we will send it to our great Chief. He and his council will examine it, and if he says it is good, he sends it back to me and the money. Then we will go to work and build you the mills. Until then you will continue to reside where you are.

But we dont want to interfere with the whites. They have the privilege to settle on any part of the country outside of the Reservation. They should not interfere with your garden and fields this is the proposition I make!

This amount is more money than you can count. But our Chief wants to do you good. My heart is that it is good! When you speak, I will then know your hearts. For the present I have nothing more to say. I will listen to you if you have anything to say.

Wm. Chinook says we do not wish to answer to day. I am not tired listening. The Indians have not got much sence. If you had said that you wished to cut the timber, we should say yes, because it would grow again. You asked us formerly when we wished to travel we had no fences to stop us, we can go on a straight road. I think in a little while it will be all fenced up here; and on that account we wish to think of it. We will give you an answer in a few days.

Gen. Palmer. I understand that William Chinook speaks for all of his people. There may be some of the other people that wish to say something.

Council adjourned 4-1/2 O'clock

Approved!

    Joel Palmer
       Supt. Ind. Affairs.

Exhibit C

Third Day Council
Monday June 25th

Council opened 10 O'clock

Gen. Palmer. Well my Brothers. We have met again in council today.
The Wascoes have not yet come but they will be here. We need not wait
for them. I expect to hear you speak this morning. I have shown you my
heart. Now I want to know your heart. Let your Chiefs speak for you
and We'll listen to it. I am in hopes you have come with one heart.
I want all to be together today. I will hear you speak.

Sim-tus-tus. I wish to talk now. The Chief talks right. I take
his words, my heart is glad to hear you speak and all my people he speaks
right and straight and I am glad: Our hearts is soft, not so hard as it
was. They have asked for our land sometime ago. Now, I have given my
word and I will stick to it. It is true I think about what he has said:
the reason that you have told him to think of the words. It is true the
whites have taken pity on us. I am afraid of their words. M. Doffa knows
my country, and I am going to talk of it. What we talk of. I know what
I am talking about, for myself and people. The De Chutes have sustained
us in fish. The Falls where we catch the fish, we would like to reserve
it. You have seen our country where we get our roots, this is the country
that I spoke about. I wish to keep the section of country beyond the Tigh
about the Mutton Mountain & between the Mutton & Jefferson Mountains, there
we gather our berries, about Jefferson Mountain there lies the big road
leading to our berry ground, about the Big Branch of De Chutes. We wish
also to reserve the Country that lies south on Tama-la-we River to the
wagon road, called the middle road to Oregon: then following the stream
down to De Chutes then down to the De Chutes Falls.

Locks-quissa. I have but a few words to say. You know the piece
of land that we ask to keep. You can see the quantity of land that Sim-
tus-tus asked for. (here he was interrupted by Kuckup) he sat down.

Kuckup said. They are not here to keep you waiting as long as the
Cayuses and others did on the other council.

I believe your words. It is for our good that you wish to place us
on a place. We will go and live where you have told us to go. I think
that we will be well there, and will not be sorry for it. It is good that
you placed us there, so that we would not be in the middle of a settlement.
We do not wish to have our Garden joining to the white mans. I wish now

Exhibit C

to do us you have said, to live a side from the whites. We do not think that it would do us any harm that you have placed us there. (here are our blankets) who has seen them first, since the whites came to us, when we first saw there things.

The piece of ground that you wish us to stay on. It appears that you are showing me the things that I was talking about, when our children learn to read and write. It will be the same as bringing them to light, as itwere, we have been a sleep, and just waked up, when we could read and write.

I have spoken what I have to say. That you have said my ears were opened, I have heard them. I do not wish to speak longer. I have heard you speak: sat down.

Alexsee. I wish to speak as Sim-tus-tus has done. I don ot wish to throw the Chiefs words away. I do not wish to tire him. I am willing to give my word and land. Our Fishing place on the Columbia we wish to keep. The Country that you have shown us we are glad to live on it. That is all I have to say. I only to talk of the fishing ground.

Gen. Palmer. We have now heard the hearts of the Tish and Tenino people. Now we wish to know the hearts of the Wascoes and Lower De Chutes.

Sim-tus-tus came forward and signed the Treaty, and followed by his sub chiefs.

Stocketly. I like a piece of my land as my heart. I have already given a piece of my land, the others have already given a part of their country. I also think it is good for me to do the same. My heart is I will not speak about the Reservation you speak of. I wish to have apiece of land on the east side of De Chutes River that is all I have to say. I wish to have a piece of land on the spot I spoke of, the rest you can have. My heart is to chose this piece of ground that I speak of from the Columbia to the Blue Mountains, also my fishing place of Columbia De Chutes Falls. This is all I have to say.

Iso says. This land belongs to you, my land that I had, my Garden is yours. I also wish to reserve the piece of land that stocketly spoke of, also the Fisheries. That is all I have to say.

G. Palmer said. I wish to reply to Stocketly & Iso.

**Exhibit C**

Foyot said. I have a few words to say. Our Chief has spoken, Our
Head Chief. His word is our word, although we speak after him, but his
word is ours. All the places our Chiefs have mentioned is also our hearts.

Gen. Palmer said. Sometime ago Gov. Gains and Dr. Dart made Treaties.
There was many different bands then, like this Council, when they made
a treaty they gave Clackamases, the Yam hill, the Twolatin, the Lockawits,
and the Santoams each a Reservation, they made a treaty with these In-
dians, they sent this treaty to the President, when he saw there Reser-
vations. Here, there, and all over. Amongst the whites he said no, it is
not good. When he saw the whites were allowed to live all around these
Reservations, he said they could not have schools, Mills & c. When he
saw this paper he said it is not good. You stand aside. Then he wrote
to me. He directed me to make a treaty with all the people. He directed
me not to make a Reservation here, there, and all over, and if I were to
make a treaty with those people and allow them to live here, there, and all
over, when he sees the paper he would say no, that is the reasonthat I
cannot permit these people to have so many reservations. I would like
to accomodate these people. But the President will not allow them to
live with the whites, because the Red andwhite men cannot agree. I have
made a treaty with all these people in the Willamette, Klackamas, & c.,
they have all agreed to live on one reservation, the Wallawallas, Cayuses,
& Umatillas they have all agreed to live on one Reservation. The Reser-
vation that I have made for them is not as large as this, I have made
for you. He cannot allow them to have a Reservation across the Deshutes.
But we have agreed on the paper to allow them to fish on their old fish-
ing ground. When they are through with their fishing season then they
can go home and say, this is my home! And it is for this reason I wish
to secure them a home. Our Chief cannot build mills andhouses & c., all
over the country. But he can build them on the Reservation and accomo-
date all the people. They can travel all over the country, over these
roads as usual they can fish, hunt, and gather roots & berries as former-
ly. And it will be good for them to say I have a home, where no white
man can come and trouble me. If I know where there is a better country,
I would say, well, let that be the Reservation. But I do not know of any
better. If this paper is signed as it is now, if your people, the Was-
coes, Iigh and Upper Deschutes would rather have another reservation.
The Wascoes would select 3 men the Stocketly's people also 3 men and Tigh
people also 3 men. These nine men would go with me or my agent to see
the country, before these people go the reservation, or before the
mills and improvements have commenced. If we could find a place any
better than this where there are no whites and can agree with us, I shall
say yes it is good. This shall be your home instead of the one named in
the treaty. What I want is to get you a good home.

Exhibit C

But that home must be where there are not whites, the price that I have agreed to give you is more than your country is worth. But we propose to do you good. But if you live scattered all over the country, we cannot do you any good. I am in hopes you will sign the treaty as it is. I want to know the hearts of the Wascoes and I will listen to them what they have to say.

Mark says. What has Sim-tus-tus said. I wish to hear, we did not hear him, and have it explained to us. Gen. Palmer then explained to him what Sim-tus-tus had said. Also what the Tigh & Tenino people had agreed to.

Gen. Palmer then said, I do not know that the whites can settle or would in that country along the Tamaloma, but I cannot allow the line to go as far as that, that the Tigh Indians do not pretend to sell the Wascoes country, only their own.

Mark said. That is good what he has said. What he the General had said it is good. We are as wild animals. We are afraid of what we have heard, like when we are near some wild animal that we are afraid of.

What the others have said, they take your word, they are good, that is my heart. The place that you have mentioned I have not seen. There is no Indians nor whites there yet, and that is the reason I say I know nothing about that country. If there were whites and Indians there then I would think it was a good country. That is all my Heart. I heard from you at the other Council good words from you. When there is good land everything produces well. Where you have given the land it is a large country. When first we commenced with a small garden then it will enlarge, now and after this we can say look, the whites have taken a pity on us. That is my Heart. I am speaking now those things that are to come after me. When I heard that our children would be taught to read and write, I am afraid of that country. I wish the line to start from Tigh. My Country lies from Dog River to the Tigh. It is not for nothing that I am thinking, you will see my heart. I am speaking the same as if I had only one good and fast horse the country that I have mentioned to you, I speak as if I had only one good horse, the country that you have already named to us there is only a small piece of it that is good. We claim the country from two miles below the Dog River, to the Mutton Mt. we want the line to commence from the Tigh and up. If you take pity on me, then I will speak to Stockely.

Exhibit C

Gen. Palmer said:  The Wagon Road passes through that country,
and I cannot give it up.  The line is at Mutton Mountain.  I have told
you already.

To-simph said:  There is no wood there, what shall we saw.  He said
he is going to build a saw mill.

Gen. Palmer said:  What did we give all this money for, and all
these improvements we propose to put them up a Mill, School House, Smith
Shops, a Hospital, & c.  Where will they send their children to School and
go to Mill.  It will be too far.  There is not much good land on Tiga, & c.
When we come to put you all on the Reservation, when we find there is not
land enough for all of you.  Then we extend and make the Reservation a
little larger.  I think it will be better for you all to take it as it is.
We do not want to occupy your country without paying you something for it
The whites will come and we cannot keep them out.  If we do not make a
Treaty before two years the country will be settled and also this country
that we are talking about.  We know these things.  That is the reason I
talk as I do.  If you act wisely, you will enter into this Treaty.  If I
did not believe it would be better for you to do so, I would not have said
so.  I want you to sign the paper.  If you do not do so I shall go home
with a heavy Heart.  When you see all the Indians around you provided
for by our Great Chief then you would think you were foolish.  Perhaps
some of them think they know much.  When they get wise they will think
better.  We have been learning ever since we were boys.  We do not know
as much as we wish we did .  But we know this is a great deal better
for them to sign the paper.  But it is for them to say so.  If they say
yes, well, it is good.  We then can do them good.  I do not see why we have
much more to talk about.  If they wish to sign the Paper it is ready.  We
shall then have some goods for them.  They are down at Mr. Thompsons.  When
they do this then I shall send it to the President and if he approves it
then he will send me the means to make these improvements.  We shall then
be able to provide something for you all.  And theme men that have signed
will get something.  I have told them before.  It will be probably two
years before we want them to remove on to the Reservation if they desire.
I shall probably let them have Powder & Ball.

Wm. Chinook.  I think this is good.  We will not leave the old
people and children.  How could we say yes when there is only two of us
that agree.  I had said yes, it would be like leaving my people.  I
like the old men and all to open their ears and hear it all.  I do not
know the heart of my people.  There Ears are stopped up.  They cannot un-
derstand.  That is what has kept me back so long.  They do not know all
our hearts yet.  And how could they say yes.  You see all that is there,

Exhibit C

when they can see. What is good then they will say yes. I know that you
buy the land from us, but my people do not think so, they think you are
taking it away from us.

It is true we are long talking about it but by talking slowly
we will all understand it. That isall I have to say, now some of the
other Chiefs will have something to say.

Gen. Palmer. It is right your people should all understand it.
I want them to understand it. If there are any more that wish to talk,
I shall be glad to hear them.

Mark. I do not wish to speak more. I know that the Country
you speak of is not a good country. And that is the reason that I want
the Tigh. The Cayuses have given you good land, and they have also kept
a good piece of land. I do not say that I do not give you this land, I
have already given it. There is good timber and good range for horses.

The winter comes, the snow falls deep. There is not a country
to raise any produce the frost kills it all, if it is a good country, I
would have said yes long ago. This country is not yet filled up it is
still opened. I do not wish to tire our Chief Gen. Palmer. We will trade.

Kas Kolla. The others talked and I have listened. I do not wish
to hurt your feeling. I am glad that you have spoken good to us. I want
the little piece of ground at Tigh. We wish to live on it. That our hearts
will be glad. We spoke about the landthat we are on. Very true that
you have given us good talk for our country. But still I think much of
my country. But I think we will emake a trade for the Country. If you had
spoken loud as to try and frighten them, I would not talked as I am doing.
My Heart is glad, the same as if I were wounded. If I do not get the piece
of land I want, at the same time if you would take pity on me to give me
that piece of land. If you would say yes, I am ready to give you all the
rest and I am done. I do not wish to speak any more but I wish to hear
that I ask for this piece of land and I wish to live on it immediately
that is all I have to say.

Gen. Palmer. I would like to accomodate him but the Great Chief
knows this country. He has Maps. He knows where the Wagon Road lies.
His instruction to me is to put the Reservation off from the White Settle-
ments the Cayuses had a Road through their Reservation. But I made arrange-
ments to put another Road further south, where is there a chance to put
another Road south of the Tigh. There is no chance. There are two

Exhibit C

Mountains running this way and that way.  If I give you the Reservation
al you asked the President will say no, it is not good, and what we have
done will be good for nothing.  I believe there is more good land in the
Reservation than they speak of.  They drive cattle there to winter.  Deer
also come down from the Mountains into the valley.  There is plenty of
game there.  I am not angry with them.  I wish them to understand it.  If
they do understand it they will not object.  There is no use of my talking
more.  Here is Stocketly and his people.  I would like to hear from them.
I want to treat them all alike.

Stocketly.  I hold to my words, my Heart is still as it was.  When
will be the time, that I shall run to this place.  I can see my country,
there is few places that I can make a garden in it.  My Heart is to have
that country that I spoke of, from Dechutes to John Day's River, from the
Columbia River to the Blue Mountains.

Gen. Palmer.  He is Chief, he talks for his people.  There is
no use talking about it I have given him the reasons why I did not allow
any land to be given across the Dechutes, he has heard me say that when we
could find a better place, than the one Selected, upon which no whites
live we would select it in place of this.  If he is unwilling to act for
the good of his people, be it so.

I do not expect always to be their Chief.  The next that comes may
not do as well by them.  If they think it is best to throw my talk behind
them, they can do so.

Stocketly.  The reason that I said no, is because I think that you
like best where there is plenty of timber.

Gen. Palmer.  I do not wish them to settle all over the country.
The President will not allow it.  I have told you the result of the treat-
ies in the Willamette Valley, by Gov. Gains and others, the same would
follow this treaty if we were to divide the country into little patches.

Yise.  My opinion is that it is good that all the people should be
put together after hearing the words of the Chief.

Gen. Palmer.  If Stocketly and his people failed to enter into a
treaty with us now, it will be to late when he wants to, the whites will
come in an we cannot prevent them.

And if he acts like a wise man and like a Chief he will do so.
His people may think they know best, they do not know the whites as well

Exhibit C

as I do.  I haould be glad to have him and other Chiefs sign the Treaty. But if they do not do it, they can not say that I have not done my duty. If Stocketly and his people know so much more than we do, they take my words and throw them away.  I shall not cry about it.

Iso.  I wish to go to the Reservation.  I give up all the country. I wished to have a piece of country on the other side of Dechutes, at the Kouse Country.  I wish to go there every Spring to dig Kouse if you give me the privilege.  My Heart will be glad.  I am done.

Mark.  He sees the Wagon Road.  It is very true that I would like to have that piece of Country.  I do not call the Tigh a good country. We can see the Wagon Road plain; I am doubtful of getting a good piece of land to Raise a garden.  If it is possible for me to show you my Heart I would do it.  I think Stocketly speaks right about getting a good piece of land on the other side.  Very true you have chosen a place where there is plenty of wood.

And they have chosen where there is no wood.  If there was any good land near the Hot Spring I would not talk so long.  That is the reason my friend, I am speaking.  It is not for any thing that is good about Tigh that I wish to have it.  Ever since three years since we have been mixed up with the whites, we have learned to do serval things.  There is not much good land about the Tigh, only a piece on the upper end.  The rest is all rocks.  The children would learn to Read & Write.  It would be like throwing it away.  There will be no good country for them to work at.

My friend my Heart is very Hunary for the Rocks on the lower end of the Tigh.  I am very much in trouble to find a good piece of land to live on.

Gen. Palmer.  I had said in the event that they did not like this Reservation that they would send 3 men with an agent to look and see if they could find a better country.  A country where they are allwilling to go.

I selected this place, I suppose it was better than any other place. I have told them already if the Reservation is not large and good enough we will extend the Reservation.

Mark.  I had one of the best running Horses that ever was in this country, and now we all take this land.  Now we know, every little piece

Exhibit C

of good land that we have in our Country now we give it up.  This day
the same as if I had given my fortune.  What amount of things will you
give to cover us with.  What amount of money.  How much to each man.

    Gen. Palmer said.  I do not know how many there are of your people.
We give you in all $150,000 besides we build you a Flouring Mill, a Saw Mill,
Blacksmith, Tin & Gun Smith Shops.  Hospital, Plow & Wagon Shops, School
House.  Also give you men to do all these things, then we build a House
for each of the Head people of Wasco, Tenino, Upper & Lower Dechutes, and
fence & plow 10 acres of land.  Then all these people will chose a Head
Chief.  We will plow and Fence 10 acres for him.  We will give him $500.00
a year.  He will be the Head man and have to attend to his people.  And
when this head Chief dies or superseded by another this new one is to give
and occupy it as the other.  I do not know how much it will amount to a
single person.  I know this much we give more than the country is worth.
They will find, they will never regret they have gone into the Reservation.
I am afraid the Great Chief will say I am doing too much for them.  We
do a great deal more for them than we did to the Indians in the Valley.
We give you more than we did the Cayuses & WallaWallas, and you have not
so much good country.  When I left my home away on the East, I thought great
deal of it, but came here because I think I could do better.

    Mark says.  He does not give enough money.  In Wallamette they sell
Half mile claims for one thousand dollars, we expected that $150,000 to
each nation.  We want so much money each, today commence to pay today.

    Gen. Palmer.  We have nothing to pay to them but goods today.  Till
the President say it is good.  All that we do is subject to the President.
He may say it is good, and may say no.  We do not give any money till
the Treaty is ratified.

    It is true that in some Country they sell a mile square for $800.00
Dollars (He does not sell any country here he gives it away).  The price
I give for their country is more than any country that I have paid in
Willamette, Umpqua, Rogue River, & c.  I ask them is it not better for
them to take what I offered than nothing.  It would be much better for the
President to pay the money down, and think no more about it.  But no.  It
would not be treating this people right.

    To-symph said.  We wanted the money now.

    Gen. Palmer said.  It is no use talking about it.  We pay no money.

Exhibit C

Suppose we give the money.  They go down in one of the stores, they would have to give $7.00 for one Blanket, we would let you have the same kind of Blanket at $3.50.  Shirting they will charge you 20¢ per Yard.  But I will charge you 4¢ per yard.  A Hoe will cost you at $1.50, but I will charge you 42¢ each.

The great Chief will deliver these things to you.  Does not cost you anything for bringing it here.

I have been talking and you have been talking.  Now I am tired.  I am going home.  And I want you to hear what I have to say.  And you know what I have said.  I am going home with a heavy Heart.  When I come again, they will see me.

I have other people to see beside these people, those that have signed will be provided for.  The Wascoes if they see fit to sign it let them come up.  And I call upon Mark first, head Chief of the Wasco Tribes, who came forward and signed the Treaty, followed by his Sub: Chiefs and head men.  Also Stocketly, sub Chiefs, and head men, and followed by additional members of the Tigh Tribe - and all the other Tribes.

Approved                                    Council adjourned 4 1/2 O'clock.
  Joel Palmer
    Supt. Ind. Affairs.

Exhibit C

NAME OF SIGNATORY PARTIES TO TREATY
JUNE 25, 1855, AS THEY APPEAR ON
Pages 718-719, Volume II. of 1904
Edition Kappler's Indian Laws.

JOEL PALMER, Superintendent of Indian Affairs, O.T. (L.S.)

Wasco:

| | | | |
|---|---|---|---|
| Mark, his x mark. | (L.S.) | Pouh-que, his x mark. | (L.S.) |
| William Chenook, his x mark. | (L.S.) | Eye-eya, his x mark. | (L.S.) |
| Cush kella, his x mark. | (L.S.) | Kam-kus, his x mark. | (L.S.) |
| | | Sim-yo, his x mark. | (L.S.) |
| Lower Dechutes: | | Kae-la-chin, his x mark. | (L.S.) |
| Stock-etley, his x mark. | (L.S.) | Plo-sho-she, his x mark. | (L.S.) |
| Iso, his x mark. | (L.S.) | Nop-pa-wan, his x mark. | (L.S.) |
| | | Sho-es, his x mark. | (L.S.) |
| | | Ta-m)-lits, his x mark. | (L.S.) |
| Upper Deschutes: | | Ys-lim, his x mark. | (L.S.) |
| Simtustus, his x mark. | (L.S.) | Ta-yes, his x mark. | (L.S.) |
| Locksquissa, his x mark. | (L.S.) | Was-su-was, his x mark. | (L.S.) |
| Shick-mae, his x mark. | (L.S.) | E-yath Kloppy, his x mark. | (L.S.) |
| Kuck-up, his x mark. | (L.S.) | Paddy, his x mark. | (L.S.) |
| | | Sto-quin, his x mark. | (L.S.) |
| Tenino: | | Charley-cam, his x mark. | (L.S.) |
| Alex_ee, his x mark. | (L.S.) | Ile-cho, his x mark. | (L.S.) |
| Talckish, his x mark. | (L.S.) | Pate-chan, his x mark. | (L.S.) |
| | | Yan-che-woc, his x mark. | (L.S.) |
| Dog River Wasco: | | Ya-toch-la-le, his x mark. | (L.S.) |
| Walachin, his x mark. | (L.S.) | Alpy, his x mark. | (L.S.) |
| Tah Symph, his x mark. | (L.S.) | Pich, his x mark. | (L.S.) |
| Ash-na-chat, his x mark. | (L.S.) | William, his x mark. | (L.S.) |
| Che-wot-aloth, his x mark. | (L.S.) | Peter, his x mark. | (L.S.) |
| Te-cho, his x mark. | (L.S.) | Ischa Ya, his x mark. | (L.S.) |
| Sha-qually, his x mark. | (L.S.) | George, his x mark. | (L.S.) |
| Louis, his x mark. | (L.S.) | Jim, his x mark. | (L.S.) |
| Yise, his x mark. | (L.S.) | Se-ya-las-ka, his x mark. | (L.S.) |
| Stanite, his x mark. | (L.S.) | Ha-lai-kola, his x mark. | (L.S.) |
| Ta-cho, his x mark. | (L.S.) | Pterro, his x mark. | (L.S.) |
| Penop-teyot, his x mark. | (L.S.) | Ash-lo-wash, his x m rk. | (L.S.) |
| Elosh-kish-kie, his x mark. | (L.S.) | Paya-tilch, his x mark. | (L.S.) |
| Am. Zelic, his x mark. | (L.S.) | Sue-pa-walt/cha, his x mark. | (L.S.) |
| Ke-chac, his x mark. | (L.S.) | Shalquilkey, his x mark. | (L.S.) |
| Tanes Salmon, his x mark. | (L.S.) | Wa-qual-lol, his x mark. | (L.S.) |
| Ta-kos, his x mark. | (L.S.) | Sin-kui-kui, his x mark. | (L.S.) |
| David, his x mark. | (L.S.) | Wacha-chiley, his x mark. | (L.S.) |
| Sowal-we, his x mark. | (L.S.) | Chi-kal-kin, his x mark. | (L.S.) |
| Postie, his x mark. | (L.S.) | Squa-yash, his x mark. | (L.S.) |
| Yawan-snewitt, his x mark. | (L.S.) | Sha Ka, his x mark. | (L.S.) |
| Own-aps, his x mark. | (L.S.) | Keaui-sene, his x mark. | (L.S.) |
| Kossa, his x mark. | (L.S.) | Che-chis, his x mark. | (L.S.) |
| Pa-wash-ti-mane, his x mark. | (L.S.) | Sche-noway, his x mark. | (L..) |
| Ma-we-nit, his x mark. | (L.S.) | Scho-ley, his x mark. | (L.S.) |
| Tipso, his x mark. | (L.S.) | We-ya-thley, his x mark. | (L.S.) |
| Jim, his x mark. | (L.S.) | Pa-leyathley, his x mark. | (L.S.) |
| Peter, his x mark. | (L.S.) | Keyath, his x mark. | (L.S.) |
| Na-yoct, his x mark. | (L.S.) | I-poth-pal, his x mark. | (L.S.) |
| Wal-tacom, his x mark. | (L.S.) | S. Folps, his x mark. | (L.S.) |
| Cho-kalta, his x mark. | (L.S.) | Mission John, his x mark. | (L.S.) |
| Pal-sta, his x mark. | (L.S.) | | |

Exhibit C

| | | | |
|---|---|---|---|
| Le-Ka-ya, his x mark. | (L.S.) | La-wit-chin, his x mark. | (L.S.) |
| La-wit-chin, his x mark. | (L.S.) | Walimtalin, his x mark. | (L.S.) |
| Low-las, his x mark. | (L.S.) | Tash-Wick, his x mark. | (L.S.) |
| Thomson, his x mark. | (L.S.) | Hawatch-can, his x mark. | (L.S.) |
| Charley, his x mark. | (L.S.) | Ta-wait-cla, his x mark. | (L.S.) |
| Copefornia, his x mark. | (L.S.) | Patoch snort, his x mark. | (L.S.) |
| Wa-toi-mettla, his x mark. | (L.S.) | Tachins, his x mark. | (L.S.) |
| Ke-la, his x mark. | (L.S.) | Comochal, his x mark. | (L.S.) |
| Pa-ow-ne, his x mark. | (L.S.) | Passayei, his x mark. | (L.S.) |
| Kuck-up, his x mark. | (L.S.) | Watan-cha, his x mark. | (L.S.) |
| Poyet, his x mark. | (L.S.) | Ta-wash, his x mark. | (L.S.) |
| Ya-wa-clax, his x mark. | (L.S.) | A-nouth-shot, his x mark. | (L.S.) |
| Tam-cha-wit, his x mark. | (L.S.) | Hanwake, his x mark. | (L.S.) |
| Tam-mo-yo-cam, his x mark. | (L.S.) | Pata-la-set, his x mark. | (L.S.) |
| Was-ca-can, his x mark. | (L.S.) | Tash-weict, his x mark. | (L.S.) |
| Talle-fish, his x mark. | (L.S.) | Wescha-matolla, his x mark. | (L.S.) |
| Waleme Toach, his x mark. | (L.S.) | Chle-mochle-mo, his x mark. | (L.S.) |
| Site-we-loch, his x mark. | (L.S.) | Quae-tus, his x mark. | (L.S.) |
| Na-ni-nect, his x mark. | (L.S.) | Skuilts, his x mark. | (LS ) |
| Pich-kan, his x mark. | (L.S.) | Panospam, his x mark. | (L.S.) |
| Stolameta, his x mark. | (LS ) | Ash-ka-wish, his x mark. | (L.S.) |
| Tamayechotote, his x mark. | (L.S.) | Pasquai, his x mark. | (L.S.) |
| Qua-losh-kin, his x mark. | (L.S.) | Wasso-kui, his x mark. | (L.S.) |
| Wiska Ka, his x mark. | (L.S.) | Quaino-sath, his x mark. | (LS.) |
| Che-lo-tha, his x mark. | (L.S.) | Cha-ya-tema, his x mark. | (L.S.) |
| Wetone-yath, his x mark. | (L.S.) | Wa-ya-lo-chol-wit, his x mark. | (L.S.) |
| We-ya-lo-chol-wit, his x mark. | (L.S.) | Flitch Kui Kui, his x mark. | (L.S.) |
| Yoka-nolth, his x mark. | (L.S.) | Walcha Kas, his x mark. | (L.S.) |
| Wacha-ka-polle, his x mark. | (L.S.) | Watch-tla, his x mark. | (L.S.) |
| Kon-ne, his x mark. | (L.S.) | Enias, his x mark. | (L.S.) |

Signed in the presence of:

Wm. C. McKay, secretary of treaty, O.T.
R. R. Thompson, Indian Agent.
R. B. Metcalfe, Indian Sub-agent.
C. Mespotie.
John Flett, interpreter.
Dominick Jondron, his x mark, interpreter.
Mathew Dofa, his x mark, interpreter.

Exhibit C



The Confederated Tribes of Warm Springs
Indian Claims Commission Judgment Area Map

Exhibit D



**The Confederated Tribes of the Grand Ronde Community of Oregon**

Tribal Attorney
Phone (503) 879-2172
1-800 422-0232
Fax (503) 879-2333

9615 Grand Ronde Rd
Grand Ronde, OR 97347

October 27, 2008

Mr. Stanley Speaks                                     *via facsimile: 503/231-2201*
Regional Director
Bureau of Indian Affairs
Northwest Regional Office
911 NE 11th Avenue
Portland, Oregon 97232

Re:    Petition for Consultation as a Nearby Indian Tribe

Dear Mr. Speaks:

On behalf of the Confederated Tribes of the Grand Ronde Community of Oregon ("Grand Ronde"), please accept this letter as a formal petition pursuant to 25 C.F.R. § 292.2 for consultation as a nearby Indian tribe in connection with the Cascade Locks Resort and Casino Project ("Project"). Although Grand Ronde today does not have Indian lands located within a 25-mile radius of the proposed gaming establishment in Cascade Locks, Grand Ronde's governmental functions, infrastructure and services would be directly, immediately and significantly impacted by the proposed gaming establishment. Furthermore, Grand Ronde's ceded lands under the treaty of January 22, 1855 (known as the 1855 Treaty with the Kalapuya, et al. or the Willamette Valley Treaty) include the area around Cascade Locks.

By way of background, the Bureau initially recognized Grand Ronde as a nearby Indian tribe pursuant to Section 20(b)(1)(A) of the Indian Gaming Regulatory Act by letter from George Skibine dated September 2, 2005 (copy enclosed). With the promulgation of the new regulations implementing Section 20, Grand Ronde made numerous efforts to confirm its status as a nearby Indian tribe. See enclosed letters dated August 5, 2008, and September 10, 2008. In response to these efforts, Mr. Skibine confirmed that Grand Ronde would be consulted as a nearby Indian tribe pursuant to Section 20(b)(1)(A) by letter dated September 29, 2008 (copy enclosed). Grand Ronde believes that any requirement to petition and be accepted for consultation under the new Section 20 regulations has been satisfied by the enclosed correspondence. However, in response to a discussion this morning with Paula Hart and other Bureau representatives regarding the need to file a petition, and in the interest of closing any procedural gap, Grand Ronde hereby submits this letter as its formal petition.

*Umpqua  Molalla  Rogue River  Kalapuya  Chasta*

Exhibit E

Mr. Stanley Speaks
October 27, 2008
Page 2

Grand Ronde's governmental functions, infrastructure and services would be directly, immediately and significantly impacted by the proposed gaming establishment. Grand Ronde is a restored tribe that is still recovering from the devastating effects of termination in 1954. Despite ongoing efforts to restore its land base, the Grand Ronde Reservation is less than 11,000 acres. Grand Ronde's on-reservation casino, Spirit Mountain Casino ("Spirit Mountain"), is its only significant source of revenue. A significant portion of the market from which Spirit Mountain draws its customers and revenues includes the Portland, Oregon metropolitan area, which is roughly 40 miles from the proposed gaming establishment in Cascade Locks. Our analysis indicates that the proposed gaming establishment in Cascade Locks would result in a loss of revenue at Spirit Mountain of as much as thirty-three percent (33%), if not more. The loss of Spirit Mountain's customers and revenue to an off-reservation casino in Cascade Locks would seriously and adversely affect Grand Ronde's ability to provide critical services and meaningful employment opportunities to our tribal members. A detailed analysis of the impacts the proposed gaming establishment would have on Grand Ronde, including an economic study on the impacts that a Cascade Locks casino would have on Spirit Mountain revenues, is described in Section II of Grand Ronde's comments to the DEIS for the Project.

The Bureau also notified Grand Ronde today that the consultation period in connection with the Project ends today and that Grand Ronde should request an extension pursuant to 25 C.F.R. § 292.19(b). However, that regulation allows the Regional Director to extend the 60-day comment period following receipt of a consultation letter described in 25 C.F.R § 292.19(a) for an additional 30 days. Grand Ronde has not yet received a consultation letter described in 25 C.F.R § 292.19(a) and therefore has not yet been afforded any time to comment. Once a consultation letter is received, Grand Ronde expects that it will have the same amount of time to respond which is afforded to other officials of nearby Indian tribes and surrounding communities. To the extent an extension is necessary, Grand Ronde hereby requests an extension.

I appreciate your attention to this important issue for Grand Ronde. Please advise as to when Grand Ronde can expect a section 20 consultation letter. You may reach me at 503/879-2270.

Very truly yours,

Rob Greene
Tribal Attorney


Enclosures

cc:   Tribal Council
      George Skibine (via electronic mail)
      Paula Hart (via electronic mail)
      Gerald Henrikson (via electronic mail)

*Umpqua  Molalla  Rogue River  Kalapuya  Chasta*

Exhibit E

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of October, 2012, I have caused service of: **BRIEF OF**
*AMICUS CURIAE* **THE CONFEDERATED TRIBES OF THE WARM SPRINGS**
**RESERVATION OF OREGON IN SUPPORT OF DEFENDANT'S AND**
**INTERVENOR-DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT, THE CONFEDERATED TRIBES OF THE WARM**
**SPRINGS RESERVATION OF OREGON'S MOTION FOR LEAVE TO APPEAR**
**AS** *AMICUS CURIAE* **AND STATEMENT OF POINTS AND AUTHORITIES IN**
**SUPPORT THEREOF**, and **PROPOSED ORDER** to be made by e-mail with the Clerk
of the Court, and by causing a full, true, and correct copy thereof to be sent by mail the
following parties:

Lisa K. Helvin
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER
LLP
1801 K. Street, NW Suite 411-L
Washington, DC 20006

Daniel Lerman
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER
LLP
1801 K. Street, NW Suite 411-L
Washington, DC 20006

Gary A. Orseck
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER
LLP
1801 K. Street, NW Suite 411-L
Washington, DC 20006

Sarah Ribstien
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER
LLP
1801 K. Street, NW Suite 411-L
Washington, DC 20006

Lawrence Saul Robbins
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER
LLP
1801 K. Street, NW Suite 411-L
Washington, DC 20006

Edward D. Gehres
PATTON BOGGS LLP
2550 M. Street, NW
Washington, DC 20037

1

Robert David Luskin
PATTON BOGGS LLP
2550 M. Street, NW
Washington, DC 20037

Suzanne R. Schaeffer
SNR DENTON US LLP
1301 K. Street, NW
Suite 600 East Tower
Washington, DC 20005

V. Heather Sibbison
SNR DENTON US LLP
1301 K. Street, NW
Suite 600 East Tower
Washington, DC 20005

Kristofor R. Swanson
U.S. DEPARTMENT OF JUSTICE
ENRD
P.O. Box 7611
Washington, DC 20044

DATED this 5th day of October, 2012.

Howard G. Arnett, OSB# 77099
Lauren J. Lester, OSB# 060858
Karnopp Petersen LLP
1201 NW Wall Street, #200
Bend, Oregon 97701
Counsel for *Amicus Curiae* Applicant
The Confederated Tribes of the Warm
Springs Reservation of Oregon

W1101.5(e)/515291.doc