# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————

| | | |
|---|---|---|
| THE CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 11-cv-00284-RWR |
| SALAZAR, *et al.*, | ) ) | |
| Defendants, | ) ) | |
| AND | ) ) | |
| COWLITZ INDIAN TRIBE | ) ) | |
| Intervenor-Defendant | ) ) | |

—————————————————————————

**BRIEF OF UNITED SOUTH AND EASTERN TRIBES, INC.
AND JAMESTOWN S'KLALLAM TRIBE
AS *AMICI CURIAE* IN OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

SUMMARY OF INTEREST OF *AMICI* ............................................................. 1

SUMMARY OF ARGUMENT ............................................................................ 2

ARGUMENT ...................................................................................................... 4

I.  DETERMINING WHETHER A TRIBE WAS "UNDER FEDERAL
    JURISDICTION" IN 1934 MUST BE MADE AGAINST THE BACKDROP
    OF FEDERAL INDIAN LAW AND ACCOUNT FOR THE UNIQUE
    HISTORY AND CIRCUMSTANCES OF EACH TRIBE ............................ 4

    A.  The Constitutional Backdrop for Federal Jurisdiction Over Tribes ......... 5

    B.  The Indian Reorganization Act of 1934 Was Enacted To Strengthen Tribal
        Governments and Bring Economic Improvement to Indian Communities .......... 6

    C.  A Tribe May Have Been Under Federal Jurisdiction in 1934 Even Though
        the United States Did Not Believe So at the Time ..................................... 9

    D.  Once A Tribe Is Under Federal Jurisdiction, It Remains Under Federal
        Jurisdiction Unless Explicitly Terminated By Congress Or Unless It
        Voluntarily Ceases Being A Tribe ......................................................... 11

II. THE IRA REQUIRES THAT A TRIBE BE A "RECOGNIZED INDIAN
    TRIBE" AT THE TIME THE LAND IS TAKEN INTO TRUST, NOT 1934,
    AND *CARCIERI v. SALAZAR* DOES NOT HOLD OTHERWISE ................ 14

    A.  The *Carcieri* Decision Held That The Word "Now" Modifies The Phrase
        "Under Federal Jurisdiction" In Which It Was Included, Not The Phrase
        "Recognized Indian Tribe" ..................................................................... 15

    B.  Basic Principles Of Statutory Construction Support The Secretary's
        Formulation ........................................................................................ 17

    C.  Congress Did Not Impose A Temporal Limitation On Recognition In
        Section 479 .......................................................................................... 18

III. AS USED TODAY, "FEDERAL RECOGNITION" IS A TERM OF ART OF
    MODERN ORIGIN AND CANNOT BE SUPERIMPOSED ON THE IRA OF
    1934 .................................................................................................... 22

CONCLUSION ................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Carcieri v. Salazar*,
   555 U.S. 379 (2009)...........................................................2, 3, 4, 9, 10, 11, 14, 15, 16, 17, 21

*Hallowell v. United States*,
   221 U.S. 317 (1911)................................................................................................................11

*Joint Tribal Council of the Passamaquoddy Tribe v. Morton*,
   528 F.2d 370 (1st Cir. 1975).............................................................................................13, 24

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. ___, 132 S. Ct. 2199 (2012)....................................................................................16

*Mescalero Apache Tribe v. Jones*,
   411 U.S. 145 (1973)..................................................................................................................7

*Montoya v. United States*,
   180 U.S. 261 (1901)................................................................................................................23

*Morton v. Mancari*,
   417 U.S. 535 (1974)..................................................................................................................6

*Perrin v. United States*,
   232 U.S. 478 (1914)................................................................................................................11

*Tiger v. Western Inv. Co.*,
   221 U.S. 286 (1911)................................................................................................................12

*Tully v. United States*,
   32 Ct. Cl. 1 (1896)............................................................................................................23, 24

*United States v. Candelaria*,
   271 U.S. 432 (1926)................................................................................................................23

*United States v. Celestine*,
   215 U.S. 278 (1909)..................................................................................................................6

*United States v. Holliday*,
   70 U.S. 407 (1865)..................................................................................................................23

*United States v. John*,
   437 U.S. 634 (1978)....................................................................................................12, 13, 14

**TABLE OF AUTHORITIES—Continued**

*United States v. Kagama*,
    118 U.S. 375 (1886).................................................................................6

*United States v. Nice*,
    241 U.S. 591 (1916)...............................................................6, 11, 12, 14

*United States v. Pelican*,
    232 U.S. 442 (1914)............................................................................12

*United States v. Sandoval*,
    231 U.S. 28 (1913)..........................................................................6, 14

*United States v. Villanueva-Sotelo*,
    515 F.3d 1234 (D.C. Cir. 2008) ......................................................17, 18

*United States v. Washington*,
    520 F.2d 676 (9th Cir. 1975) ...............................................................24

*United States v. Yermain*,
    468 U.S. 63 (1984).........................................................................17, 18

**Statutes, Regulations, Legislative History**

Act of July 22, 1790, ch. 33, § 1, 1 Stat. 137.................................................6

Act of March 3, 1891, ch. 538, § 1, 26 Stat. 851 ...........................................23

Pub. L. No. 73-383, 48 Stat. 984 (1934)....................................................2, 8

25 U.S.C. § 177.........................................................................................13

25 U.S.C. § 331 *et. seq.*..............................................................................6

25 U.S.C. § 461...........................................................................................8

25 U.S.C. § 462...........................................................................................8

25 U.S.C. § 463(a).......................................................................................8

25 U.S.C. § 464...........................................................................................8

*25 U.S.C. § 465................................................................................6, 8, 14, 18

## TABLE OF AUTHORITIES—Continued

25 U.S.C. § 466 ................................................................................................7

25 U.S.C. § 470 ................................................................................................7

25 U.S.C. § 471 ...........................................................................................7, 22

25 U.S.C. § 472 ................................................................................................7

25 U.S.C. § 473a ..............................................................................................8

25 U.S.C. § 476 ................................................................................................7

25 U.S.C. § 477 ..............................................................................................21

25 U.S.C. § 478 .............................................................................................7, 8

*25 U.S.C. § 479 .......................................................2, 8, 9, 14, 15, 16, 18

25 U.S.C. § 479a ............................................................................................22

25 U.S.C. §§ 501-509 ......................................................................................8

25 U.S.C. § 2202 ..............................................................................................8

25 C.F.R. Part 83 ............................................................................................25

25 C.F.R. § 83.2 ..............................................................................................27

25 C.F.R. § 83.7 ..............................................................................................26

*Hearing on S. 2755 and S. 3645 Before the S. Comm. on Indian Affairs,*
    73d Cong. 2d Sess. (1934) ...............................................................7, 19, 20

*Hearings on H.R. 7902 Before H. Comm. on Indian Affairs,*
    73d Cong. 2d Sess. (1934) ...............................................................................7

*Executive Branch Authority to Acquire Trust Lands for Indian Tribes: Oversight*
*Hearing Before the S. Comm. on Indian Affairs,*
    111th Cong. (2009) ..........................................................................................7

*Federal Acknowledgement: Political and Legal Relationship Between Governments:*
*Oversight Hearing Before the Senate Committee on Indian Affairs,*
    112th Cong. (2012) ...................................................................................26, 27

## TABLE OF AUTHORITIES—Continued

H.R. Rep. 73-1804 (1934)..................................................................................7

H.R. Rep. 73-2049 (1934)..................................................................................7

S. Rep. 73-1080 (1934) .....................................................................................7

H.R. Rep. No. 103-781 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3768 .....................................27

AM. INDIAN POLICY REVIEW COMM'N, FINAL REPORT (1977)................................................24, 25

## Regulatory Materials

43 Fed. Reg. 39361 (Sept. 5, 1978) ........................................................................25

59 Fed. Reg. 9280 (Feb. 25, 1994) ....................................................................10, 25

65 Fed. Reg. 7052 (Feb. 11, 2000) ........................................................................25

77 Fed. Reg. 47868 (Aug. 10, 2012)........................................................................22

## Other Authorities

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (2005 ed.) ......................................................7, 8

Matthew L.M. Fletcher, *The Original Understanding of the Political Status of Indian Tribes*, 82 ST. JOHN'S L. REV. 153 (2008)........................................................................5

Letter from Acting Regional Director to Honorable Earl Barbry, Sr (Aug. 11, 2011) ..............10

Powers of Indian Tribes, 55 Interior Dec. 14 (1934) .................................................21

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 3..........................................................................5

U.S. Const. art. II, § 2, cl. 2 .........................................................................5

## SUMMARY OF INTEREST OF *AMICI*

The United South and Eastern Tribes, Inc. ("USET") is a non-profit organization representing 26 federally recognized Indian tribes[1] in 12 states stretching from Texas to Maine. Established over forty years ago, USET works at the regional and national level to educate federal, state and local governments with regard to the unique historic and political status of its member tribes.  USET also operates a number of programs for the benefit of its membership. Because of their location in the South and Eastern regions of the United States, the USET-member tribes have the longest continuous direct relationship with the United States government, dating back to some of the earliest treaties.  One of the most significant aspects of this long relationship has been the steady loss of tribal land.

Today, USET-member tribes retain only small remnants of their original homelands. Because of their small land base, the provisions of the Indian Reorganization Act of 1934 ("IRA") are of particular significance and importance to USET-member tribes.  Through the provisions of the IRA, USET-member tribes have been able to purchase land and petition the Secretary of the Interior ("Secretary") to place that land into trust status for a wide-variety of purposes.  For this reason, the interpretation of the IRA is of special importance to USET and is an area of federal Indian law in which USET has particular expertise.

The Jamestown S'Klallam Tribe is located in eastern Clallam County, Washington, on the Olympic Peninsula.  Members of the Tribe were signatories to the Treaty of Point No Point in

---

[1] The USET-member tribes include: Eastern Band of Cherokee Indians; Miccosukee Tribe of Indians of Florida; Mississippi Band of Choctaw Indians; Seminole Tribe of Florida; Chitimacha Tribe of Louisiana; Seneca Nation of Indians; Coushatta Tribe of Louisiana; Saint Regis Mohawk Tribe; Penobscot Indian Nation; Passamaquoddy Tribe – Pleasant Point; Passamaquoddy Tribe – Indian Township; Houlton Band of Maliseet Indians; Tunica-Biloxi Tribe of Louisiana; Poarch Band of Creek Indians; Narragansett Indian Tribe; Mashantucket Pequot Tribal Nation; Wampanoag Tribe of Gay Head (Aquinnah); Alabama-Coushatta Tribes of Texas; Oneida Indian Nation; Aroostook Band of Micmacs; Catawba Indian Nation; Jena Band of Choctaw Indians; Mohegan Tribe; Cayuga Nation; Mashpee Wampanoag Tribe; and Shinnecock Indian Nation.  They can be found in Maine, New York, Massachusetts, Mississippi, North Carolina, South Carolina, Florida, Louisiana, Alabama, Rhode Island, Connecticut and Texas.

1855, whereby the Tribe effectively ceded title to approximately 450,000 acres of land.  The

Jamestown S'Klallams received services from the Federal Government until 1953, at which point

the Federal Government no longer "recognized" them.  However, the Tribe maintained its

cohesion, continued to be recognized as a distinct community by other S'Klallam groups and

other Washington Indians.  The Tribe began an effort to regain recognition in 1974, and on

February 10, 1981, the Tribe was finally federally re-recognized.  Since then, the Tribe has been

working to rebuild some of the land base it lost by acquiring properties on the open market and

placing those lands into trust status.

For the *amici*, the reacquisition and rebuilding of their homelands is of critical

importance for achieving their goal of economic self-sufficiency as self-governing entities.  The

revenues generated from economic development enterprises on trust and reservation lands

provide each tribe with the ability to strengthen its tribal government, improve the quality of life

of its members and provide capital for other economic development and investment

opportunities.

## SUMMARY OF ARGUMENT

In *Carcieri v. Salazar*, 555 U.S. 379 (2009), the Supreme Court held that the phrase "now

under Federal jurisdiction" in the Indian Reorganization Act of 1934 ("IRA"), Pub. L. No. 73-

383, § 19, 48 Stat. 984 (codified at 25 U.S.C. § 479), meant that the Narragansett Indian Tribe, a

USET-member tribe, had to demonstrate that it was "under Federal jurisdiction" at the time the

IRA was enacted in 1934 in order to be eligible to have land taken into trust.  The IRA authorizes

the Secretary of the Interior to take land into trust for Indians, and defines "Indian" to include

tribes "now under Federal jurisdiction."  *Id.*  The narrow question addressed by the Court in

*Carcieri* was whether the phrase "now under Federal jurisdiction" referred to 1934 when the IRA

was enacted, or to the time the Secretary acts to take land into trust for a tribe.  555 U.S. at 382.

The Court held that "now under Federal jurisdiction" referred to 1934.  *Id.*  The Court had no

occasion to explain what it meant to be "under Federal jurisdiction" in 1934 because it

determined, based on a concession made by the United States, that the Narragansett Indian Tribe

was not "under Federal jurisdiction" in 1934.[2]  Moreover, the Court in *Carcieri* did not hold that

a tribe must also be "recognized" in 1934.

    *Amici* submit this brief to provide this Court additional background on the historic

meaning and legislative intent of Congress in enacting the IRA that we believe will not be fully

addressed in the briefs of the parties.[3]  After the *Carcieri* decision, it is incumbent on the

Secretary to determine whether a tribe was "under Federal jurisdiction" in 1934 on a case-by-

case basis against the backdrop of federal Indian law and in a manner that accounts for the

unique history of each tribe and its relationship with the United States.  It is a longstanding

principle of federal Indian law that once a tribe has come under the jurisdiction of the United

---

[2] Its holding with regard to the Narragansett Indian Tribe was not based on an application of the Tribe's factual circumstances.  Rather, it relied on the fact that the petition for certiorari had asserted that the Tribe was not under federal jurisdiction in 1934 and that "[t]he respondents' brief in opposition declined to contest this assertion."  *Carcieri*, 555 U.S. at 395-396.  Because the United States failed to contest it, the petitioner's allegation was automatically accepted by operation of the Court's procedural rules.  *Id.* ("Under our rules, that alone is reason to accept this as fact for purposes of our decision in this case.").  Furthermore, the Tribe-- which was not a party to the case -- had no opportunity to object to the petitioner's allegation or prove a factual basis for federal jurisdiction in 1934.  Indeed, Justices Souter and Ginsberg noted that the parties simply did not understand that the issue was present. The two justices dissented from the Court's straight reversal and stated that they would have remanded the case so that the United States and the Narragansett Tribe would have had the opportunity to argue that the Tribe was "under Federal jurisdiction."  555 U.S. at 401.

[3]  We understand that at the scheduling conference held February 10, 2012, this Court instructed the parties that any *amicus curiae* briefs in support of any party must be filed on the same day that briefs are due for the party they support.  Because of this, we have had only a limited opportunity to review a draft of the brief we understand will be filed by the Cowlitz Tribe and have not reviewed the final brief.  We have not had any opportunity to review the brief filed by the United States.  In this brief we demonstrate that the test for determining whether a tribe is eligible to take land into trust under the IRA has always been informed by longstanding principles of Indian law, taking into account the unique legal and historical circumstances of each tribe and its relationship with the United States.  We bring a unique and broad perspective on the historical basis for this test, including that its application must necessarily be flexible in order to account for the differences among tribes.  We do not believe that the parties will address this broader perspective because they are compelled to focus on the unique circumstances of the Cowlitz Tribe alone.

States, it will remain under federal jurisdiction unless that relationship has been expressly and unambiguously terminated by Congress, or the tribe itself voluntarily abandons tribal relations. An important corollary to that rule, recognized by Justice Breyer in his concurring opinion explaining the majority opinion in *Carcieri*, is that "a tribe may have been 'under Federal jurisdiction' in 1934 even though the Federal Government did not believe so at the time." *Carcieri*, 555 U.S. at 397 (Breyer, J., concurring).

Although the Court in *Carcieri* held that a tribe must demonstrate that it was "under Federal jurisdiction" in 1934 before it qualifies to take land into trust today, nothing in the Court's decision or the text or legislative history of the IRA indicates that a tribe must also demonstrate that it was a "recognized Indian tribe" in 1934 in order to take land into trust today. As the concurring opinions in the *Carcieri* decision indicate, "under Federal jurisdiction" and "recognized Indian tribe" historically had two separate meanings, and must be given separate effect. In this brief, *Amici* provide additional information and background to the Court on the separate genesis and meaning of these two terms historically, and how those two terms came to be treated together after a formal recognition process was developed in the 1970s.

## ARGUMENT

### I. DETERMINING WHETHER A TRIBE WAS "UNDER FEDERAL JURISDICTION" IN 1934 MUST BE MADE AGAINST THE BACKDROP OF FEDERAL INDIAN LAW AND ACCOUNT FOR THE UNIQUE HISTORY AND CIRCUMSTANCES OF EACH TRIBE

Determining whether a tribe falls under the jurisdiction of the United States for purposes of the IRA must be made by the Secretary on a case-by-case basis and measured against the backdrop of well-established principles of Indian law, as well as the unique history and circumstances of each tribe and its relationship to the United States. Federal jurisdiction over Indian tribes is rooted in the Constitution, and has been given expression in federal statutes since

the beginning of the Republic.  It has been invoked to enact laws that divested tribes of much of their lands and destroyed their economies, and invoked again, as it was in the IRA, with the intent to reverse the negative effects of those prior laws.

The United States has established a wide variety of relations with tribes arising out of historical and other circumstances.  In some cases, these relationships have been broad and all encompassing; in others it has been limited.  However the relationship is established and whatever its scope, though, any relationship with the United States can only be withdrawn by the United States.   It is a longstanding principle of federal Indian law that once a tribe has been determined to fall under the jurisdiction of the United States, it remains under the jurisdiction of the United States unless it has voluntarily abandoned tribal relations or jurisdiction has been unambiguously terminated by an explicit Act of Congress.  An important corollary to this rule is that a tribe may have been under federal jurisdiction even though federal officials were unaware of it at the time.

### A.        The Constitutional Backdrop for Federal Jurisdiction Over Tribes

Federal jurisdiction to deal with Indian tribes is exclusive of State jurisdiction and has a constitutional dimension grounded in provisions such as the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and the Treaty Clause, U.S. Const. art. II, § 2, cl. 2.  One of the abiding concerns of the Framers of the Constitution was that the Indian tribes – both those who already fell under the jurisdiction of the original United States, and those that did not – would ally themselves with foreign powers.  *See generally*, Matthew L.M. Fletcher, *The Original Understanding of the Political Status of Indian Tribes*, 82 ST. JOHN'S L. REV. 153, 166-170 (2008).  The Indian Commerce Clause was adopted by the Continental Congress in part to remedy difficulties with Article IX of the Articles of Confederation, which had been interpreted by some of the States to authorize them to treat directly with the tribes.  *Id. at* 166-170.  In the

Framers' eyes, this interpretation of Article IX impermissibly interfered with the federal-tribal relationship and necessitated adoption of the Indian Commerce Clause.  *Id*.  Upon adoption of the Constitution  in 1789, Congress possessed sole and exclusive  jurisdiction over the affairs of all Indian tribes in the United States.  For example, one of the very first acts of the first Congress was to enact the Trade and Intercourse Act which asserted exclusive federal power with regard to trading with Indians.  The Act provided that "no person shall be permitted to carry on any trade or intercourse with the Indian tribes… ." Act of July 22, 1790, ch. 33, § 1, 1 Stat. 137.[4]

The courts have consistently upheld the notion that the United States exercises original authority over all Indian tribes throughout its borders.  *United States v. Sandoval*, 231 U.S. 28, 45-46 (1913); *United States v. Kagama*, 118 U.S. 375, 384-85 (1886).  This constitutional power is "a continuing power of which Congress could not divest itself."  *United States . v. Nice*, 241 U.S. 591, 600 (1916).

**B.**    **The Indian Reorganization Act of 1934 Was Enacted to Strengthen Tribal Governments and Bring Economic Improvement to Indian Communities**

In 1934, Congress enacted the IRA with the "overriding purpose" of "establish[ing] machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." *Morton v. Mancari*, 417 U.S. 535, 542 (1974).  That "sweeping" legislation manifested a sharp change of direction in federal Indian policy.  *Id*.  It replaced the assimilationist policy characterized by the General Allotment Act of 1887, 25 U.S.C. § 331 *et. seq.*, which had been designed to "put an end to tribal organization" and to "dealings with Indians . . . as tribes." *United States v. Celestine*, 215 U.S. 278, 290 (1909).  It

---

[4] Though initially temporary, the Trade and Intercourse Act was reenacted several times with minor changes and additions.  Congress made the law permanent in 1802, and amended the Act again in 1834.

was preceded by lengthy consultations with tribes, straw votes among tribal memberships, extensive public debate, and lengthy hearings before Congress.[5]

The IRA was intended to improve tribal governance and tribal economies as well as help restore a land base for tribes.  It authorized Indian tribes to adopt their own constitutions and bylaws, Pub. L. No. 73-838, § 16 (codified at 25 U.S.C. § 476), and to incorporate for business purposes, *id.* at § 17 (codified at 25 U.S.C. § 477).  In addition, the IRA authorized the Secretary to take steps to improve the economic and social condition of Indians, including: adopting regulations for forestry and livestock grazing on Indian units, *id.* at § 6 (codified at 25 U.S.C. § 466), making loans to Indian-chartered corporations "for the purposes of promoting … economic development," *id.* at § 10 (codified at 25 U.S.C. § 470), paying expenses for Indian students at vocational schools, *id.* at § 11 (codified at 25 U.S.C. § 471), and giving preference to Indians for employment in government positions relating to Indian affairs, *id.* at § 12 (codified at 25 U.S.C. § 472).  It also allowed tribes to decide, by referendum, whether to exclude their reservation from the IRA's application.  *Id.* at § 18 (codified at 25 U.S.C. § 478).

In service of the broader goal of encouraging the Indian tribes "to revitalize their self-government" and to take control of their "business and economic affairs," Congress also sought to assure they had a solid territorial base by "put[ting] a halt to the loss of tribal lands through allotment." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151 (1973).[6]  The IRA thus

---

[5] *Readjustment of Indian Affairs: Hearings on H.R. 7902 Before H. Comm. on Indian Affairs*, 73d Cong. 2d Sess. (1934); *To Grant Indians Living Under Federal Tutelage the Freedom to Organize for Purposes of Local Self-Government and Economic Enterprise: Hearings on S. 2755 and S. 3645*, 73d Cong. 2d Sess. (1934).  *See also* S. Rep. 73-1080 (1934); H.R. Rep. 73-1804 (1934); H.R. Rep. 73-2049 (1934).

[6] The federal policy of allotment resulted in the loss of 90 million acres of Indian lands.  COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.04 (2005 ed.).  Since the IRA was enacted, only about 8 percent of those lands have been restored to tribal status.  *Executive Branch Authority to Acquire Trust Lands for Indian Tribes: Oversight Hearing Before the S. Comm. on Indian Affairs,* 111th Cong. (2009) (testimony of the National Congress of American Indians.

prohibited any further allotment of reservation lands, Pub. L. No. 73-838, § 1 (codified at 25 U.S.C. § 461), extended indefinitely the periods of trust or restrictions on individual Indian trust lands, *id.* at § 2 (codified at 25 U.S.C. § 462), provided for the restoration of surplus unallotted lands to tribal ownership, *id.* at § 3(a) (codified at 25 U.S.C. § 463(a)) and prohibited any transfer of restricted Indian lands, with limited exceptions, other than to the tribe or by inheritance, *id.* at § 4 (codified at 25 U.S.C. § 464).

The IRA was generally intended to apply to all tribes, except those electing to affirmatively opt out of the IRA.[7]  25 U.S.C. § 478.  Tribes in Oklahoma and Alaska were initially exempted from much of the IRA, but in 1936 Congress extended protections to tribes in those two states.[8]

Section 5 of the IRA authorizes the Secretary to acquire lands "for the purpose of providing land for Indians," and provides that title to such lands "shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired…."  25 U.S.C. § 465.

Section 19 of the IRA, in turn, defines "Indian" as follows:

"[25 U.S.C.] § 479.  Definitions.

"[a] The term 'Indian' as used in this Act shall include

"[1] all persons of Indian descent who are members of any recognized Indian tribe ***now under Federal jurisdiction,*** and

"[2] all persons who are descendents of such members who were, on June 1, 1934, residing within the present boundaries of any Indian

---

[7] Pub. L. No. 73-383, § 13, 48 Stat. 984, 986-87 (1934).  Some tribes did exclude themselves, including the Navajo Nation.  COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.05, n.542 (2005 ed.).  Congress later extended the provisions of Section 5 of the IRA to those tribes who had voted to opt out of the IRA.  25 U.S.C. § 2202 ("The provisions of section 465 of this title shall apply to all tribes notwithstanding the provisions of section 478 of this title…").

[8] In 1936 the main provisions of the IRA were extended to Alaska, 25 U.S.C. § 473a.  The Oklahoma Indian Welfare Act applied similar principles to tribes in that State.  25 U.S.C. §§ 501-509.

> reservation, and
>
> "[3] shall further include all other persons of one-half or more Indian blood  . . . .
>
> "[b] The term 'tribe' wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation . . . ."

25 U.S.C. § 479 (emphasis and subparagraphing added).

The words "now under Federal jurisdiction" were added to Section 19 of the bill at the end of the Senate Committee on Indian Affairs hearing on the bill and enacted with limited discussion. Neither the text of the IRA nor its legislative history provide any explanation of what the term "now under Federal jurisdiction" meant. However, it is clear that the term "now under Federal jurisdiction" involved a separate legal inquiry from what it means to be a "recognized Indian tribe."

### C.   A Tribe May Have Been Under Federal Jurisdiction in 1934 Even Though the United States Did Not Believe So at the Time

In his Record of Decision ("ROD"), the Secretary correctly recognized that "a tribe may have been under federal jurisdiction in 1934 even though the United States did not believe so at the time." AR000126 (ROD at 97). The Secretary's determination reflects the concurring opinions of Justices Breyer, Souter and Ginsberg explaining the *Carcieri* majority opinion, and is consistent with longstanding principles of federal Indian law.

In his concurring opinion, Justice Breyer made it a point to note that a tribe could well have been under federal jurisdiction in 1934 even if the Federal Government did not know about it at the time:

> [A] tribe may have been "under Federal jurisdiction" in 1934 even though the Federal Government did not believe so at the time. We know, for example, that following the Indian Reorganization Act's enactment, the Department [of the Interior] compiled a list of 258 tribes covered by the Act; and we also know that it

wrongly left certain tribes off the list. The Department later recognized some of those tribes on grounds that showed that it should have recognized them in 1934 even though it did not. And the Department has sometimes considered that circumstance sufficient to show that a tribe was "under Federal jurisdiction" in 1934—even though the Department did not know it at the time.

555 U.S. at 397-98 (internal citations omitted). Justice Breyer provides a series of examples of tribes recognized in the modern era and notes that the possibility that "later recognition reflects earlier 'Federal jurisdiction,'" could explain instances of early administrative practice cited in the dissenting opinion. *Id*. at 398-99. The Department of the Interior (the "Department") has acknowledged that its understanding of which tribes were under federal jurisdiction in the 1930s was limited and often inaccurate. *See, e.g.*, Procedures for Establishing that an American Indian Group Exists as a Tribe, 59 Fed. Reg. 9280, 9281 (Feb. 25, 1994) ("the studies of unrecognized [reflecting the modern usage of the term] groups made by the Government in the 1930s were often quite limited and inaccurate. Groups known now to have existed as tribes then, were portrayed as not maintaining communities or political leadership, or had their Indian ancestry questioned.").

Justice Breyer's point is illustrated by a recent land into trust decision by the Department on behalf of a USET-member tribe. In the so-called Red River Record of Decision for the Tunica-Biloxi Tribe of Louisiana, a USET-member tribe, the Department found evidence of active federal supervision over the Tribe in several respects, particularly in a federal agent's efforts to protect the Tribe in the continued possession of its aboriginal territory. *See* Letter from Acting Regional Director to Honorable Earl Barbry, Sr 6-12 (Aug. 11, 2011). In addition, the Department found a distinct legal basis for approval of the application from the reservation-like nature of the Tribe's aboriginal lands in 1934 "although the Department failed to recognized it as such in the 1930s." *Id.* at 14. Thus, the IRA can apply because of circumstances unknown

to the United States at the time that give rise to legal obligations imposed by federal statutes that apply generally to tribes.

> **D.      Once A Tribe Is Under Federal Jurisdiction, It Remains Under Federal Jurisdiction Unless Explicitly Terminated By Congress Or Unless It Voluntarily Ceases Being A Tribe**

Neither the text of the IRA nor the Supreme Court's decision in *Carcieri* define the phrase "under Federal jurisdiction."  In the ROD, the Secretary noted that assessing whether a tribe was "under Federal jurisdiction" in 1934 entailed a two-part inquiry.  AR000123 (ROD at 94).  First, the Secretary stated, a determination must be made as to whether "there is a sufficient showing in the tribe's history, at or before 1934, that it was under federal jurisdiction."  *Id.* Second, the Secretary must "ascertain whether the tribe's jurisdictional status remained intact in 1934."  AR000124 (ROD at 95).  The Secretary's two-part formulation is fully consistent with the longstanding legal principle established by the courts that once a tribe has been determined to come under the jurisdiction of the United States, it remains under federal jurisdiction unless it is explicitly terminated by Congress or unless it voluntarily abandons tribal relations.

By the time of the IRA, the disruptive effects of the allotment/assimilationist policy had spawned numerous challenges to continuing federal jurisdiction over given tribes, for a variety of factual circumstances.  The Supreme Court uniformly rejected these challenges, insisting that federal jurisdiction continued, even as federal supervision shrank and state authority expanded over former tribal lands.  *See Perrin v. United States,* 232 U.S. 478, 487 (1914) (upholding constitutionality of federal liquor law as applied to lands ceded by the Yankton Sioux Tribe, where "the tribal relation has not been dissolved"); *United States v. Nice,* 241 U.S. 591, 597 (1916) (upholding constitutionality of federal liquor law notwithstanding citizenship of allottees); *Hallowell v. United States,* 221 U.S. 317, 323 (1911) (upholding constitutionality of

federal liquor law to  scattered allotments notwithstanding widely applicable state law otherwise); *United States v. Pelican,* 232 U.S. 442, 447 (1914); and *Tiger v. Western Inv. Co.,* 221 U.S. 286, 298 (1911) (upholding constitutionality of federal prohibition against conveyance of allotment without secretarial consent).

In all such cases, the federal relationship had diminished in quality and extent because of prevailing federal policy, and yet the federal relationship continued.  The Court applied the same rule in each case:  "the tribal relation may be dissolved and the national guardianship brought to an end; but it rests with Congress to determine when and how this shall be done, and whether the emancipation shall at first be complete or only partial."  *United States v. Nice,* 241 U.S. at 591; *see also Tiger v. Western Inv. Co.,* 221 U.S. at 315 ("it may be taken as well settled doctrine of this Court that Congress, in pursuance of long-established policy of the government, has a right to determine for itself when the guardianship which has been maintained over the Indian shall cease").

In its seminal *United States v. John* decision, the Supreme Court applied this principle in setting out the rule that a tribe will remain under federal jurisdiction even when the United States does not continually exercise its jurisdiction over the tribe.  *United States v. John*, 437 U.S. 634 (1978).  In *John*, the Court considered whether federal criminal jurisdiction existed over a Choctaw Indian residing on an Indian reservation in Mississippi.  The State argued that federal jurisdiction no longer existed:

> [S]ince 1830 the Choctaws residing in Mississippi have become fully assimilated into the political and social life of the State, and the Federal Government long ago abandoned its supervisory authority over these Indians.  Because of this abandonment, and the long lapse in the federal recognition of a tribal organization in Mississippi, the power given Congress [under the Indian Commerce Clause] cannot provide a basis for jurisdiction.

*Id.* at 652.  The Court rejected this argument, holding instead that "[n]either the fact that the Choctaws in Mississippi are merely a remnant of a larger group of Indians, long ago removed from Mississippi, *nor the fact that federal supervision over them has not been continuous*, destroys the federal power to deal with them."  *Id.* at 653 (emphasis added).  Thus, federal jurisdiction remained intact, even during those periods when it was not actively employed.

Similarly, in *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1st Cir. 1975), the Passamaquoddy Tribe brought suit against the Secretary of the Interior, requesting a declaratory judgment that the Trade and Intercourse Act (25 U.S.C. § 177) applied to the Tribe.  The Secretary argued that because the Tribe was not formally federally recognized (either by treaty, statute, or other agreements), there was no trust relationship.  The court rejected this argument:

> [O]nce Congress has established a trust relationship with an Indian tribe, Congress alone has the right to determine when its guardianship shall cease. *Neither the Passamaquoddy Tribe nor the State of Maine, separately or together, would have the right to make that decision and so terminate the federal government's responsibilities.*
>       We turn, then, to whether Congress itself has manifested at any time a determination that its responsibilities under the Nonintercourse Act should cease with respect to the Tribe. …  We agree with the district court that any withdrawal of trust obligations by Congress would have to have been 'plain and unambiguous' to be effective.  We also agree that there is no affirmative evidence that Congress at any time terminated or withdrew its protection under the Nonintercourse Act. *The federal government has been largely inactive in relation to the Tribe and has, on occasion, refused requests by the Tribe for assistance.* Intervenor argues that this course of dealings is sufficient in and of itself to show a withdrawal of protection. However, refusing specific requests is quite different from broadly refusing ever to deal with the Tribe, and, as stated above, there is no evidence of the latter.

*Id.* at 380 (internal citations omitted) (emphasis added).  Thus, even with a period of inaction between the Federal Government and the Tribe, the trust relationship remained intact because Congress had never acted explicitly and unambiguously to terminate jurisdiction over the Tribe.

Thus, the rule in *John* remains the law today:  unless unambiguously terminated by Congress, a tribe that comes under the federal jurisdiction of the United States remains under the federal jurisdiction of the United States even if there have been periods where the United States failed to actively exercise its jurisdiction over the tribe.[9]  But where a tribe has not been arbitrarily recognized as a tribe, has maintained tribal relations and has not been expressly and unambiguously terminated by Congress, the tribe remains under federal jurisdiction.

## II.  THE IRA REQUIRES THAT A TRIBE BE A "RECOGNIZED INDIAN TRIBE" AT THE TIME THE LAND IS TAKEN INTO TRUST, NOT 1934, AND *CARCIERI v. SALAZAR* DOES NOT HOLD OTHERWISE

The IRA granted the Secretary of the Interior authority to take land into trust status for "any recognized Indian tribe now under Federal jurisdiction."  25 U.S.C. §§ 465, 479.  In *Carcieri*, the Supreme Court concluded that the phrase "now under Federal jurisdiction" meant that an applicant tribe had to be "under Federal jurisdiction" at the time the IRA was enacted in 1934 in order to have land taken into trust.  Nothing in the decision or the IRA suggests that an applicant tribe also must show that is was a "recognized Indian tribe" in 1934 in order to satisfy the requirements of the Act.

In the final ROD, the Secretary correctly "construe[d] 'recognized' and 'under Federal jurisdiction' as necessitating separate inquiries," stating this was "[c]onsistent with the grammatical structure of the sentence – in which 'now' qualifies 'under Federal jurisdiction' and

---

[9] To be sure, Congress's authority to place Indian tribes under its jurisdiction is not without limitation.  First, as the Supreme Court noted in *United States v. Sandoval*, Congress cannot "bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe." 231 U.S. 28, 46 (1913).  Second, a tribe will no longer fall under the jurisdiction of the United States if it voluntarily ceases to be an Indian tribe.  *Nice*, 241 U.S. at 600 (Congress' constitutional authority over Indian tribes exists "during the continuance of the tribal relation").  Third, as previously noted, a terminated tribe no longer falls under the jurisdiction of the United States when the termination is made explicit by Congress (although even then, Congress has the jurisdictional authority to reverse that termination).

does not qualify 'recognized' – and consistent with Justice Breyer's concurring opinion."  AR 000109, n. 15 (ROD at 80 n. 15).[10]  The Secretary's construction is consistent with Congress' intent in the IRA and the Court's holding in *Carcieri*.

A.      **The *Carcieri* Decision Held That The Word "Now" Modifies The Phrase "Under Federal Jurisdiction" In Which It Was Included, Not The Phrase "Recognized Indian Tribe"**

In *Carcieri* , the Supreme Court considered whether the Secretary of the Interior had authority to take land into trust for the Narragansett Indian Tribe.  The Court noted that all parties had agreed that the issue turned on whether the Narragansett Indian Tribe qualified as "members of any recognized Indian tribe now under Federal jurisdiction."  *Carcieri*, 555 U.S. at 388.  The Court thus framed the question before it as follows:

> In reviewing the determination of the Court of Appeals, we are asked to interpret the statutory phrase "now under Federal jurisdiction" in § 479.   Petitioners contend that the term "now" refers to the time of the statute's enactment, and permits the Secretary to take land into trust for members of recognized tribes that were "under Federal jurisdiction" in 1934.  The respondents argue that the word "now" is an ambiguous term that can reasonably be construed to authorize the Secretary to take land into trust for members of tribes that are "under Federal jurisdiction" at the time that the land is accepted into trust.

*Carcieri*, 555 U.S. at 382.[11]  Nowhere in its statement of the question does the Court make reference to the meaning of the phrase "recognized Indian tribe."  The Court's ultimate holding in the case is similarly devoid of any mention of the meaning of the phrase "recognized Indian tribe," or whether the word "now" modifies "recognized Indian tribe."  Rather, the holding mirrors the statement of the question: "for the purposes of § 479, the phrase 'now under Federal

---

[10] As discussed infra at 16, Justice Breyer's concurring opinion explained that there was no requirement that a tribe be recognized in 1934 to take land into trust.  Justices Souter and Ginsberg concurred in Justice Breyer's explanation of the majority opinion in the concurring portion of their opinion.

[11] The Court's decision in *Carcieri* was based on the first of the three categories of "Indian" in § 479, as was the Secretary's decision in this case.  Neither the Secretary's decision in the ROD nor the Court's decision in *Carcieri* implicate the other two categories of "Indian" set out in § 479 (*i.e.,* "all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation," or "all other persons of one-half or more Indian blood").

jurisdiction' refers to a tribe that was under federal jurisdiction at the time of the statute's enactment." (*i.e.,* 1934).  *Id*.

The Court's analysis focuses entirely on the phrase "now under Federal jurisdiction" as a whole and not the phrase "recognized Indian tribe."  *See, e.g.*, *Carcieri*, 555 U.S. at 395 ("We hold that the term 'now under Federal jurisdiction' in § 479 unambiguously refers to those tribes that were under the federal jurisdiction of the United States when the IRA was enacted in 1934").  The Court noted with approval contemporaneous correspondence from the Commissioner of Indian Affairs which paraphrased the requirements of Section 19 of the IRA as including "all persons of Indian descent who are members of any recognized tribe that was under Federal jurisdiction at the date of the Act."  *Id*. at 390 (quoting Letter from John Collier, Commissioner, to Superintendents (Mar. 7, 1936)).  This formulation, as understood by both the Act's contemporaries and the Court, ties the date of the Act only to "under Federal jurisdiction" and not "recognized Indian tribe."

Justice Breyer, in a concurring opinion explaining the majority opinion, noted that the terms "recognized" and "under Federal jurisdiction" were not synonymous and that "[t]he statute, after all, imposes no time limit upon recognition."  *Carcieri*, 555 U.S. at 398 (Breyer, J., concurring); *cf. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. ___, 132 S. Ct. 2199, 2204 n.2  (2012) (citing Breyer concurrence in declining to address whether "under Federal jurisdiction" related to petitioners' claims that a tribe was also not federally recognized in 1934).  Similarly, Justices Souter and Ginsberg distinguished "recognition" and "under Federal jurisdiction" in the concurring portions of their opinion:

> The disposition of the case turns on the construction of the language from 25 U.S.C. § 479, "any recognized Indian tribe now under Federal jurisdiction." Nothing in the majority opinion forecloses the possibility that the two concepts, recognition and jurisdiction, may be given separate content.  As Justice Breyer

makes clear in his concurrence, the statute imposes no time limit upon recognition, and in the past, the Department of the Interior has stated that the fact that the United States Government was ignorant of a tribe in 1934 does not preclude that tribe from having been under federal jurisdiction at the time. See Memorandum from Associate Solicitor, Indian Affairs, Request for Reconsideration of Decision Not to Take Land in Trust for the Stillaguamish Tribe (Oct. 1, 1980), Lodging of Respondents 7. And giving each phrase its own meaning would be consistent with established principles of statutory interpretation.

*Carcieri*, 555 U.S. at 400 (Souter, J., concurring in part and dissenting in part).

**B.      Basic Principles Of Statutory Construction Support The Secretary's Formulation**

Basic principles of statutory construction instruct that the word "now" modifies "under Federal jurisdiction," and not "recognized Indian tribe." From a grammatical standpoint, the word "now" modifies only "under Federal jurisdiction," because it directly precedes only that phrase. *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1238 (D.C. Cir. 2008) (holding that "[t]he [modifying word] technically modifies only the verb that follows it"). It does not modify the phrase "recognized Indian tribe," since that is a separate phrase that appears before the modifier "now" is introduced. *United States v. Yermian*, 468 U.S. 63, 69 (1984).

In *Yermian*, the Supreme Court interpreted the following passage: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representations ... shall be fined ... ." *Id.* at 68. Yermain argued that "knowingly and willfully" modified both the "within the jurisdiction" phrase preceding it and the "makes any … statements" phrase following it. *Id.* at 66. The Court disagreed, holding that the "natural reading" of the section established that the term "knowingly and willfully" modified only the terms that followed it, "and not the predicate circumstance that those statements be made in a matter within the jurisdiction of a federal agency." *Id.* at 69.

In *Yermain*, The Court was unwilling to unpackage the modifier "knowingly and willfully," which imposed a cognitive limitation on the modifying term, from the discrete phrase in which it appeared.  468 U.S. at 75.  The Court found that the modifying term *as a whole* qualified the statutory passage.  Similarly, the word "now" should not be artificially unpackaged from the phrase "now under Federal jurisdiction" and read to apply separately to modify the phrase "recognized Indian tribe."  Furthermore, as an adverb, the modifier "now" clearly modifies only the adjective phrase "under Federal jurisdiction" rather than the subject noun "recognized Indian tribe."  *Villanueva-Sotelo*, 515 F.3d at 1238 ("An adverb, in standard English, modifies almost anything except a noun.") (quoting ROBERT FUNK ET. AL., THE ELEMENTS OF GRAMMAR FOR WRITERS 62 (MacMillan 1991)).

### C.      Congress Did Not Impose A Temporal Limitation On Recognition In Section 479

Congress did not impose a temporal limitation on recognition in § 479, and did not intend to prevent tribes that are unambiguously recognized today and can demonstrate they were under federal jurisdiction in 1934 from having land taken into trust under 25 U.S.C. § 465. "Recognized Indian tribe" and "under Federal jurisdiction" mean two different things, and the legislative history of the IRA indicates that Congress added the phrase "now under Federal jurisdiction" as a separate requirement in addition to "recognized Indian tribe."  To be sure, if a tribe sought to have land taken into trust in 1934, it would have had to show it was recognized at that time.  But because the word "now" only modifies the phrase "under Federal jurisdiction," and not "recognized Indian tribe," a tribe seeking to have land taken into trust today need only demonstrate that it is recognized today, not in 1934.

As the Secretary points out in the ROD, the phrase "now under Federal jurisdiction" was added by Congress during the Senate Committee hearings on May 17, 1934 as an additional

requirement to the clause containing the phrase "recognized Indian tribe." AR000115 (ROD at

86).  As originally drafted, Section 19 of the IRA would have applied to members of any

"recognized Indian tribe," and did not include the modifying phrase "now under Federal

jurisdiction."[12]  The Senators understood the bill as drafted to cover all recognized tribes:

> Commissioner Collier.  This bill provides that any Indian who is a member of a
> recognized tribe or band shall be eligible to Government aid.

> Senator Thomas of Oklahoma.  Without regard to whether or not he is now under
> your supervision?

> Commissioner Collier.  Without regard; yes.  It definitely throws open
> Government aid to those rejected Indians.

AR135115 (citing *Hearing on S. 2755 and S. 3645 Before the S. Comm. on Indian Affairs*, 73d

Cong. at 80 (May 17, 1934)).  Near the end of the hearing, the Senate considered whether the

term "recognized Indian tribe" was over or under-inclusive.  Senator O'Mahoney attempted to

clarify that the term "recognized Indian tribe" would include all recognized tribes, and Chairman

Wheeler responded that it would:

> Senator O'Mahoney: … The first sentence of this section says, "The term 'Indian'
> shall include all persons of Indian descent who are members of any recognized
> Indian tribe" – comma.  There is no limitation of blood so far as that is concerned.

> Senator Frazier:  That would depend on what is construed membership.

> Senator O'Mahoney:  "The term 'tribe' wherever used in this act" – and that means
> up above – 'shall be construed to refer to any Indian tribe, band, nation, pueblo."
> …

> The Chairman:  You would have to have a limitation after the description of the
> tribe.

---

[12] Section 19 of the bill under consideration at the May 17, 1934 hearing read, in relevant part, as follows:  "The
term 'Indian' as used in this Act shall include all persons of Indian descent who are members of any recognized
Indian tribe, and all persons who are descendants of such members who were, on or about June 1, 1934, actually
residing within the present boundaries of any Indian reservation, and shall further include all other persons of one
fourth or more Indian blood."  AR000114 (citing *Hearing on S. 2755 and S. 3645 Before the S. Comm. on Indian
Affairs*, 73d Cong. at 234 (May 17, 1934)).

> Senator O'Mahoney:  If you wanted to exclude any of them you certainly would in my judgment.
>
> The Chairman:  Yes; I think so.  You would have to.

AR135301 (*Hearing on S. 2755 and S. 3645 Before the S. Comm. on Indian Affairs* at 266).

After the Chairman expressed concerns that the provision could include people who were no longer Indians, Senator O'Mahoney suggested that the Chairman's concerns could be addressed with new language.  Commissioner Collier then suggested adding the phrase "now under Federal jurisdiction:"

> Senator O'Mahoney:  If I may suggest, that could be handled by some separate provision excluding from the benefits of the act certain types, but must have a general definition.
>
> Commissioner Collier:  Would this not meet your thought, Senator: After the words "recognized Indian tribe" in line 1 insert "now under Federal jurisdiction"? That would limit the act to the Indians now under Federal jurisdiction, except that other Indians of more than one-half Indian blood would get help.

AR135301 (*Hearing on S. 2755 and S. 3645 before the S. Comm. on Indian Affairs* at 266).

Although there is no further discussion on the matter and the hearing ended shortly thereafter, this colloquy demonstrates three things.  First, that the word "now" was inserted as part of the phrase "now under Federal jurisdiction."  Second, that whatever the intent of Congress in adding the phrase, "now under Federal jurisdiction," it was added separately, and there is no indication that Congress intended the term "now" to modify the phrase "recognized Indian tribe" rather than "under Federal jurisdiction," the phrase in which it was included.  Third, the hearing record demonstrates that, in many respects, the question of whether particular Indians were subject to federal law was not settled and remained to be resolved in the future.

Congress intended to remedy the uncertainty about which Indians were covered by the IRA in the IRA itself, by establishing a prospective process for addressing these issues.  In the

20

IRA, Congress defined "Indians" and provided that Indians could organize as tribes after the IRA

was enacted – with such tribes enjoying the full benefits of the Act.  So, for example, the IRA

provides that "[a]ny Indian tribe shall have the right to organize for its common welfare and may

adopt an appropriate constitution and by-laws," pursuant to an election administered by the

Secretary of the Interior.  25 U.S.C. § 477.  Congress in the IRA clearly contemplated Indians

organizing as tribes after the IRA was enacted.

And this was how the IRA was implemented.  Following the IRA's enactment, the status

of many tribes remained uncertain.  Typically, these questions were resolved by the Department,

through Solicitor's opinions.  *See Carcieri*, 555 U.S. at 398-99 (Breyer, J., concurring)

(referencing post-IRA Solicitor's opinions regarding the Stillaguamish, Mole Lake, Grand

Traverse, Shoshone, St. Croix Chippewas and Nahma and Beaver Indians). This evolving

process underscored that "recognition" of a tribe need not precede the IRA.  This understanding

was made explicit in a landmark Solicitor's Opinion issued shortly after enactment of the IRA in

1934, which detailed the inherent powers of Indian tribes preserved by the IRA.  As the Solicitor

there emphasized, these powers apply "to all Indian tribes recognized now *or hereafter* by the

legislative or the executive branch of the Federal Government."  Powers of Indian Tribes, 55

Interior Dec. 14, 89 (1934), *reprinted in* 1 U.S. DEP'T OF THE INTERIOR, OPINIONS OF THE

SOLICITOR OF THE DEP'T OF THE INTERIOR RELATING TO INDIAN AFFAIRS 1917-1974 447 (1970)

(opinion of Oct. 25, 1934) (emphasis added).

Since the IRA contemplated prospective recognition of Indian tribes, it cannot properly

be understood to have required tribes to have been "recognized" in 1934.  *Carcieri* held that a

tribe must be "under Federal jurisdiction" in 1934 – meaning that there was a federal legal

obligation at that time.  But *Carcieri* did *not* hold that a tribe must also be "recognized" in 1934.

Congress used two separate phrases – "recognized Indian tribe" and "now under Federal jurisdiction" – and each must be given effect.

### III.   AS USED TODAY, "FEDERAL RECOGNITION" IS A TERM OF ART OF MODERN ORIGIN AND CANNOT BE SUPERIMPOSED ON THE IRA OF 1934

In order to be entitled to the full panoply of federal rights and benefits that accrue to Indian tribes, a tribe today must be "federally recognized."  The Department of Interior maintains a list of all 556 currently recognized tribes as required by Public Law 103-454, the Federally Recognized Indian Tribe List Act, 108 Stat. 4791, 4792 (codified at 25 U.S.C. § 479a) ("List Act"); 77 Fed. Reg. 47868 (Aug. 10, 2012).

The List Act was enacted in 1994.  There was no list of federally recognized tribes in 1934, no formal requirements for recognition in 1934, and no standard criteria for recognition in 1934.  As the Secretary noted in the ROD, the term "recognized Indian tribe" had a different meaning in 1934 than it does today:

> The term "recognized Indian tribe" has been used historically in at least two distinct senses.  First, "recognized Indian tribe'" has been used in what has been termed the "cognitive" or quasi-anthropological sense. Pursuant to this sense, federal officials simply "knew" or "realized" that an Indian tribe existed, as one would "recognize."  Second, the term has sometimes been used in a more formal or "jurisdictional" sense to connote that a tribe is a governmental entity comprised of Indians and that the entity has a unique relationship with the United States.

AR000116 (ROD at 87).[13]

Congress historically distinguished the concepts of recognition and jurisdiction in other contexts as well.  In the Indian Depredation Act of 1891, for example, Congress authorized claims to be brought against the United States (and the tribe responsible) for "property of citizens

---

[13] Indeed, the only other use of the term "recognized" in the IRA refers to vocational and trade schools.  In Section 11 of the IRA, Congress authorized appropriations for loans to Indians for the payment of tuition and other expenses in "recognized vocational and trade schools." Pub. L. No. 73-838,  § 11, (codified as amended at 25 U.S.C. § 471).  Congress was not referring to recognition in the jurisdictional sense of the word in Section 11, as vocational and trade schools are not as a class under the jurisdiction of the Federal Government.

of the United States taken or destroyed by Indians belonging to any band, tribe, or nation *in amity with the United States*." Act of Mar. 3, 1891, ch. 538, § 1, 26 Stat. 851 (emphasis added). The courts were left to determine whether such "bands, tribes, or nation[s]" although known (i.e., "recognized") by the United States, were nonetheless not "in amity with" the United States. *See, e.g.*, *Montoya v. United States*, 180 U.S. 261 (1901).

Because no required process or standard criteria had been developed for recognition in 1934, Congress and the Executive branches of government historically made case-by-case determinations as to tribal status. These determinations by the political branches were generally viewed by the Courts as political questions not subject to judicial review:

> In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same.

*United States v. Holliday*, 70 U.S. 407, 419 (1865). There were nevertheless instances where the courts were left to determine whether a group of Indians met the definition of Indians covered by certain acts of Congress. In its *Montoya* decision, the Supreme Court set out the following common law standard for identifying a tribe:

> By a "tribe" we understand a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory; by a "band," a company of Indians not necessarily, though often, of the same race or tribe, but united under the same leadership in a common design.

*Montoya*, 180 U.S. at 266; *see also United States v. Candelaria*, 271 U.S. 432 (1926). In addition, identification as a tribe was accorded deference by the courts. *Tully v. United States*, 32 Ct. Cl. 1, 5 (1896). In *Tully*, the Court of Claims held:

> The policy of the United States in dealing with the Indians has been, as we understand, to accept the subdivisions of the Indians into such tribes or bands as the Indians themselves adopted, and to treat with them accordingly.

23

So that if such subdivisions, whether into tribes or bands, have not been recognized by treaty, but have been by the officers of the Government whose duty it was to report in respect thereto, then the court will accept that as sufficient recognition of the tribe or band upon which to predicate a judgment.

Or if there be no such recognition by the Government, then the court will accept the subdivisions into such tribes or bands as made by the Indians themselves, whether such tribes and bands be named by reason of their geographical location or otherwise.

*Id*. at 7.

The modern standards for formal recognition were not developed until the late 1970s against the backdrop of several court decisions and the findings of the American Indian Policy Review Commission (the "Commission").   In 1975, the United States Court of Appeals for the Ninth Circuit held that a tribe that was a party to a federal treaty reserving tribal fishing rights maintained those rights despite the fact that it had not received formal federal acknowledgment by the Department.  *United States v. Washington*, 520 F.2d 676 (9th Cir. 1975).  That same year, the United States Court of Appeals for the First Circuit held that a tribe did not have to be formally recognized in order to qualify for the benefits and protections of the Trade and Intercourse Act.  *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1st Cir. 1975).

The American Indian Policy Review Commission, commissioned by Congress in 1975 to review the status of the Federal Government's relationship with Indians, concluded that the recognition process to date had resulted in many tribes being mistakenly not formally recognized by the United States.  AM. INDIAN POLICY REVIEW COMM'N, FINAL REPORT 461 (1977).  The Commission stated that it believed there were 130 tribes that should be formally recognized but which had not received formal recognition due to mistakes by federal officials.  *Id*.  The final report of the Commission concluded that:

> There is no legal basis for withholding general services from Indians, with the sole exception of specific termination acts. There is no legitimate foundation for denying Indian identification to any tribe or community. The BIA has no authority to refuse services to any member of the Indian population.

*Id*. at 8. The Commission recommended that an office be established to formalize the process for allowing tribes to be acknowledged by the Department, and that a set of consistent factors be employed to ensure that only bona fide Indian tribes could qualify for recognition. *Id.* at 479-84.

These findings led the Department to develop for the first time a formal regulatory process for recognizing and acknowledging the existence of Indian tribes. In 1978, the Department issued a regulation setting forth "procedures for establishing that an American Indian group exists as an Indian tribe." 43 Fed. Reg. 39361 (Sept. 5, 1978). Noting that "heretofore, the limited number of [requests for acknowledgement] permitted an acknowledgement of the group's status on a case-by-case basis at the discretion of the Secretary," the "recent increase in the number of such requests before the Department necessitates the development of procedures to enable the Department to take a uniform approach in their evaluation." *Id*.

Now set out at 25 C.F.R. Part 83,[14] the Department's recognition regulations require a petitioning tribe to demonstrate it meets seven mandatory criteria:

> (a) The tribe has been identified as an American Indian entity on a substantially continuous basis since 1900 [i.e., is recognized in the sense used in the IRA];
>
> (b) A predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present;
>
> (c) The tribe has maintained political influence or authority over its members as an autonomous entity from historical times until the present;

---

[14] The Department's acknowledgment regulations have been renumbered and amended and clarified twice since they were first promulgated. 59 Fed. Reg. 9280 (Feb. 25, 1994); 65 Fed. Reg. 7052 (Feb. 11, 2000).

(d) The tribe has provided a copy of the group's present governing document including its membership criteria;

(e) The tribe's membership consists of individuals who descend from an historical Indian tribe or from historical Indian tribes that combined and functioned as a single autonomous political entity, and provide a current membership list;

(f) The membership of the petitioning group is composed principally of persons who are not members of any acknowledged North American Indian tribe; and,

(g) Neither the petitioner nor its members are the subject of congressional legislation that has expressly terminated or forbidden the federal relationship.

25 C.F.R. § 83.7.

Today, the Department maintains that the Part 83 acknowledgement process "is the exclusive regulatory process used by the Department to acknowledge Indian tribes that have yet to establish a government-to-government relationship with the United States, or where such a relationship has lapsed[,]" though the Department will also use its authority to "include additional tribes on the list of federally recognized tribes by rectifying previous administrative errors that resulted in the exclusion of a tribe from the list or resolving litigation for tribes that were wrongfully terminated." *Federal Acknowledgement: Political and Legal Relationship Between Governments: Oversight Hearing Before the Senate Committee on Indian Affairs*, 112th Cong. at 3 (2012) (statement of Bryan Newland, Senior Policy Advisor, Office of the Assistant Secretary for Indian Affairs). The Part 83 administrative recognition process, requiring tribes to meet seven mandatory criteria in order to be treated as "federally recognized," has only been in place since 1978. Since that time, the Department of the Interior has required tribes to either meet that criteria or seek recognition pursuant to a circumscribed set of formal processes established by statute or administrative practice.

Essentially, the modern Part 83 process of acknowledgment marries the concepts of recognition and federal jurisdiction. It is the Department's position today that if a tribe meets the

criteria in the Federal Acknowledgment Process, then a tribe is not only recognized and

acknowledged by the United States, but it also enjoys a government-to-government relationship

with the United States and comes under its federal jurisdiction.  As the Department recently

stated:

> The decision to acknowledge an Indian tribe has a significant impact on the petitioning group, other Indian tribes, surrounding communities, and federal, state, and local governments. Acknowledgment generally carries with it certain powers, privileges, and immunities, including the authority to establish a land-base over which to exercise jurisdiction, provide government services to tribal citizens, and sovereign immunity from lawsuits and taxation from other governments.

*Id.*; *see also* 25 C.F.R. § 83.2. The House Report accompanying the List Act explains that federal

acknowledgment "establishes tribal status for *all federal purposes*." H.R. Rep. No. 103-781, at 3

(1994), *reprinted in* 1994 U.S.C.C.A.N. 3768 (emphasis added).  Acknowledgment is not lightly

accorded by the Department.  Since 2009, only one in six final determinations issued by the

Department resulted in the acknowledgement of an Indian tribe.  *Federal Acknowledgement:*

*Political and Legal Relationship Between Governments: Oversight Hearing Before the Senate*

*Committee on Indian Affairs*, 112th Cong. at 2 (2012) (statement of Bryan Newland, Senior

Policy Advisor, Office of the Assistant Secretary for Indian Affairs).


**CONCLUSION**

The Secretary's determination in this case should be upheld.

Respectfully Submitted,

By:_____
Elliott A. Milhollin (D.C. Bar No. 477322)
Hobbs, Straus, Dean & Walker LLP
2120 L Street N.W., Suite 700
Washington, D.C. 20037
Phone:  (202) 822-8282

Gregory A. Smith (D.C. Bar No. 413071)
Hobbs, Straus, Dean & Walker LLP
2120 L Street N.W., Suite 700
Washington, D.C. 20037
Phone:  (202) 822-8282

Geoffrey D. Strommer
Hobbs, Straus, Dean & Walker LLP
806 S.W. Broadway, Suite 900
Portland, OR 97205
October 5, 2012                    Phone:  (503) 242-1745